## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

JUDITH RAANAN, NATALIE RAANAN, URI RAANAN, ESTATE OF ITAY GLISKO, OREN GLISKO, LIAT RASEL GLISKO, Y.G., ORI GLISKO, and JEFFREY LUDMIR,

Plaintiffs,

-v-

BINANCE HOLDINGS LIMITED, CHANGPENG ZHAO, THE ISLAMIC REPUBLIC OF IRAN, and THE SYRIAN ARAB REPUBLIC,

Defendants.

-----------------------------------------------------------------------x

Civil Action No. _____

**COMPLAINT**

Plaintiffs Judith Raanan, Natalie Raanan, Uri Raanan, the Estate of Itay Glisko, Oren Glisko, Liat Rasel Glisko, Y.G., Ori Glisko, and Jeffrey Ludmir (collectively, "Plaintiffs"), by their undersigned counsel, as and for their Complaint against Binance Holdings Limited ("Binance"), Changpeng Zhao ("Zhao"), the Islamic Republic of Iran ("Iran"), and the Syrian Arab Republic ("Syria," and collectively with Binance, Zaho, and Iran, the "Defendants"), allege as follows:

### PRELIMINARY STATEMENT

1.      This action is brought by and on behalf of United States citizens who were murdered, maimed, taken hostage, or otherwise injured in unspeakable acts of terror perpetrated by Hamas and other terrorist groups in the State of Israel on October 7, 2023.  At least thirty United States citizens (including family members of Plaintiffs) were murdered in the attacks, out of a total of approximately 1,200 fatalities.  At least ten Americans, including several of the Plaintiffs, were taken hostage in the terrorist attacks committed by Hamas that began on October 7, 2023 (the "October 7 Terrorist Attacks").  Hamas murdered these victims and took these hostages in an

attempt to extract political concessions from Israel and the United States.

2.      By this action, Plaintiffs seek damages under the United States Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331, *et seq.*, and the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1605(a) and 1605A, from Defendants who provided substantial assistance to the terrorists, including Iran (a state sponsor of Hamas and co-planner of the October 7 Terrorist Attacks), Syria (which provided weapons and funding to Hamas), and the leading cryptocurrency exchange (and its founder), which for years provided a funding mechanism for Hamas and other terrorists and concealed vital information about this from U.S. regulators and the public.

3.      Defendant Binance processed numerous transactions associated with Hamas and related Palestinian terrorist groups between 2017 and mid-2023, providing a clandestine financing tool that Binance deliberately hid from U.S. regulators.  Indeed, in criminal plea agreements and civil settlements that were announced in late 2023, the U.S. Department of Justice ("DOJ") and U.S. regulators disclosed that for years Binance and its former chief executive officer, Defendant Zhao, not only knowingly permitted illicit actors, including Hamas and other terror groups, to evade U.S. laws and regulatory restrictions related to terror financing, but also refused to put into place the legally-required-infrastructure mandated under U.S. law to stop terrorism financing.

4.      Defendant Iran is the leading global sponsor of Hamas and international terrorism. As more fully detailed herein, Iran has provided hundreds of millions of dollars in support to Hamas, including military training, equipment, and expertise.  Iran hosted and trained many of the terrorists who participated in the October 7 attacks, provided critical military equipment and technology for the attacks including missiles, rockets, drones and paragliders, and partnered with the Hamas terrorists in the planning and execution of the attacks.

5.      Defendant Syria has for years provided Hamas with financial, military, and

logistical support.  Syria also supplied Hamas with the Captagon drug, the sale of which is believed to be a financial source for terrorist groups and which was used by Hamas terrorists to promote feelings of rage, irritability, and impatience, all of which encouraged them to murder and torture their victims in connection with the October 7 Terrorist Attacks.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. §§ 2333(a), which provides for jurisdiction over civil actions brought by citizens of the United States, their estates, and family members who have been killed or injured by reason of acts of international terrorism.

7.     With respect to Iran and Syria, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330 and 28 U.S.C. §§ 1605(a) and 1605A, which provides for a terrorism exception to the jurisdictional immunity of a sovereign state.

8.     This Court has personal jurisdiction over Iran and Syria pursuant to 28 U.S.C. § 1330.

9.     This Court has personal jurisdiction over Binance under N.Y. § CPLR 302(a) because Plaintiffs' claims against Binance arise from its conduct and operations in New York, including (as described further below) the fact that several of Binance's key "market makers" were headquartered in and directed trading from New York.  These market makers provided critical and deliberately sought-after liquidity to Binance's international exchange, Binance.com, effectively fueling an unregulated marketplace that gave known terrorist groups, including Hamas, the ability to freely trade cryptocurrency and accept direct donations.  Further, as alleged herein, Binance purposefully availed itself of the New York banking system in the course of providing substantial assistance to Hamas.  Binance also from September 2019 through February 2023 issued an

unregulated security, BUSD, in partnership with Paxos Trust Company ("Paxos"), a New York limited purpose trust company. BUSD is a U.S. dollar-backed stablecoin and those USD reserves were maintained by Paxos in New York. Binance and Paxos also had a profit-sharing agreement to invest those reserves for their mutual benefit. As of February 2023, over $16 billion worth of BUSD were in circulation. Alternatively, this Court may exercise personal jurisdiction over Binance pursuant to FRCP 4(k)(2).

10.     Further, investigations by the DOJ and U.S. regulators found that Binance secretly provided service to millions of users in the United States between August 2017 and October 2022. By September 2020, Binance internal documents attributed 16% of its total user base, or 2.51 million users, to the United States, more than any other country. The following month, Zhao directed Binance personnel to categorize U.S. users as "unknown," for a total of 2.83 million "unknown" customers, or 17% of its userbase. According to Binance's own transaction data, U.S. users conducted trillions of dollars in transactions on the platform between August 2017 and October 2022 – transactions that generated over $1.6 billion in profit for Binance. Upon information and belief, many of these U.S. customers and transactions were located in New York. Additionally, a cloud computing platform and application programming service operated by a U.S. technology service provider also hosted Binance's website, stored Binance's data, and operated Binance's exchange.

11.     According to its settlement agreement with OFAC, "[f]rom approximately August 2017 to October 2022" Binance "matched and executed virtual currency trades on its online exchange platform **between U.S. person users and users in sanctioned jurisdictions or blocked persons.**" Upon information and belief, these included customers located in New York. These transactions which constituted "direct or indirect exportation or other supply of goods and services

**from the United States**, or **by U.S. persons**, to users whom [Binance] identified through its Know Your Customer (KYC) process . . . as being [sanctioned entities or in sanctioned jurisdictions] . . . . resulted in at least 1,667,153 virtual currency transactions – totaling approximately $706,068,127."

12.     This Court has personal jurisdiction over Zhao pursuant to N.Y. CPLR § 302(a) as an individual corporate officer who supervised and controlled the activity subjecting Binance to jurisdiction above. *See Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163-64 (2d Cir. 2010).  This Court also has jurisdiction over Zhao because he conspired with Binance and other agents to conceal their illegal operation of an unlicensed money transmitting business and agents acting at Zhao's direction engaged in overt acts in New York on Zhao and Binance's behalf, including aiding New York-based trading firms in circumventing technological controls in order to supply needed liquidity to Binance's platform. Between 2019 and 2023, Zhao also owned and controlled multiple offshore entities that maintained accounts at Signature Bank in New York and were the counterparties to many large transactions with Binance totaling in the hundreds of millions of dollars.

13.     Venue is proper in this District pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§ 1391(b), (c)(3), and (d).

## THE PARTIES

**Plaintiffs**

**Raanan Family**

14.     Plaintiff Judith Raanan was taken hostage by Hamas during the terrorist attack committed by Hamas in Israel that began on October 7, 2023.  At the time of the acts alleged, and at all other times relevant hereto, Judith Raanan was a citizen of the United States.  Plaintiff Judith Raanan suffered severe mental anguish and extreme emotional pain and suffering as a result of

Hamas's taking her and her daughter (Plaintiff Natalie Raanan) hostage.  Hamas terrorists forcibly kidnapped Judith Raanan and physically held her against her will, in fear for her and her daughter's lives.  Judith Raanan was released on or about October 20, 2023, after being held captive for approximately two weeks.

15.     Plaintiff Natalie Raanan was taken hostage by Hamas during the terrorist attack committed by Hamas in Israel that began on October 7, 2023.  At the time of the acts alleged, and at all other times relevant hereto, Natalie Raanan was a citizen of the United States and the daughter of Plaintiff Judith Raanan.  At the time she was taken hostage, Natalie Raanan was a minor child. Plaintiff Natalie Raanan suffered severe mental anguish and extreme emotional pain and suffering as a result of Hamas's taking her and her mother hostage.  Hamas terrorists forcibly kidnapped Natalie Raanan and physically held her against her will, in fear for her and her mother's lives. Natalie Raanan was released on or about October 20, 2023, after being held captive for approximately two weeks.

16.     Plaintiff Uri Raanan is the father of plaintiff Natalie Raanan and ex-husband of plaintiff Judith Raanan. Plaintiff Uri Raanan suffered severe mental anguish and extreme emotional pain and suffering as a result of the fact that Natalie and Judith Raanan were taken hostage in the October 7, 2023 terrorist attack.

**Glisko Family**

17.     The Estate of Itay Glisko is a legal representative of Itay Glisko, who was murdered by Hamas during the terrorist attack committed by Hamas in Israel that began on October 7, 2023. At the time of the acts alleged, and at all other times relevant hereto, Itay Glisko was a citizen of the United States.

18.     Plaintiff Oren Glisko is the father of United States citizen Itay Glisko. Plaintiff Oren

Glisko suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7, 2023 terrorist attack that claimed the life of Itay Glisko.  Plaintiff Oren Glisko brings this action individually and on behalf of the Estate of his son, Itay Glisko, and on behalf of Plaintiff Oren Glisko's minor child, Y.G.

19.     Plaintiff Liat Rasel Glisko is the mother of United States citizen Itay Glisko. Plaintiff Liat Rasel Glisko has suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7, 2023 terrorist attack that claimed the life of her son Itay Glisko. Plaintiff Liat Rasel Glisko brings this action individually and on behalf of the Estate of her son, Itay Glisko, and on behalf of Plaintiff Oren Glisko's minor child, Y.G.

20.     Plaintiff Y.G. is a minor child and the brother of United States citizen Itay Glisko. Plaintiff Y.G. suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7, 2023 terrorist attack that claimed the life of his brother, Itay Glisko.

21.     Plaintiff Ori Glisko is the brother of United States citizen Itay Glisko.  Plaintiff Ori Glisko suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7, 2023 terrorist attack that claimed the life of his brother, Itay Glisko.

**Jeffrey Ludmir**

22.     Plaintiff Jeffrey Ludmir is a U.S. citizen residing in Miami, Florida.  Mr. Ludmir is the uncle of Dr. Daniel Levi Ludmir, a native of Peru and a physician at the Soroka Medical Center in Beersheba, Israel, who was murdered by Hamas terrorists while treating the wounded at Kibbutz Be'eri on October 7, 2023.  Jeffrey Ludmir suffered severe mental anguish and extreme emotional pain and suffering as a result of the October 7, 2023 terrorist attack that claimed the life of his nephew Daniel Levi.

23.     When Daniel Levi was a young boy, his father abandoned his mother and siblings.

7

With Daniel Levi's father being absent for over 25 years, Jeffrey Ludmir assumed the role of a father figure for his nephew, Daniel Levi.  Mr. Ludmir played a guardian-like role in providing monetary support to his sister (Daniel Levi's mother) to help her raise Daniel Levi and her other two children.  He would often speak with Daniel Levi on the phone and would visit him in Peru where he was born and raised.   Daniel Levi also traveled to Miami repeatedly in order to visit Jeffrey Ludmir in Miami.

## **DEFENDANTS**

### **The Islamic Republic of Iran**

24.     Defendant Iran, through its political subdivisions, agencies, instrumentalities, officials, employees, and agents, provided Hamas with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated and caused the October 7 Terrorist Attacks.

25.     Iran is a foreign state within the meaning of 28 U.S.C. § 1603.  Iran maintains an Interest Section within the United States at the Embassy of Pakistan at 3517 International Court NW, Washington, DC 20008, and maintains a permanent mission to the United Nations located at 622 3rd Ave, 34th Floor, New York, NY 10017.

26.     Since 1984, Iran has been continuously designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).  The United States State Department's *Country Reports on Terrorism* for 2022 noted that Iran is "the leading state sponsor of terrorism, facilitating a wide range of terrorist and other illicit activities around the world."

### **The Syrian Arab Republic**

27.     Defendant Syria, through its political subdivisions, agencies, instrumentalities,

officials, employees, and agents, provided Hamas with material support and resources, within the meaning of 28 U.S.C. § 1605A(a)(1), that enabled, facilitated, and caused the October 7 Terrorist Attacks.

28.     Syria maintains a permanent mission to the United Nations located at 820 2nd Ave, 15th Floor, New York, NY 10017.

29.     Since 1979, Syria has been continuously designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

**Binance**

30.     Binance Holdings Limited ("Binance") is an entity registered in the Cayman Islands that holds employment contracts for certain employees operating Binance.com.   Binance has stated that it does not have a headquarters and refuses to disclose the location of its main Binance.com exchange.

31.     Since at least July 2017, Binance has operated a web-based virtual currency exchange under the name Binance.com that offers trading in virtual currencies, digital asset commodities and related derivatives, among other financial products and services, to over 100 million customers throughout the world.

32.     On November 21, 2023, Binance pled guilty to federal charges of failing to maintain an effective anti-money laundering program and entered into settlements with three U.S. regulators in connection with charges of violations of the Bank Secrecy Act and U.S. sanctions. These violations included processing and failing to report transactions with cryptocurrency wallets that Binance senior executives had knowledge were linked to terrorist groups such as Hamas or Palestine Islamic Jihad, which the United States government has since 1997 designated as a foreign terrorist organization ("FTO").

**Zhao**

33.     Changpeng Zhao ("Zhao") is Binance's primary founder, majority owner and was formerly Binance's Chief Executive Officer.  He is a Canadian citizen and upon information and belief is a resident of the United Arab Emirates.  Zhao launched Binance in 2017.  Together with a core senior management group, as Binance's CEO, Zhao made strategic decisions for Binance, and supervised and exercised day-to-day control over its operations and finances.

34.     On November 21, 2023, Zhao pled guilty to willful violations of the Bank Secrecy Act.  Zhao was also a named party with "control person" liability in regulatory settlements with Binance.

35.     Zhao is scheduled to be sentenced in February 2024 and has been ordered to remain in the United States pending sentencing.

## FACTUAL ALLEGATIONS

### The Hamas Terrorist Organization

36.     Hamas emerged in 1987 during the first Palestinian uprising (or intifada) as an outgrowth of the Muslim Brotherhood's Palestinian branch.  The group is committed to the destruction of the State of Israel and has launched countless terrorist attacks to destabilize it.  Hamas's charter calls for establishing an Islamic Palestinian state in Israel's place.  In its pursuit of these goals, Hamas has killed dozens of Americans over the course of decades.  These terrorist attacks included an unprecedented wave of suicide bombings during the Second Intifada, from roughly 2000-2005, which captured the world's attention and horror due to their barbarity and unusual nature at the time.

37.     Hamas has been the *de facto* governing body in the Gaza Strip since June 2007, when it ejected the Palestinian Authority from power in a murderous *coup d'etat* in which over 150 Palestinians died by execution or other means (including by being thrown from rooftops).

According to a 2008 report by Human Rights Watch, during their violent takeover of Gaza, "Hamas forces committed serious violations of international humanitarian and human rights law, including summary executions and torture."

38.     Hamas operates primarily in and from Gaza.  It also maintains a presence in the West Bank, Palestinian refugee camps in Lebanon, and in Middle Eastern countries, including Iran, Syria, Qatar, and Egypt.

39.     Hamas has a "military wing" known as the Izz al-Din al-Qassam Brigades ("al-Qassam Brigades") that has conducted numerous terrorist attacks in both Israel and the Palestinian territories since the 1990s.  The al-Qassam Brigades has been separately and explicitly designated as a terrorist organization by the European Union, Australia, New Zealand, Egypt, and the United Kingdom.

40.     The U.S. State Department sanctioned Hamas in 1995 and designated it as a foreign terrorist organization in October 1997.  In the decades since, the U.S. has imposed additional sanctions on Hamas's leaders, charities, companies, and facilitators as well as banks acting as financial arms of Hamas.  The United States has also sanctioned Iran for its role in financing, training and arming Hamas.

41.     In total, between 1995 and 2023, the United States has sanctioned "nearly 1,000 individuals and entities connected to terrorism and terrorist financing by the Iranian regime and its proxies, including Hamas," according to a U.S. Treasury Department statement in October 2023.

42.     According to the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury, Hamas raises funds to support its operations and members in a variety of ways, including through: (i) support from Iran; (ii) private donations; (iii) a global portfolio of investments; (iv) diverting aid and support from legitimate charities; (v) the control of

border crossings and avenues of commerce; (vi) racketeering business frameworks; (vi) extortionary practices around local populations; and (viii) fundraising campaigns involving virtual currency and fictitious charities raising both fiat and virtual currency.  Hamas moves funds through the smuggling of physical currency as well as a regional network of complicit money transmitters, exchange houses, and Hezbollah-affiliated banks.

43.      A significant source of funding for Hamas is cryptocurrency. Since at least early 2019, the al-Qassam Brigades has attempted to use cryptocurrencies as an alternative fundraising method to support its military operations. Hamas initially tested cryptocurrency fundraising by soliciting Bitcoin donations on its Telegram channel before shifting to direct fundraising on its website.

44.      In August 2020, the DOJ announced the global disruption of three terror financing campaigns, including the seizure of cryptocurrency accounts associated with al-Qassam Brigades. Working together, agents from the Internal Revenue Service ("IRS"), the Department of Homeland Security, and the Federal Bureau of Investigation ("FBI") tracked and seized 150 cryptocurrency accounts that laundered funds to and from the al-Qassam Brigades' accounts.

45.      In recent years, Israel's National Bureau for Counter Terror Financing ("NBCTF") has seized dozens of cryptocurrency addresses with tens of millions of dollars in volume controlled by entities affiliated with Hamas, such as Dubai Co. for Exchange, al-Muhtadon, al-Mutahadun for Exchange and al-Wefeq Co. for Exchange.

**The October 7 Terrorist Attacks**

46.      On October 7, 2023, several thousand terrorists from Gaza invaded Israel and butchered approximately 1,200 people, many of whom were burned alive or subject to horrific tortures, rapes, mutilations, and other atrocities.  Over 350 people were massacred at a music

festival located near Kibbutz Re'im near the Gaza border.  Hundreds of others were murdered in communities in southern Israel near the Gaza border.

47.     Hamas-led terrorists also kidnapped several hundred men, women, and children from Israel and forcibly took them as hostages to Gaza, where many of them were tortured and imprisoned in horrific conditions in poorly ventilated underground tunnels.

48.     While the October 7 Terrorist Attacks were planned and led by Hamas, other Palestinian terror groups also participated in the attacks, including Palestine Islamic Jihad ("PIJ"), the Popular Resistance Committees, the Popular Front for the Liberation of Palestine, and the Democratic Front for the Liberation of Palestine.  Several of these terror groups, including Hamas and PIJ, claimed to have captured hostages in the attacks.

49.     The October 7 Terrorist Attacks amounted to the largest massacre of Jews since the Holocaust and one of the worst terrorist attacks in world history in terms of the number of fatalities. The barbaric cruelty of the October 7 Terrorist Attacks repulsed the civilized world.  As President Biden stated in a speech on the afternoon of that day:

> Hundreds — hundreds of young people at a music festival of — the festival was for peace — for peace — gunned down as they ran for their lives. Scores of innocents — from infants to elderly grandparents, Israelis and Americans — taken hostage. Children slaughtered. Babies slaughtered. Entire families massacred.  Rape, beheadings, bodies burned alive.  Hamas committed atrocities that recall the worst ravages of ISIS, unleashing pure unadulterated evil upon the world.

50.     Reportedly, the Hamas terrorists carried with them detailed maps of Israeli kibbutzim as well as an Israeli military base, which could only have been compiled with "inside knowledge" – almost certainly from Hamas spies.   The extraordinary detail and sheer scale of the preparation for the attacks have reportedly led Israeli military officials to conclude that Hamas engaged in many years of planning for the October 7 Terrorist Attacks.

**Iran's Multi-Decade Sponsorship of Hamas Terrorism and The October 7 Terrorist Attacks**

51.     Iran has been sponsoring terrorism against the United States and Israel for over three decades, often through proxies such as Hamas.

52.     On January 19, 1984, the U.S. State Department added Iran to the list of designated state sponsors of terrorism, and it has been so designated every year since.  Iran's designation came on the heels of the October 23, 1983 suicide bombing of the United States Marine barracks in Beirut, which was carried out by Iranian sponsored terrorists and claimed the lives of 241 American service members who had been sent on a peacekeeping mission.  Iran has repeatedly been found liable in U.S. courts for deaths and injuries of U.S. citizens caused by its activities as a state sponsor of international terrorism.

53.     Over the past few decades, Iran has emerged as the principal backer of Hamas terrorism.

54.     Iran began supporting Hamas from the time of Hamas's founding in late 1980s.  By 1994, Iran reportedly provided at least tens of millions of dollars to Hamas in the form of military training and logistical support.  Reportedly, by 1999, Iran was training Hamas terrorists within its borders, and the Iranian Intelligence Service made a $35 million transfer to Hamas to finance terrorist operations.

55.     In 2004, Iran's funding to Hamas dramatically increased.  At the time, while in Damascus, Syria, the then-leader of Hamas, Khaled Mishal, reportedly sought increased funds from Iran to reinvigorate Hamas operational cells, which Iran willingly provided.

56.     After Hamas's violent takeover of Gaza in 2007, Iran's support for Hamas terrorism escalated.  According to a 2010 U.S. Department of Defense report, Iran provided Hezbollah and several Palestinian terrorist groups—including Hamas—with funding, weapons, and training to

attack Israel and disrupt the Middle East peace process.

57.    The U.S. State Department has reported that since seizing power in 2007, Hamas has utilized "the majority of its activity in Gaza" to bolster its defenses, build up weapons supplies, and launch military attacks on Israel.

58.    After the conflict between Hamas and Israel in 2014, Iran again increased its funding to Hamas and also began providing Hamas with missile technology as well as materials to construct and rebuild tunnels used for smuggling and terrorist attacks.  This included frequent and routine transfers of tens of millions of dollars from Iran to Saudi Arabia and then to Hamas, or transfers from Iran to Hezbollah in nearby Lebanon and then to Hamas.  By 2017, Iran was Hamas's largest financial and military backer.

59.    In November 2018, the U.S. Treasury Department reportedly uncovered an "oil-for-terror" scheme that benefited Hamas, among others.  The scheme involved the shipment of Iranian oil to Syria; Syria would sell the oil and pay hundreds of millions of U.S. dollars in profits to Iran.  From there, Iran would distribute the funds to Hezbollah and Hamas.

60.    In recent years, Iran and Hamas have adopted cryptocurrencies as a clandestine terrorism funding mechanism.  According to a November 12, 2023 expose in *The Wall Street Journal* (entitled *Hamas Needed a New Way to Get Money From Iran.  It Turned to Crypto*):

> Initially, Hamas used crypto only to receive small-scale donations from supporters as part of a broader crowdfunding effort, which Israeli officials said has likely raised several million dollars.  Around 2020, crypto became a method of large-scale transfers between Iran and the group within the hawala networks…

61.    In 2021, Israeli military intelligence reportedly traced tens of millions of dollars in cryptocurrency transfers from Iran to Hamas to buy weapons and pay fighters.

62.    According to Reuters, Iran has utilized the cryptocurrency Tron to evade sanctions

implemented by the United States.  Specifically, between 2018 and 2022, Iranian firms used Tron to conduct $8 billion in transactions, which led Israel's NBCTF to seize 56 Tron "wallets" that it determined were linked to Hamas.  Of the 56 Tron wallets, 46 were connected to a single Gaza-based money exchange company called Dubai Co., which Israel considers a terrorist organization because it sends tens of millions of dollars to the military arm of Hamas annually.

63.     On January 22, 2024, the U.S Treasury Department further exposed the close financial ties between Iran and Hamas's terrorist activities when it sanctioned, among others, "Gaza-based moneychanger Zuhair Shamlakh" for, among other things, facilitating the transfer of tens of millions of dollars between Iran, Hamas, and other terrorist organizations.

64.     According to the 2022 U.S. State Department's Country Report on Terrorism, "[i]n 2022, Iran continued providing weapons systems and other support to Hamas and other U.S.-designated Palestinian terrorist groups, including Palestine Islamic Jihad and the Popular Front for the Liberation of Palestine-General Command.  These groups were behind numerous deadly attacks originating in Gaza and the West Bank."

65.     In 2023, Iran's funding for Hamas reportedly increased from $100 million to $350 million annually.

66.     Iran's support for Hamas extends far beyond financial assistance.  Prior to the ousting of Sudanese dictator Omar al-Bashir in 2019, Hamas was almost entirely reliant on Iran-supplied rockets that were smuggled into Gaza via Sudan and then Egypt.

67.     As has been extensively reported, Iran in recent years has helped Hamas develop more advanced rockets to strike Israel as well as assisting with the building of rocket-production facilities in the Gaza Strip.  Hamas commanders routinely traveled to Iran to receive training in the production and operation of weapons and to tour the Islamic Revolutionary Guard Corps's

("IRGC") own rocket-production facilities.  Reportedly, according to intelligence officials, Iran's technological assistance has resulted in a significant improvement in the terrorist organization's ability to strike targets deep inside Israel and has contributed to the deaths of numerous Israelis. Indeed, while Hamas rockets were manufactured in Gaza, they have been based on an Iranian design.  The close collaboration between Iran and Hamas has resulted in significant improvements in terms of range, precision, lethality, and the extent of destruction that Hamas's weapons can cause.

68.     In January 2021, IRGC Aerospace Force commander Amir Ali Hajizadeh stated, "All the missiles you might see in Gaza and Lebanon were created with Iran's support."

69.     In May 2021, it was reported that Iran's military, Hezbollah, and Hamas were coordinating their efforts to fight Israel at a joint "war room" in Beirut, Lebanon.

70.     Recently, Iran's Supreme Leader, Ayatollah Ali Khamenei, hosted Hamas leader, Ismail Haniyeh.

**Iran Knowingly Provided Material Support for Hamas in Perpetrating the October 7 Terrorist Attacks**

71.     As reported by the *Wall Street* Journal, since August 2023, the IRGC worked with Hamas to plan the October 7 Terrorist Attacks at a series of meetings held in Beirut, Lebanon.

72.     Iran was threatened by Israel's expanding ties with certain Gulf Arab states, such as Saudi Arabia, Egypt and Jordan, which, according to Iran, if left unchecked could economically choke Iran.  In order to disrupt expanding peace talks with Israel, Iran intended to create a multi-front war on Israel with Hamas attacking Israel in the south and Hezbollah attacking Israel in the north.

73.     Beginning in April 2023, Ismail Qaani – a leader in Iran's IRGC – held a meeting in Lebanon to begin his coordination efforts to promote Hamas and Hezbollah working together

on their initiatives against Israel and regional stability. Around the same time, to test the new-found coordination among its proxies, Iran directed several attacks from Lebanon and Gaza on Israel.

74. More recently, since August 2023, representatives from Hamas and Hezbollah reportedly met with Iran's IRGC leaders on a biweekly basis to discuss the planned October 7 Terrorist Attacks, which included the determination of when the attacks would take place. Among those reportedly in attendance at the strategy and planning meetings were Iran's Ismail Qaani, Hezbollah's leader Hassan Nasrallah, Hamas's military chief Saleh al-Arouri, and the Iranian Foreign Minister Hossein Amir-Abdollahian.

75. As many experts have indicated, Hamas cannot and does not make war without prior explicit agreement from Iran. Indeed, some experts (such as former National Security Adviser John Bolton) have stated that the October 7 Terrorist Attacks marked the beginning of an Iranian war against Israel, carried out by Tehran's terrorist proxies including Hamas.

76. As the *Wall Street Journal* reported on October 25, 2023, "[i]n the weeks leading up to Hamas's [October 7] attacks on Israel, hundreds of the Palestinian Islamist militant group's fighters received specialized combat training in Iran." As the *Wall Street Journal* reported, approximately 500 Hamas militants reportedly attended military exercises and trainings in Iran in September 2023, which may have supported Hamas's use of drones, paragliders, and motorcycles during the October 7 Terrorist Attacks.

77. Similarly, a group of Hamas fighters were reportedly sent to Iran to complete a training with the "Godfather" of Iranian ballistic missile program, Commander Hassan Tehrani-Moghaddam. Captured Hamas terrorists reportedly revealed to Israeli forces that they had been training for the October 7 Terrorist Attacks for a year and were instructed by Iran's IRGC and

Hezbollah.  The training reportedly included instruction on paragliding and hostage taking.

78.    Likewise, Iran reportedly helped plan the attack, select the timing of it, trained militants, and had at least one year's advanced knowledge of it.  Specifically, multiple reports have emerged that Iran even elected to postpone the attacks from Passover in the spring of 2023 (when the attacks were initially scheduled to occur) to October 7, 2023.

79.    In late September 2023, the leader of Iran's IRGC's Quds Force, General Esmail Qaani, reportedly oversaw a joint military drill with the Syrian army, and, on October 2, 2023, Qaani entered Lebanon to meet with Hezbollah and Hamas.

80.    Despite Iran's initial denials of its involvement with the October 7 Terrorist Attacks – which were muffled by Iran's direct calls of support for Hamas – Iran has now stopped denying its involvement and has begun threatening Western powers, including the United States, for their support of Israel.

81.    Indeed, Iran has now reportedly gone one step further, and, as of December 2023, the IRGC claimed ownership of the October 7 Terrorist Attacks, explaining that it was a response to the January 2020 assassination of Qasem Soleimani, the former commander of the IRGC's Quds Force.  In fact, as the *Times of Israel* reported in December 2023, IRGC spokesman Ramazan Sharif stated that Hamas' October 7 Terrorist Attacks on Israel was "one of the revenges for the slaying of Soleimani."

82.    Further, as many experts have reportedly stated, Hamas's more sophisticated military capabilities, including its use of drones, paragliders, and hostage taking tactics, are hallmarks of Iran's involvement.

83.    As the *Washington Post* reported, more than a dozen intelligence analysts and military experts expressed astonishment at the stealth and sophistication of the Hamas assault,

which involved coordinated raids across the Israeli border by hundreds of gunmen traveling by land, sea, and air — including motorized paragliders. The ground offensive was accompanied by swarms of rockets and drones that began streaking across the border early Saturday, hitting targets with a degree of precision not seen in previous Hamas attacks. The intelligence analysts and military experts noted that while Hamas has a capable militia and indigenous assembly lines for rockets and drones as a result of the decades of state sponsorship, the October 7 Terrorist Attacks would have been extremely challenging without considerable outside help.

84.      Further underscoring the depth of Iran's involvement, on November 14, 2023, in the third round of sanctions since the October 7 Terrorist Attacks, the U.S. Treasury Department determined that Iran transferred "tens of millions of dollars" to Hamas by utilizing "the Lebanon-based money exchange company Nabil Chouman & Co ("Chouman") to transfer money from Iran to Gaza."

85.      The U.S. Treasury Department also determined in its November 14, 2023 sanctions that Iran "trained Palestinian Islamic Jihad fighters to build and develop missiles in Gaza" in connection with the October 7 attacks.

**Syria's Material Support for Hamas and the October 7 Attacks**

86.      Syria is one of the cradles of Hamas terrorism. Prior to its violent takeover of the Gaza Strip in 2007, Hamas relied heavily on financial support from Syria as well as Iran.

87.      Between 2001 and 2012, Syria openly hosted Hamas terrorists and provided them with a base of operations in Damascus. Indeed, Hamas's main headquarters outside of the West Bank and Gaza was in Damascus, and hundreds of Hamas terrorists were reportedly posted there. Further, one of Hamas's key leaders, Khaled Mashaal, lived there.

88.      After the outbreak of the civil war in Syria in 2011, relations between Syria and

Hamas cooled when Hamas supported Syrian rebels.   However, Syria's support for Hamas continued.

89.    As noted above, in November 2018, the Treasury Department uncovered a complex "oil-for-terror" network that benefited Hamas, among others.  The scheme involved the shipment of Iranian oil to Syria, which distributed hundreds of millions of U.S. dollars in profits to the IRGC. The IRGC, in turn, sent the funds to Hezbollah and Hamas.

90.    In October 2022, Syria hosted a Hamas delegation in Syria and publicly reaffirmed its support for Hamas.  Syrian President Bashar al-Assad ("Assad") told the Hamas delegation that: "despite the war that Syria is being subjected to, it did not change its stance of backing resistance by all forms."  Assad announced that as "everyone knew before and after the war," Syria "will not change and will continue as a supporter of resistance."

91.    Hamas chief of Arab relations Khalil al-Hayya told reporters in Damascus that: "This is a glorious and important day, in which we come back to our dear Syria to resume joint work."

92.    Syria materially contributed to Hamas's massive military buildup that preceded the October 7 Attacks.  As reported by *Al Jazeerah* in December 2023, Hamas leader Ismail Haniyeh told Al Jazeera that part of Hamas's long-range rocket arsenal comes from Syria.

93.    On October 7, 2023, the Assad regime issued a statement immediately praising "Operation Al-Aqsa Flood," the name that Hamas gave to its terror attack of that day.  The statement indicated that: "Syria raises its head high in honor of the martyrs of the Palestinian revolution and the heroes who planned and achieved the Al-Aqsa Flood operation."

94.    Syria also abetted the October 7 Terrorist Attacks by supplying Hamas with Captagon, a synthetic amphetamine-type drug.

95.     The Hamas terrorists who perpetrated the October 7 Attacks were reportedly found to be under the influence of Captagon.   Reportedly, Hamas handlers provided Captagon to the invading terrorists because the drug promotes feelings of rage, irritability, and impatience, and encouraged terrorists to murder and torture their victims.

96.     Syria produces the vast majority of Captagon, and the Syrian government is reportedly responsible for its production and distribution, including to Hamas.

97.     In November 2023, U.S. Congressman Jared Moskowitz (D-Florida) co-sponsored bipartisan legislation that calls on the U.S. Government to dismantle and disrupt the production and trafficking of Captagon.  Representative Moskowitz issued a statement noting that "Captagon is supplied to terrorist organizations across the Middle East by the Assad Regime in Syria," and that he was "horrified to learn that Captagon pills were found on the bodies of dead Hamas terrorists, allowing them to remain alert and restless as they slaughtered innocent men, women, and babies."

98.     Representative Moskowitz added that "This drug not only aided Hamas in their October 7th attack, but it also funds the terrorist activities of the Assad regime and Hezbollah."

**Binance's Business and Evasion of U.S. Sanctions**

99.     Binance holds itself out as the world's "largest crypto exchange by trade volume" and was reported to have amassed over half of the global market share for digital asset exchange activity as of the end of 2022.  Between 2021 and 2022, Binance processed nearly $15 trillion in crypto trades.

100.     Binance's primary online virtual currency exchange is operated on the Binance.com platform, where users may trade fiat or virtual currency through a variety of arrangements, including spot, futures, derivatives, and margin trading.  To use Binance, a user must first open a

Binance account and then fund the account by depositing assets, either through a virtual currency or fiat currency deposit.  Upon onboarding, Binance users can transact in hundreds of virtual currencies and financial products using the funds in their Binance-hosted "wallets."  Binance user funds are held in omnibus digital wallets that are visible on the blockchain.  Users' funds are accounted for via an internal Binance ledger, and Binance acts as the custodian of the user funds.

101.    Binance customers may place orders through www.binance.com, through a Binance mobile application, and by direct connection to Binance's matching engines via the Binance application programming interface ("API").  API connections are generally used by more technologically sophisticated customers, such as proprietary trading firms or other institutional market participants.

102.    Binance operates through a number of subordinate or affiliated entities, in multiple jurisdictions, all tied to Zhao as the beneficial owner.  According to a June 2023 complaint filed by the U.S. Securities and Exchange Commission ("SEC") against Binance and Zhao in the District of Columbia, Zhao has been publicly dismissive of "traditional mentalities" about corporate formalities and has refused to identify the headquarters of Binance, claiming, "Wherever I sit is the Binance office. Wherever I meet somebody is going to be the Binance office."  As the SEC indicated in the complaint, according to Zhao, a formal corporate entity with a headquarters and its own bank account is unnecessary: "All of those things [don't] have to exist for blockchain companies."

103.    While holding itself out as a foreign virtual-currency exchange, Binance secretly operated in the United States between at least August 2017 and October 2022, soliciting and serving millions of U.S. customers that Binance helped to circumvent technological access restrictions and whose existence Binance deliberately concealed from U.S. regulators.    In

particular, Binance sought to retain high-volume traders referred to as "VIP" users on the Binance.com platform.

104.    Liquidity is a crucial aspect of financial markets, including the cryptocurrency market.  It refers to the ease with which an asset can be bought or sold without significantly affecting its price.  The liquidity of a market impacts trading efficacy and market stability.  High liquidity leads to smoother transactions and less price volatility.  Low liquidity can result in trading challenges and higher price volatility.

105.    The high-volume VIP users that Binance prioritized functioned as market makers and provided necessary liquidity that was crucial to the exchange's success.  Their high volume of trades generated massive fees and profits for Binance.

**Binance's Extensive Ties to New York**

106.    Between 2017 and 2023, Binance maintained over one million U.S. users, who accounted for 15 to 20 percent of Binance's transaction fees.  Binance's business had extensive ties to New York.

107.    At least two of Binance's VIP "market maker" customers were quantitative trading firms headquartered in New York, one of which (according to the Commodity Futures Trading Commission) ("CFTC"), was "among Binance's largest customers."  One of these New York firms conducted trading on Binance's platform through at least 15 independent trading teams.  Upon information and belief, other New York-based VIP customers secretly acted as market makers and provided necessary liquidity to the Binance.com platform, effectively fueling an unregulated marketplace that (as described further below) gave known terrorists, including Hamas and entities linked to Hamas, the ability to freely trade cryptocurrency and accept direct donations.

108.    As the CFTC detailed in a consent order against Binance and Zhao in the Northern

District of Illinois, Binance's largest and most important users include three trading firms headquartered or otherwise based in New York:

**Trading Firm A:**

    a. Trading Firm A is a quantitative trading firm that has traded bitcoin perpetuals on Binance, among other products, through at least three different accounts during the Relevant Period. Trading Firm A is a Delaware limited liability company headquartered in Chicago, Illinois. **Trading Firm A has offices in New York.**

**Trading Firm B:**

    b. **Trading Firm B is a quantitative trading firm headquartered in New York** and incorporated in Delaware. Trading Firm B has at all relevant times been ultimately majority-owned by U.S. residents. Numerous senior managers, including the individual who functions as Trading Firm B's CEO, have worked from Trading Firm B's New York headquarters**.**

    c. Trading Firm B conducts its digital asset trading activity on Binance through a dedicated trading desk that utilizes automated trading strategies programmed into computer algorithms developed by personnel at Trading Firm B's New York headquarters. Trading Firm B's algorithms determine whether to place or cancel any orders based on the instructions in their code. Trading Firm B's algorithms are built using computer code that Trading Firm B considers to be valuable intellectual property. Trading Firm B's computer code is owned, directly or by assignment from its various wholly-owned subsidiaries, by Trading Firm B.

    d. The global head of Trading Firm B's digital asset trading desk works from Trading Firm B's New York headquarters. Other employees, including members of the business development team responsible for interacting with Binance, also work from Trading Firm B's New York headquarters.

    e. **Trading Firm B has been among Binance's largest customers and has consistently received reduced trading fees due to its status as a Binance VIP.**

**Trading Firm C:**

    f. **Trading Firm C, another quantitative trading firm that trades digital asset derivatives on Binance through automated trading strategies, is headquartered and incorporated in New York**. Trading Firm C is majority-owned by U.S. residents and the individual with the largest

ownership share is also a U.S. citizen. Trading Firm C trades in numerous financial markets around the globe and is part of a corporate "umbrella" of commonly controlled affiliates and subsidiaries that has branch offices in London, Singapore, and Hong Kong, among other locations.

g. **Zhao communicated directly with Trading Firm C's CEO, who has a New York phone number.**

109.    These users were among the "VIP" U.S. users that Binance actively sought to retain on the Binance.com platform and aided in circumventing the technological controls that Binance had ostensibly put in place to block U.S. users from the Binance.com platform. Binance deliberately concealed from U.S. authorities that these users retained access to and traded on Binance.com, instead making false public statements that U.S. users were blocked from accessing the platform. Binance did this because these VIP users were critical to Binance's business. As FinCEN noted in its November 2023 settlement agreement (described further below), "Binance also prioritized attracting and maintaining relationships with large U.S. market makers to drive activity on the platform and increase profits" and that "[a]s a result of these actions, Binance now conducts roughly five times the daily trading volume of its next largest competitor" and has "an unfair competitive advantage in the marketplace as compared to other companies offering similar products and services."

110.    Further, Binance used accounts at the now-defunct Signature Bank to transfer billions of dollars between 2019 and 2022. Headquartered in New York, Signature Bank had approximately 40 branches in the United States and just under $100 billion in assets before its collapse in 2023.

111.    As CEO, Zhao supervised and directed this conduct. As part of his November 2023 guilty plea with the DOJ, he admitted to willful violations of the Bank Secrecy Act. He was aware of the presence of significant U.S. business on his trading platform and the concurrent

requirements to comply with U.S. laws, including those pertaining to customer due diligence, monitoring and reporting designed to prevent known terrorist organizations from transacting on the Binance platform.  He nevertheless told Binance employees that it was "better to ask for forgiveness than permission" in what he described as a "grey zone."

112.    Zhao engaged a consultant in 2018 who recommended many of the steps Binance ultimately took to conceal illegal activity on the Binance.com platform.  Following receipt of these recommendations, according to an SEC complaint, Zhao directed Binance to implement a plan to encourage customers to circumvent U.S. IP-blocking controls.  As alleged by the SEC, Zhao also directed Binance employees to encourage certain U.S.-based VIP customers, including VIPs located in New York, to circumvent KYC restrictions by submitting updated KYC information that deleted any U.S. nexus.

113.    As Zhao explained in a June 9, 2019 weekly meeting of senior Binance officials:

> We don't want to lose all the VIPs which actually contribute to quite a large number of volume. So ideally we would help them facilitate registering companies or moving the trading volume offshore in some way—in a way that we can accept without them being labeled completely U.S. to us.

114.    With respect to its VIP customers, including VIP customers based in New York, Zhao explained in a June 24, 2019 meeting with other senior Binance officials:

> We do need to let users know that they can change their KYC on Binance.com and continue to use it. But the message, the message needs to be finessed very carefully because whatever we send will be public. We cannot be held accountable for it.

115.    The following day, Zhao met with other senior Binance officials to discuss their VIP U.S. customers, and Zhao provided further instructions on crafting the message to customers about changing IP addresses or KYC documentation.  During the meeting, Binance's Chief Compliance Officer ("CCO") noted that Binance would engage in "the international circumvention

of KYC," and Zhao affirmed that his "goal" was "to reduce the losses to ourselves, and at the same time to make the U.S. regulatory authorities not trouble us."

116.    In addition to the accounts held at New York-based Signature Bank on behalf of Binance and other Binance affiliates that were all beneficially owned by Zhao, Zhao also owned and controlled multiple foreign entities that also maintained accounts at Signature Bank and were the counterparties for many of the large transfers described above, totaling hundreds of millions of dollars.

117.    In addition, as set forth by the SEC in a complaint against Binance, Binance also relied on other New York-based entities to conduct business.  For example, Binance relied on Paxos, a New York limited purpose trust company. Beginning in September 2019, pursuant to a "Stablecoin as a Service" agreement with a Binance affiliate, Paxos issued in partnership with Binance a proprietary USD-backed stablecoin called "BUSD," which was approved by and under the supervision of the New York State Department of Financial Services ("NYDFS") but was never registered with the SEC.  Binance and Paxos also had a profit-sharing agreement to invest those reserves for their mutual benefit.  As of February 2023, over $16 billion worth of BUSD were in circulation.

118.    BUSD could be and was traded on the Binance platform until February 2023, when NYDFS ordered Paxos to cease minting BUSD "as a result of several unresolved issues related to Paxos' oversight of its relationship with Binance in regard to Paxos-issued BUSD."

**Binance Was Required to Comply with U.S. Laws and Regulations Related to Preventing Funding of Terrorist Groups Such as Hamas and PIJ**

119.    Given that Binance was conducting substantial business with U.S. users, Binance was required to comply with a wide range of regulatory requirements, including federal statutes designed to prevent the use of the U.S. financial system to fund terrorist activities.  As described

further below, many of these statutes provide for criminal penalties enforced by the DOJ.  They also authorize financial regulators such as FinCEN, the U.S. Department of Treasury, Office of Foreign Assets Control ("OFAC"), the SEC, and the CFTC to promulgate regulations that aid in civil enforcement, including licensing, reporting, and monitoring requirements.

International Emergency Economic Powers Act

120.    The International Emergency Economic Powers Act ("IEEPA," 50 U.S.C. §§ 1701–05) authorizes the President to declare the existence of an unusual and extraordinary threat to the national security, foreign policy, or economy of the United States. It further authorizes the President to preclude transactions and block the transfer of property to address the threat.

121.    U.S. presidents have subsequently issued several executive orders pursuant to this authority to address the threat of terrorism.

122.    Between 1995 and 1997, President Clinton relied on IEEPA in issuing Executive Orders 12957, 12959 and 13059 prohibiting virtually all trade and investment activities with Iran because of Iranian support of international terrorism.

123.    On September 23, 2001, President George W. Bush issued Executive Order 13224 pursuant to IEEPA declaring a national state of emergency with respect to global terrorism. The order designated a list of individuals and organizations as Specially Designated Global Terrorists ("SDGTs") and authorized the Secretary of the Treasury to further designate other individuals and entities that U.S. intelligence indicated were involved in terrorism.

124.    All American persons are barred from having any financial relationship with an SDGT and all SDGTs' U.S.-based assets are frozen.  U.S. persons may not engage in financial transactions with an SDGT unless they have obtained a license from OFAC. They also may not engage in any transaction to circumvent this restriction.

125.     Violations of an executive order or implementing regulation of IEEPA carry civil penalties.  Willful violation is a criminal offense.

The Bank Secrecy Act

126.     The Bank Secrecy Act ("BSA") was established in 1970 to combat money laundering, including the financing of terrorist activities.  Its provisions are designed to help identify the source, volume and movement of currency transmitted into or out of the U.S. or deposited at financial institutions.

127.     The BSA established requirements for recordkeeping and reporting of financial transactions by banks and other financial institutions, including "money services businesses" ("MSB").  The term "money services business" is defined in 31 C.F.R. § 1010.100(ff) to include "money transmitters," which are further defined in 31 C.F.R. § 1010.100(ff)(5) as a person who either "provides money transmission services" or who is otherwise "engaged in the transfer of funds."  FinCEN regulations define "money transmission services" as "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." Foreign-located businesses are considered MSBs if they do business "wholly or in substantial part within the United States."

128.     Under the BSA, MSBs are required to register with FinCEN within 180 days of beginning operations and to renew that registration every two years.

129.     Under the BSA and its implementing regulations, MSBs are required to develop, implement, and maintain an effective AML program that is reasonably designed to prevent the MSB from being used to facilitate money laundering and the financing of terrorist activities and to maintain an effective, written AML program that (1) incorporates policies, procedures and

internal controls reasonably designed to assure ongoing compliance with the BSA and its implementing regulations; (2) designates an individual responsible to assure day-to-day compliance with the program, the BSA and BSA regulations; (3) provides education and/or training for appropriate personnel, including training in detection of suspicious transactions; and (4) provides for independent review to monitor and maintain an adequate program.

<u>Suspicious Activity Reporting</u>

130.    The BSA and its implementing regulations require an MSB to identify and report suspicious transactions relevant to a possible violation of law or regulation in Suspicious Activity Reports ("SARs") filed with FinCEN. Specifically, the BSA and its implementing regulations require MSBs to report transactions that involve or aggregate to at least $2,000, are conducted by, at, or through the MSB, and that the MSB "knows, suspects, or has reason to suspect" are suspicious. A transaction is "suspicious" if an MSB "knows, suspects or has reason to suspect" the transaction: (a) involves funds derived from illegal activities, or is conducted to disguise funds derived from illegal activities; (b) is designed to evade the reporting or recordkeeping requirements of the BSA or regulations implementing it; or (c) has no business or apparent lawful purpose or is not the sort in which the customer normally would be expected to engage, and the MSB knows of no reasonable explanation for the transaction after examining the available facts, including background and possible purpose of the transaction. An MSB is generally required to file a SAR no later than 30 calendar days after the initial detection by the MSB of the facts that form the basis for filing a SAR.

131.    Laws and regulations pertaining to other types of financial market participants include provisions bringing them within the scope of the BSA. For example, Regulation 42.2 of 17 C.F.R. § 42.2 requires commodities exchanges to comply with the BSA. Rule 17a-8 of the

Securities Exchange Act of 1934 requires broker-dealers to comply with the reporting, recordkeeping, and record retention rules of the BSA.

**Binance and Zhao Created a Platform That Enabled Financing of Terrorist Groups Such as Hamas, in Violation of U.S. Anti-Terror Financing Regulations**

132.   Binance and Zhao evaded U.S. regulatory oversight through an elaborate scheme by which Binance created U.S. entities and a separate platform, Binance.US (available at www.binance.US), which Binance held out as its U.S. crypto exchange.  Binance misrepresented to the public, U.S. authorities and U.S. courts that Binance.US was the exclusive platform on which U.S. persons could trade.  Binance.US and its U.S.-domiciled holding companies are not parties to this action.

133.   Behind the scenes, however, Binance was making efforts to retain its most valuable U.S. customers on the Binance.com platform.  When the Binance.US platform launched in 2019, Binance announced that it was implementing controls to block U.S. customers from the Binance.com platform.  In reality, Binance did the opposite.  Zhao directed Binance to assist certain high-value U.S. customers in circumventing those controls and to do so surreptitiously because— as Zhao himself acknowledged—Binance did not want to "be held accountable" for these actions.  According to an SEC complaint, the Binance CCO explained, "[o]n the surface we cannot be seen to have US users[,] but in reality, we should get them through other creative means."  Indeed, Zhao's stated "goal" was "to reduce the losses to ourselves, and at the same time to make the U.S. regulatory authorities not trouble us."

134.   On a June 25, 2019 call, Binance employees and executives told Zhao that they were implementing the plan by contacting U.S. VIP users "offline," through direct phone calls, "leav[ing] no trace."  If a U.S. VIP user owned or controlled an offshore entity, *i.e.*, located outside of the United States, Binance's VIP team would help the VIP user register a new, separate account

for the offshore entity and transfer the user's VIP benefits to that account, while the user transferred its holdings to the new account.  On the same call, an employee described a script that Binance employees could use in communications with U.S. VIPs to encourage them to provide non-U.S. KYC information to Binance by falsely suggesting that the user was "misidentified" in Binance's records as a U.S. customer.  Zhao authorized and directed this strategy, explaining on the call, "[w]e cannot say they are U.S. users and we want to help them. We say we mis-categorized them as U.S. users, but actually they are not."

135.    Also during the call on or around June 25, 2019, a senior employee provided guidance on what Binance should not do: "We cannot advise our users to change their KYC. That's, that's of course against the law."  The senior employee provided an alternative route to the same end: "But what we can tell them is through our internal monitoring, we realize that your account exhibits qualities which makes us believe it is a US account ... if you think we made a wrong judgment, please do the following, you know, and we have a dedicated customer service VIP service officer."  The senior employee described Binance's plan as "international circumvention of KYC."

136.    Binance, at Zhao's direction, agreed to and implemented this strategy to keep U.S. VIP users on Binance.com as documented in an internal document titled "VIP handling."

137.    As indicated in a December 2023 consent order filed by the CFTC, as of January 2020 approximately 19.9 percent of Binance's customers were located in the United States, and as of June 2020, approximately 17.8 percent of Binance's customers were still located in the United States.

138.    Binance's substantial operations and business with U.S.-based customers brought it into the jurisdiction of U.S. financial regulators, including the SEC, CFTC and FinCEN and

33

subjected Binance to U.S. laws and regulations such as those described above that were designed to prevent its platform from being misused by criminals, including terrorists. These laws required Binance to, among other things, establish robust anti-money laundering programs, to perform due diligence on their customers, to file reports of suspicious activity on its platform and to prevent access to the U.S. financial system by sanctioned countries and entities, including terrorists and state sponsors of terrorism.

139. Binance actively violated these laws and regulations. As FinCEN found, Binance willfully failed to register with any regulatory agency for years and misled U.S. authorities. For years, Binance remained willfully blind to the use of its platform by illicit actors, including terrorists, by failing to do any due diligence on the vast majority of its users prior to August 2021.

140. Prior to that time, Binance allowed users to open "Level 1" or "Tier 1" accounts without submitting any KYC information. Instead, users could open Level 1 accounts simply by providing an email address and a password. Binance required no other information, including the user's name, citizenship, or location. A Level 1 account holder could deposit virtual currency into its account, and then transact in, an unlimited amount of virtual currency. While Level 1 accounts had certain limitations, including a virtual currency withdrawal limit of up to the-value of two Bitcoins ("BTC") per day, Binance allowed users to open multiple Level 1 accounts by providing a new email address for each account, which effectively circumvented the withdrawal limit. Even if a user adhered to the daily two BTC withdrawal limit on a single account, for most of Binance's existence, the user could still withdraw thousands-and sometimes many tens of thousands-of U.S. dollars due to the rising value of a single Bitcoin, which increased from approximately $3,000 to $63,000 in value between December 2018 and April 2021. Level 1 accounts comprised the vast majority of user accounts on Binance.com.

141.    Once Binance began doing customer due diligence, it was deficient and haphazard. In August 2021, Binance announced that it would require all new users to submit full KYC information.   But Binance allowed existing users who had not submitted KYC information - including all Level 1 accounts (which were the majority of Binance's user accounts) - to trade on the platform without providing full KYC information until May 2022.

142.    Binance personnel had actual knowledge that illicit activity was flowing through the platform as the result of these deficient KYC procedures.   In a September 2018 chat conversation, a senior Binance employee learned that Binance had "[n]othing ... in place" to review high-volume accounts for suspicious activity.   In the same chat, he listed types of transactions that, "in [the] aml world," would be flagged for money laundering risks, while noting that "as of now[,] there is no regulation for .com to play by."   Binance did not have protocols to flag or report such transactions.   The senior employee further noted: "its [sic] challenging to use the aml standards to impose on [Binance].com especially when Cz [Zhao] doesn't see a need to."   Binance compliance personnel recognized that Binance's AML controls were ·woefully inadequate and would thereby attract criminals to the platform.   For example, in a February 2019 chat conversation, one compliance employee wrote that Binance needed "a banner" that stated "is washing drug money too hard these days - come to Binance we got cake for you."

143.    Binance also took steps to retain known illicit actors on the platform, particularly if they were VIP users.   For example, in July 2020, Binance's chief financial officer ("CFO") and others discussed a VIP user who was offboarded after being publicly identified as among the "top contributors to illicit activity."   The CFO wrote that, as a general matter, Binance's compliance and investigation teams should check a user's VIP level before offboarding them, and then Binance

could "give them a new account (if they are important/VIP)" with the instructions "not to go through XXX channel again."

144.    Binance's willful failure to implement an effective AML program directly led, according to FinCEN, "to the platform being used to process transactions related to . . . unregistered convertible virtual currency mixing services uses to launder illicit proceeds, high-risk jurisdictions, individuals listed on OFAC's SDN List, [and] terrorist financing."   FinCEN determined that Binance's willful failure to report hundreds of thousands of suspicious transactions "inhibited law enforcement's ability to disrupt the illicit actors" and that its conduct "extensively harmed FinCEN's mission to safeguard our financial system from illicit use" and "expos[ed] the U.S. financial system to a significant volume of illicit financial activity."

**Binance Processed Crypto Transactions with Known Hamas Accounts on its Exchange**

145.    According to a November 2023 settlement Binance entered into with FinCEN, FinCEN identified numerous transactions between Binance users and users with Hamas ties, including the Al-Qassam Brigades and Palestine Islamic Jihad.  FinCEN found that senior Binance employees and compliance personnel were aware that entities officially designated as terrorist groups were transacting on the Binance.com platform.   Binance did not file a single SAR in connection with any of these transactions.

146.    Binance's facilitation of this terrorist financing continued for years and up until the months prior to the October 7 Terrorist Attacks.   Indeed, as FinCEN determined, Binance processed numerous transactions with Hamas and other Palestinian terrorist groups between July 14, 2017 to July 30, 2023.

147.    As FinCEN determined, Binance failed to perform any due diligence at all on the vast majority its customers during its first two years of operation, and only limited and inadequate due diligence in subsequent years, in contravention of regulatory requirements to do so.  As stated

by FinCEN and the CFTC in public filings, Binance was nevertheless aware that Hamas-affiliated users were transacting on its platform.

148.    As demonstrated by FinCEN's extensive findings, Binance knowingly permitted Hamas and other terror groups to evade U.S. regulatory restrictions related to terror financing.  For example, as FinCEN found:

> **Binance failed to file SARs with FinCEN on significant sums being transmitted to and from entities officially designated as terrorist organizations by the United States and United Nations**, as well as high-risk exchanges associated with terrorist financing activity. Binance user addresses were found to interact with bitcoin wallets associated with the Islamic State of Iraq and Syria (ISIS), **Hamas' Al-Qassam Brigades**, Al Qaeda, and the **Palestine Islamic Jihad (PIJ).**

149.    Indeed, FinCEN found that Binance received reports from its third-party service provider, which identified Hamas-associated transactions.  Instead of filing SARs as required and thereby alerting U.S. regulators to the existence of Hamas-associated transactions on its platform, Binance attempted to influence how the service provider reported these transactions:

> The al-Qassam Brigades is the military wing of the Palestinian Hamas organization. Currently, the al-Qassam Brigades are listed as a terrorist organization by the United States and multiple other countries and organizations. The al-Qassam Brigades' CVC fundraising began in early 2019 with advertisements on Twitter to "Donate to Palestinian Resistance via Bitcoin." **FinCEN observed multiple direct bitcoin transactions worth over $2,000 with these CVC wallets during the Relevant Time Period. Binance received reports from its third-party service provider in April 2019 identifying Hamas-associated transactions and filed no SARs with FinCEN. Instead, Binance's former Chief Compliance Officer attempted to influence how its third-party service provider reported on Binance's conduct.**

150.    Binance was specifically aware that Hamas and persons directing support to Hamas were using its platform.  For example, as alleged in the CFTC's complaint, in February 2019, after receiving information "**regarding HAMAS transactions**" on Binance, Binance's then-CFO

37

explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering."  A colleague replied that one "can barely buy an AK47 with 600 bucks."

151.    Incredibly, Binance went out of its way to protect users associated with Hamas and other terrorist groups from regulatory scrutiny, especially if they were "VIP" users who generated huge profits for Binance.  As FinCEN found:

> [I]n July 2020, after a third-party service provider flagged **accounts associated with ISIS and Hamas**, [Binance's] former Chief Compliance Officer described it as "[e]xtremely dangerous for our company" and instructed compliance personnel to "[c]heck if he is a VIP account, if yes, to… *[o]ffboard the user but let him take his funds and leave. Tell him that third party compliance tools flagged him*."

152.    Binance further provided substantial assistance to Hamas by turning a blind eye to the activities of BuyCash, an entity that raised funds for Hamas. FinCEN found: "Binance also failed to file a SAR with FinCEN on its connections to BuyCash, a money transmitter that OFAC designated in October 2023 for its involvement in Hamas fundraising, as well as ties to al-Qaeda and ISIS.  Prior to OFAC's designation of BuyCash, Binance was aware of extensive suspicious activity involving this entity—including connections related to terrorist organizations—but failed to file a SAR with FinCEN."

153.    Similarly, Binance provided substantial assistance to PIJ, one of the terror groups that (together with Hamas) perpetrated the October 7 Terrorist Attacks. FinCEN found that Binance processed numerous transactions related to this terror group:

> [Palestinian Islamic Jihad] is a Sunni Islamist militant group seeking to establish an Islamist Palestinian state that is committed to the destruction of Israel and has been designated as a foreign terrorist organization since 1997. **FinCEN's investigation identified dozens of former Binance users with tens of millions of dollars in transactions with an identified [Palestinian Islamic Jihad] network**. Binance failed to file a SAR with FinCEN on this activity

some of which occurred late in the Relevant Time Period [July 14, 2017 to July 30, 2023].

154.    Israeli law enforcement also identified Hamas linked accounts on the Binance.com platform. Its inquiries to Binance resulted in "numerous seizures related to the al Qassam Brigades" stretching from 2021 through at least October 2023.

155.    As FinCEN concluded, "Binance senior management misled U.S. authorities," and "Binance's willful failure to implement an effective [anti-money laundering] program directly led to the platform being used to process transactions related to . . . terrorist financing," among other illicit activities.

156.    FinCEN's review of Binance's transactions was extensive but not comprehensive. As stated in its settlement agreement, it had identified "hundreds of thousands of potentially suspicious transactions that went through the Binance platform."  As noted below, however, and as part of its settlement with FinCEN, Binance must engage a consultant to perform a SAR lookback review of its transactions between January 1, 2018 and December 31, 2022 and to report on the findings no later than May 2025, to be followed by the filing of any necessary SARs within 90 days of the report.  Upon information and belief, further review will identify substantial additional transactions that funded Hamas and related entities.  Indeed, OFAC identified more than $600 million worth of transactions between U.S. persons and crypto wallets located in or otherwise connected with Iran, a significant funding source for Hamas, and tens of millions of dollars of additional transactions between U.S. persons and crypto wallets located in or otherwise connected with Syria, another funding source.

157.    Zhao was personally responsible for causing Binance's misconduct as set forth above, including Binance's facilitation of transactions with Hamas.  In his plea agreement with the DOJ (discussed further below), Zhao agreed that "[s]tarting at least as early as August 2017 and

39

continuing to at least October 2022, [he] violated the Bank Secrecy Act . . . **by willfully causing [Binance] to fail to implement and maintain an effective [anti-money laundering] program**."

**Binance and Zhao Plead Guilty and Have to Pay a $4.3 billion Penalty for Violating U.S. Law, including Prohibitions on Transactions for Terrorists and State Sponsors of Terrorism**

158.    On November 21, 2023 Binance pled guilty to charges of conspiracy to conduct an unlicensed money transmitting business ("MTB"), in violation of 18 U.S.C. §§ 1960(a), 1960(b)(1)(B); failing to maintain an effective anti-money laundering program, in violation of , in violation of 31 U.S.C. §§ 5318(h), 5322; and 18 U.S.C. § 371; conducting an unlicensed MTB, in violation of 18 U.S.C. §§ 1960(a), 1960(b)(1)(B); and to violating the International Emergency Economic Powers Act, in violation of 50 U.S.C. § 1705 and 31 C.F.R. §§ 560 *et seq*.  Binance entered into concurrent settlements with OFAC, FinCEN, and the CFTC for various willful violations of IEEPA, the Bank Secrecy Act, and related regulations, including Regulation 42.2, 17 C.F.R. § 42.2 for failing to implement a Customer Identification Program, "Know Your Customer" ("KYC") policies and procedures, and AML program, failure to retain required customer information, and failure to implement procedures to determine whether a customer appears on lists of known or suspected terrorist organizations.

159.    On November 21, 2023, Binance and Zhao entered into a comprehensive settlement with the DOJ Criminal Division, Money Laundering and Asset Recovery Section; DOJ's National Security Division, Counterintelligence & Export Control Section; the U.S. Attorney's Office for the Western District of Washington, FinCEN, OFAC, and the CFTC to resolve years-long investigations into Binance and Zhao's misconduct.  Disgorgement and financial penalties between these law enforcement arms in aggregate require Binance to pay more than $4.3 billion.

160.    In addition to monetary penalties and forfeiture, Binance's plea agreement requires Binance to be subject to an independent compliance monitor for three years to oversee remediation

steps taken to improve Binance's AML program, to admit to a 25-page statement of facts outlining the misconduct, and to cooperate and self-report with respect to any additional violations discovered.

161.     Zhao pled guilty to failing to maintain an effective AML program, in violation of 31 U.S.C. §§ 5318(h), 5322(b), 5322(c) and 5322(e); 18 U.S.C. § 2; and 31 C.F.R. § 1022.210. In the plea, Zhao agreed to pay a $50 million fine.

162.     Binance entered into an agreement with OFAC to settle charges of violations of multiple sanctions-related regulations, including the Iranian Transactions and Sanctions Regulations, the Syrian Sanctions Regulations, and Section 594.201(a) of the Global Terrorism Sanctions Regulations, as well as IEEPA.

163.     As part of the OFAC settlement, in addition to monetary penalties, Binance agreed to commit to a number of remedial measures to improve its internal controls, audit and training functions and to undertake risk assessments.  Binance also agreed to further cooperation with OFAC and to the appointment of a monitor for five years.  Binance also agreed to certify annually its efforts to meet the compliance commitments of the agreement.

164.     Binance and two Ireland-based affiliates settled with FinCEN, who determined that Binance and the two affiliates willfully violated the BSA and its implementing regulations with regard to their obligations to register as an MSB, maintain an effective AML program, and report suspicious transactions, in violation of 31 U.S.C. § 5330, 31 C.F.R. § 1022.380, 31 U.S.C. § 5318(h)(1), 31 C.F.R. § 1022.210l, 31 U.S.C. § 5318(g) and 31 C.F.R. § 1022.320.

165.     In addition to monetary penalties, Binance agreed to appointment of an independent compliance monitor for a term of five years, to perform a review within 90 days of the monitor's appointment for any U.S. users on the Binance.com platform; to provide a report summarizing the

review's findings and offboarded customers within 21 days of completion of the review; and to offboard those users no later than 60 days after providing the report to FinCEN and to certify that those users have been removed.  Binance agreed to annual performance of this exercise during the term of the monitorship.

166.    Binance also agreed pursuant to the FinCEN settlement to hire a SAR lookback consultant and perform a SAR lookback review of transactions between January 1, 2018 and December 31, 2022 and to report on the findings no later than May 2025, to be followed by the filing of any necessary SARs within 90 days of the report.

167.    Binance also agreed to undertake specified measures to improve its AML program and to provide FinCEN with reporting and access to related documentation.

168.    OFAC's settlement with Binance is part of a comprehensive settlement with DOJ, FinCEN, and the CFTC, pursuant to which it has undertaken to pay substantial additional penalties and undertake other significant remedial measures.

169.    Binance, its Irish affiliates, and Zhao entered into a settlement with the CFTC, admitting various violations of the Commodities Exchange Act and related regulations, including executing futures transactions on an unregistered board of trade, in violation of 7 U.S.C. §§ 6(a) and 6(b) and 17 C.F.R. § 48.3; illegally entering into off-exchange options trades in violation of 7 U.S.C. §§ 6c(b) and 17 C.F.R. § 32.2; failure to register as a futures commission merchant in violation of 7 U.S.C. § 6(d); failure to register as a designated contract market or swap execution facility in violation of 7 U.S.C. § 7b-3(1) and 17 C.F.R. § 37.3(a)(1); failure to diligently supervise, including by failing to implement an effective customer identification program, failing to implement effective KYC procedures, failing to implement effective AML procedures, purposefully instructing customers to evade compliance controls and intentionally destroying

documents related to illegal conduct, in violation of 17 C.F.R. § 166.3; failing to implement a customer identification program, KYC policies and procedures, and AML program, failing to retain required customer information and failure to implement procedures to ascertain whether a customer appears on lists of known or suspected terrorists or terrorist organizations in violation of 17 C.F.R. § 42.2; and willful evasion of the Commodities Exchange Act in violation of 17 C.F.R. § 1.6(a).  Zhao's liability was established due to his status as a "control person" of Binance pursuant to 7 U.S.C. § 13c(b).

170.    In addition to monetary penalties, Binance was enjoined from continued U.S. operations pertaining to the offering, sale, or execution of digital asset trades in violation of the CEA, to implement an effective AML program, to cease permitting customers to trade through sub-accounts to circumvent compliance controls, to certify compliance, and to create a new board structure that excluded Zhao and included a compliance and audit committee.

171.    The CFTC separately entered into a settlement with Binance's former chief compliance officer for aiding and abetting Binance's violations and imposing an injunction and a $1.5 million fine.

172.    Hamas and PIJ are designated under U.S. law as foreign terrorist organizations because they murdered hundreds of U.S. and Israeli citizens, acts for which they are globally infamous.  Knowingly providing resources to Hamas and PIJ is to knowingly contribute to foreseeable future attacks on U.S. and Israeli citizens.

173.    Supporters of Hamas and PIJ and their political goals encounter many barriers to funding such organizations because of their listing as terrorist organizations by so many countries. When a platform or financial institution such as Binance provides a freewheeling environment which allows for such funding, the call goes out and very quickly those wishing to send funds to

Hamas and PIJ converge on Binance and utilize the financing stream until it is shut down.  Binance allowed such funding for many years.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**AIDING AND ABETTING DESIGNATED FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d)(2)**
**(Against Defendants Binance Holdings Limited and Changpeng Zhao)**

174.    Plaintiffs repeat and reallege each and every allegation of the foregoing paragraphs as if fully set forth herein.

175.    Plaintiffs assert this cause of action against Defendants Binance Holdings Limited and Changpeng Zhao under 18 U.S.C. § 2333(d)(2), which provides for liability (in an action under 18 U.S.C. § 2333(a) involving acts of international terrorism by a designated foreign terrorist organization), against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."

176.    Plaintiffs are nationals of the United States who were injured in their persons or property by acts of international terrorism, or the estates, survivors or heirs of such U.S. nationals.

177.    Hamas and PIJ were designated FTOs when they committed, planned, and authorized the October 7 Terrorist Attacks that injured and/or killed the Plaintiffs or their family members.

178.    The October 7 Terrorist Attacks were acts of international terrorism, as defined by 18 U.S.C. § 2331.  The attacks: (a) involved violence and endangered human life; (b) would have violated federal and state criminal law, had they been committed in the United States; (c) appeared to be intended to intimidate or coerce the civilian populations of Israel and the United States, to influence the policies of the Israeli and American governments, and to affect the policies of those

governments through violent action; and (d) occurred primarily outside the United States and transcended national boundaries in that Hamas raised money internationally, intended to impact the citizens and governments of Israel and the United States, operated internationally and sought asylum in multiple countries in the Middle East.

179.   Defendants Binance Holdings Limited and Changpeng Zhao knowingly provided substantial assistance to Hamas and PIJ.

180.   The substantial assistance that Defendants Binance Holdings Limited and Changpeng Zhao knowingly provided to Hamas and PIJ included: (a) transferring significant sums of money to Hamas, PIJ, and their agents; (b) maintaining bank accounts or other financial accounts, or hosting transactions involving cryptocurrency exchange wallets, for the benefit of Hamas, PIJ, their front organizations, and its senior operatives; (c) providing Hamas and PIJ with access to U.S. dollars and the U.S. banking system; (d) providing seeming legitimacy to Hamas and PIJ's efforts to raise funds to finance its operations and to compensate terrorists and their family members following terrorist attacks; and (e) enabling Hamas and PIJ to access funds that could foreseeably be used to commit terrorist attacks.

181.   Specifically, Defendants Binance Holdings Limited and Changpeng Zhao knowingly provided Hamas and PIJ with unrestricted access to Binance's cryptocurrency exchange platform, enabling Hamas and PIJ to receive and send payments, and to engage in cryptocurrency trading for profit, in violation of U.S. law.  Such unrestricted access included, but was not limited to: (i) failing to take steps to prevent Hamas and PIJ, designated terrorist organizations, from transacting on Binance's cryptocurrency exchange platform, by either performing no or inadequate customer due diligence, in violation of U.S. law; (ii) concealing the presence of Hamas and PIJ on its cryptocurrency exchange platform, in violation of U.S. law; (iii) facilitating direct transmission

of cryptocurrency to and from Hamas and PIJ, in violation of U.S. law; (iv) failing to report known transactions involving Hamas and PIJ, in violation of U.S. law; and (v) permitting Hamas and PIJ to withdraw balances held with Binance.com, in violation of U.S. law.  Binance Holdings Limited continued providing these services even after senior executives learned that the platform had provided services to Hamas, PIJ and their funders, despite its knowledge that Hamas and PIJ are terrorist organizations.

182.    At the time Defendants Binance Holdings Limited and Changpeng Zhao provided substantial assistance to Hamas and PIJ, they knew that: (a) the U.S. government had designated Hamas and PIJ as terrorist organizations; (b) Hamas and PIJ engaged in acts of international terrorism resulting in the murder of hundreds of Israeli and U.S. citizens; and (c) clandestine funding was essential to Hamas and PIJ's ability to carry out terrorist attacks.

183.    Defendants Binance Holdings Limited and Changpeng Zhao also knew that their substantial assistance would facilitate the ability of Hamas and PIJ to carry out terrorist attacks.

184.    The assistance that Defendants Binance Holdings Limited and Changpeng Zhao provided to Hamas and PIJ was a substantial factor in causing Plaintiffs' injuries. Moreover, the October 7 Terrorist Attacks, as well as Plaintiffs' injuries in the attacks, were foreseeable results of that substantial assistance.

185.    As a direct and proximate result of the substantial, knowing assistance that Defendants Binance Holdings Limited and Changpeng Zhao provided to Hamas and PIJ, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

186.    Defendants Binance Holdings Limited and Changpeng Zhao are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## SECOND CAUSE OF ACTION

**PROVIDING MATERIAL SUPPORT TO TERRORISTS
IN VIOLATION OF 18 U.S.C §§ 2333(a) AND 2339A
(Against Defendants Binance Holdings Limited and Changpeng Zhao)**

187.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

188.    Plaintiffs assert this claim against Defendants Binance Holdings Limited and Changpeng Zhao for violations of 18 U.S.C. §§ 2333(a) and 2339A.   Under 18 U.S.C. § 2333(a), a civil cause of action may be asserted by U.S. nationals who are killed or injured as a result of an "act of international terrorism."  The phrase "international terrorism" is defined under 18 U.S.C. § 2331(1) to include, among other things, "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States."  The criminal laws of the United States include 18 U.S.C. § 2339A, which provides for criminal lability for persons who provide material support to terrorists.

189.    Plaintiffs are nationals of the United States who were injured in their persons or property by acts of international terrorism, or the estates, survivors or heirs of such U.S. nationals.

190.    Defendants Binance Holdings Limited and Changpeng Zhao provided material support to Hamas and PIJ and facilitated their efforts to engage in acts of international terrorism, including the attacks that killed and injured Plaintiffs and their family members.

191.    At the time that Defendants Binance Holdings Limited and Changpeng Zhao provided that material assistance to Hamas and PIJ, they knew that Hamas and PIJ were terrorist organizations and that such organizations were transacting on the Binance.com platform.  Further, at the time, it was foreseeable to Binance Holdings Limited and Changpeng Zhao that Hamas and PIJ would use that material assistance to prepare for or carry out terrorist attacks.  Plaintiffs'

injuries were a foreseeable result of the material support and substantial assistance that Defendants provided to Hamas and PIJ.

192.    The material assistance that Defendants Binance Holdings Limited and Changpeng Zhao provided to Hamas and PIJ constituted activities dangerous to human life that violated 18 U.S.C. § 2339A and that were either unlawful under state law, including New York Penal Law §§ 490.10 and 490.15, or would have been unlawful under that state law if committed in the United States.

193.    The material assistance that Defendants Binance Holdings Limited and Changpeng Zhao provided to Hamas was dangerous to human life because that assistance provided material support to Hamas and PIJ in financing their violent attacks and recruit individuals to carry out those attacks. The financial assistance that Defendants provided to Hamas and PIJ also provided material support for them to expand their purported charitable activities, and thereby attract additional donors and recruits for terrorist operations.

194.    The material assistance that Defendants Binance Holdings Limited and Changpeng Zhao provided to Hamas and PIJ  appeared to be intended to (or was made with reckless disregard for the risk that it would): (a) intimidate or coerce the civilian populations of Israel and the United States; (ii) influence the policies of Israel and the United States by means of intimidation and coercion; or (iii) affect the conduct of the governments of Israel and the United States by mass destruction, assassination, or kidnapping.

195.    The substantial financial assistance that Defendants Binance Holdings Limited and Changpeng Zhao provided to Hamas and PIJ occurred primarily outside the United States and transcended national boundaries in that Defendants operated internationally in providing financial assistance to Hamas and PIJ.

196. As a result, Defendants Binance Holdings Limited and Changpeng Zhao committed acts of international terrorism, as defined by 18 U.S.C. § 2331.

197. Hamas and PIJ's acts of violence caused the injuries that Plaintiffs suffered and the deaths of Plaintiffs' family members.

198. The material support and substantial assistance that Defendants Binance Holdings Limited and Changpeng Zhao provided to Hamas and PIJ was a substantial factor in causing Plaintiffs' injuries. Moreover, the October 7 Terrorist Attacks, as well as Plaintiffs' injuries in the attacks, were foreseeable results of the material support and substantial assistance that Defendants provided to Hamas and PIJ.

199. As a direct and proximate result of the material support and substantial assistance that Defendants Binance Holdings Limited and Changpeng Zhao knowingly provided to Hamas and PIJ, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

200. Defendants Binance Holdings Limited and Changpeng Zhao are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## THIRD CAUSE OF ACTION

**PROVIDING MATERAL SUPPORT TO FOREIGN TERRORIST ORGANIZATIONS IN VIOLATION OF 18 U.S.C. §§ 2333(a) AND 2339B(a)(1) (Against Binance Holdings Limited and Changpeng Zhao)**

201. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

202. Plaintiffs assert this claim against Defendants Binance Holdings Limited and Changpeng Zhao for violation of 18 U.S.C. §§ 2333(a) and 2339B(a)(1). Under 18 U.S.C. § 2333(a), a civil cause of action may be asserted by U.S. nationals who are killed or injured as a

result of an "act of international terrorism." The phrase "international terrorism" is defined under 18 U.S.C. § 2331(1) to include, among other things, "violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States." The criminal laws of the United States include 18 U.S.C. § 2339B(a)(1), which provides for criminal lability for persons who provide material support or resources to foreign terrorist organizations.

203.   Plaintiffs are nationals of the United States who were injured in their persons or property by acts of international terrorism, or the estates, survivors or heirs of such U.S. nationals.

204.   At the time of the attack that injured Plaintiffs, Hamas and PIJ were each an FTO.

205.   At that time, Defendants Binance Holdings Limited and Changpeng Zhao knew that each of Hamas and PIJ was an FTO, that each engaged in terrorist activity (as defined in 8 U.S.C. § 1182(a)(3)(B)), and that each engaged in terrorism (as defined in 22 U.S.C. § 2656f(d)(2)).

206.   As Plaintiffs allege in detail above, Defendants Binance Holdings Limited and Changpeng Zhao provided material support to Hamas and PIJ.

207.   That material support was integral to the ability of Hamas and PIJ to carry out terrorist attacks, including the attacks that injured Plaintiffs and killed their family members.

208.   As Plaintiffs allege in detail above, the material support that Defendants Binance Holdings Limited and Changpeng Zhao provided to Hamas and PIJ constituted acts of international terrorism, as defined in 18 U.S.C. § 2331(1).

209.   The material support that Defendants Binance Holdings Limited and Changpeng Zhao provided to Hamas and PIJ was a substantial and foreseeable factor in causing Plaintiffs' injuries.

210.     Moreover, the October 7 Terrorist Attacks, as well as Plaintiffs' injuries in the attacks, were foreseeable results of the material support and substantial assistance that Defendants Binance Holdings Limited and Changpeng Zhao provided to Hamas and PIJ.

211.     As a direct and proximate result of the material support and substantial assistance that Defendants knowingly provided to Hamas and PIJ, Plaintiffs have suffered significant physical, psychological, and emotional injuries.

212.     Defendants Binance Holdings Limited and Changpeng Zhao are therefore liable to Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Plaintiffs in connection with this action.

## FOURTH CAUSE OF ACTION

### DAMAGES AGAINST STATE SPONSORS OF TERRORISM FOR PROVIDING MATERIAL SUPPORT TO AN ACT OF TERRORISM
### (Against Iran)

213.     Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

214.     Iran is a foreign state that since 1984 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

215.     Iran provided material support and resources to Hamas, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the October 7 Terrorist Attacks.

216.     Iran consistently and continuously provided funding to Hamas in the amount of a hundred million U.S. dollars each year for the purpose of allowing Hamas to buy weapons and pay its terrorist fighters and otherwise carry out its terrorist operations.  A substantial amount of such funding was in the form of cryptocurrency, and it was as such for the purpose of evading sanctions implemented by the United States.  In addition to financial support, Iran provided tactical training

to Hamas, facilitated, planned, and organized the October 7 Terrorist Attacks, supplied Hamas with rockets and other weapons, coordinated with Hamas in fighting against Israeli military forces via a joint military center established in Beirut, Lebanon, and recently hosted one of Hamas's leaders Ismail Haniyeh.

217.   The October 7 Terrorist Attacks included acts of extrajudicial killing, torture and hostage taking within the meaning of 28 U.S.C. § 1605A.

218.   Plaintiffs were severely injured by the terrorist acts, and their injuries include death, maiming, and other severe injuries, including: conscious pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

219.   Plaintiffs' injuries were a direct and proximate result of the conduct of Iran.

220.   Iran is liable under 28 U.S.C. §1605A(c) and/or applicable U.S. state law or foreign national law for the full amount of plaintiffs' damages.

221.   The conduct of Iran was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## FIFTH CAUSE OF ACTION

### DAMAGES AGAINST STATE SPONSORS OF TERRORISM FOR PROVIDING MATERIAL SUPPORT TO AN ACT OF TERRORISM
### (Against Syria)

222.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

223.   Syria is a foreign state that since 1979 has continuously been designated as a state sponsor of terrorism within the meaning of 28 U.S.C. § 1605A.

224.     Syria provided material support and resources to Hamas, within the meaning of 28 U.S.C. § 1605A, which caused and facilitated the October 7 Terrorist Attacks.

225.     Syria has provided extensive financial, military, and logistical support for Hamas, including supplying Hamas with long range rockets and hosting a Hamas headquarters in Damascus which was a base for hundreds of Hamas terrorists.  Syria also supplied Hamas with the Captagon drug, which was used by the Hamas terrorists to encourage murder and torture of victims.

226.     The October 7 Terrorist Attacks included acts of extrajudicial killing, torture and hostage taking within the meaning of 28 U.S.C. § 1605A.

227.     Plaintiffs were severely injured by the terrorist acts, and their injuries include death, maiming, and other severe injuries, including: conscious pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

228.     Plaintiffs' injuries were a direct and proximate result of the conduct of Syria.

229.     Syria is liable under 28 U.S.C. §1605A(c) and/or applicable U.S. state law or foreign national law for the full amount of plaintiffs' damages.

230.     The conduct of Syria was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment against Defendants jointly and severally and in favor of Plaintiffs for:

(a)     Compensatory damages in amounts to be determined at trial;

(b)     Treble damages pursuant to 18 U.S.C. § 2333(a);

(c)     Punitive damages under 28 U.S.C. § 1605A(c);

(d)     Any and all costs sustained in connection with the prosecution of this action, including attorneys' fees pursuant to 18 U.S.C. § 2333(a);

(e)     Pre-judgment interest; and

(f)     Such other and further relief as justice requires.

Dated: January 31, 2024
       New York, New York

SEIDEN LAW LLP

*/s/ Amiad Kushner*
Robert W. Seiden
Amiad Kushner
Jake Nachmani
Jennifer H. Blecher
Dov B. Gold
322 Eighth Ave, Suite 1200
New York, NY 10001
646-766-1914
rseiden@seidenlaw.com
akushner@seidenlaw.com
jnachmani@seidenlaw.com
jblecher@seidenlaw.com
dgold@seidenlaw.com

PERLES LAW FIRM, P.C.

Steven R. Perles (*pro hac vice motion to be filed*)
Joshua K. Perles (*pro hac vice motion to be filed*)
Edward B. MacAllister (*pro hac vice motion to be filed*)
816 Connecticut Avenue, NW
12th Floor
Washington, D.C. 20006
(202) 955-9055

*Attorneys for Plaintiffs*