**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUDITH RAANAN *et al.*,<br><br>                       Plaintiffs,<br><br>  - v. -<br><br>BINANCE HOLDINGS LIMITED and<br>CHANGPENG ZHAO,<br><br>                      Defendants. | Civil Action Case No.<br>24 Civ. 00697 (JGK)<br><br>**ORAL ARGUMENT**<br>**REQUESTED** |

**BINANCE HOLDINGS LIMITED'S AND CHANGPENG ZHAO'S**
**MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

**CAHILL GORDON & REINDEL LLP**
Samson A. Enzer
Anirudh Bansal
Sesi Garimella
Lauren A. Riddell
32 Old Slip
New York, New York 10005
(212) 701-3125

*Attorneys for Binance Holdings Limited*
*and Changpeng Zhao*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................... 1

THE AMENDED COMPLAINT'S ALLEGATIONS ..................................................................... 3

I.      THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR PRIMARY
        LIABILITY (COUNTS 2 AND 3). .................................................................................... 10

   A.   The Amended Complaint Fails to Adequately Allege That Defendants Committed an
        Act of International Terrorism. ...................................................................................... 11

   B.   The Amended Complaint Fails to Adequately Allege That Defendants Proximately
        Caused Plaintiffs' Alleged Injuries. .............................................................................. 13

II.     THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR AIDING-AND-
        ABETTING LIABILITY (COUNT 1). ............................................................................. 15

   A.   The Amended Complaint Does Not Allege That Defendants Knowingly and
        Substantially Assisted the Attacks. ............................................................................... 15

   B.   The Amended Complaint Does Not Allege That Defendants Were Generally Aware of
        Their Role in the Relevant Terrorist Activity. .............................................................. 18

III.    NEARLY HALF THE PLAINTIFFS LACK STANDING. ....................................... 19

IV.     THE AMENDED COMPLAINT FAILS TO ESTABLISH PERSONAL
        JURISDICTION. ............................................................................................................... 20

   A.   Plaintiffs Fail to Plead a Basis for Personal Jurisdiction Over BHL. ........................... 20

   B.   Plaintiffs Fail to Plead a Basis for Personal Jurisdiction Over Mr. Zhao. .................... 22

CONCLUSION ............................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Albany Int'l Corp.* v. *Yamauchi Corp.*,
    978 F. Supp. 2d 138 (N.D.N.Y. 2013)....................................................................................22

*Amorosa* v. *Gen. Elec. Co.*,
    2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022)...................................................................2n, 5

*Averbach for Estate of Averbach* v. *Cairo Amman Bank*,
    2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).........................................................................20

*Bernhardt* v. *Islamic Republic of Iran*,
    47 F.4th 856 (D.C. Cir. 2022), *cert. denied sub nom. Bernhardt* v. *HSBC*
    *Holdings PLC*, 144 S. Ct. 280 (2023).....................................................................................19

*Brown* v. *Nat'l Bank of Pakistan*,
    2022 WL 1155905 (S.D.N.Y. Apr. 19, 2022).................................................................19, 20

*Byfield* v. *New York City Dep't of Educ.*,
    2023 WL 3293644 (S.D.N.Y. May 5, 2023) ....................................................................2n, 5

*Halberstam* v. *Welch*,
    705 F.2d 472 (D.C. Cir. 1983)...............................................................................................18

*Kaplan* v. *Lebanese Canadian Bank, SAL*,
    405 F. Supp. 3d 525 (S.D.N.Y. 2019), *vacated in part on other grounds*, 999
    F.3d 842 (2d Cir. 2021)..........................................................................................................14

*King* v. *Habib Bank Ltd.*,
    2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022)........................................................................10

*Lelchook* v. *Lebanese Canadian Bank*,
    2024 WL 967078 (S.D.N.Y. Mar. 6, 2024) ...........................................................................20

*Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d. Cir. 2012)...............................................................................................20, 22

*Licci* v. *Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)....................................................................................................21

*Linde* v. *Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018)........................................................................................10, 13, 19

*O'Sullivan* v. *Deutsche Bank AG*,
    2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) .......................................................................13

*Rothstein* v. *UBS AG*,
   708 F.3d 82 (2d Cir. 2013)..........................................................................................14

*Stutts* v. *De Dietrich Grp.*,
   2006 WL 1867060 (E.D.N.Y. June 30, 2006) ........................................................12

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 118 (2d Cir. 2013)...................................................................................13, 14

*Twitter, Inc.* v. *Taamneh*,
   598 U.S. 471 (2023).......................................................................................... *passim*

*Waldman* v. *Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016)......................................................................................21

*Weiss* v. *Nat'l Westminster Bank, PLC*,
   993 F.3d 144 (2d Cir. 2021)......................................................................................12

*Weiss* v. *Nat'l Westminster Bank, PLC*,
   453 F. Supp. 2d 609, 620 (E.D.N.Y. 2006) ............................................................20

*Zapata* v. *HSBC Holdings PLC*,
   414 F. Supp. 3d 342 (E.D.N.Y. 2019) .....................................................................14

**Statutes and Rules**

18 U.S.C. § 2331............................................................................................................11

18 U.S.C. § 2333.................................................................................................... *passim*

18 U.S.C. §2339A.......................................................................................................3, 12

18 U.S.C. § 2339B ...................................................................................................3, 12, 13

Federal Rule of Civil Procedure 4(k)(2) ...................................................................21, 22

Federal Rule of Civil Procedure 12(b)(6) .......................................................................1

Federal Rule of Civil Procedure 12(b)(2) .......................................................................1

N.Y. C.P.L.R. § 302(a) ...................................................................................................20

Defendants Binance Holdings Limited ("BHL") and Changpeng Zhao respectfully submit this memorandum of law in support of their motion to dismiss Plaintiffs' Amended Complaint (ECF No. 17 ("AC")) under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(2).[1]

## PRELIMINARY STATEMENT

BHL and Mr. Zhao condemn all acts of terrorism, including the heinous attacks by Hamas and other terrorist groups in Israel on and after October 7, 2023 (the "Attacks"). The perpetrators of the Attacks should be brought to justice—and they may well also have civil liability to Plaintiffs for the death and destruction they caused. But there is no legal basis for Plaintiffs to sue BHL and Mr. Zhao for those Attacks.

Plaintiffs here are alleged victims of the Attacks (or their representatives), who seek damages based on speculative and conclusory assertions that BHL (a foreign company which owns an international digital asset trading exchange) and Mr. Zhao (the company's co-founder and former chief executive) somehow facilitated the Attacks. Yet what the Amended Complaint actually alleges—and all it plausibly could allege—is that BHL provided routine transaction services to its customers worldwide. The Amended Complaint does not connect those services to the Attacks.

Nevertheless, on the basis of conjecture without the necessary supporting factual allegations, the Amended Complaint purports to assert causes of action against BHL and Mr. Zhao under the Anti-Terrorism Act ("ATA"), accusing them of ***committing and aiding and abetting acts of terrorism***. As discussed in Sections I and II below, these allegations fail to state a plausible

---

[1] Unless otherwise noted, capitalized terms have the same definitions as in the Amended Complaint, emphasis is added, and internal citations and quotations are omitted.

claim upon which relief can be granted.

To actually prove the alleged violations, Plaintiffs would have to establish, at a minimum, that BHL and Mr. Zhao actively, intentionally, and knowingly assisted terrorists in carrying out the Attacks. Yet Plaintiffs do not connect a single transaction by users on BHL's digital asset trading exchange to the Attacks, nor do they explain how BHL's transaction services had anything to do with Plaintiffs' injuries. Plaintiffs never allege, other than in the most conclusory terms, that any BHL users were members of Hamas or any other terrorist group, nor do Plaintiffs even indirectly connect BHL users with Hamas. The only alleged connection between BHL's services and Hamas is that some transactional activity on the BHL exchange (in many cases only with the benefit of hindsight) has some alleged connection (which the Amended Complaint fails to specify) with Hamas or other terrorist groups. Nowhere does the Amended Complaint allege that BHL or Mr. Zhao (1) planned or participated in the Attacks, (2) intended to support the Attacks, (3) had advance knowledge of the Attacks, or (4) had any connection with the Attacks' perpetrators. In similar circumstances, courts have dismissed ATA actions against banks arising from their role in facilitating ordinary financial transactions. By the same legal principles, the Amended Complaint fails to plead a plausible ATA claim arising from the routine transaction services provided by BHL.

The U.S. Supreme Court recently made clear just how far short Plaintiffs' claims fall. In *Twitter, Inc.* v. *Taamneh*, the Court held that to plead aiding-and-abetting liability under the ATA, a plaintiff must allege facts showing that the defendant engaged in "truly culpable conduct" by "consciously, voluntarily, and culpably" participating in the terrorist attack that injured the plaintiff. 598 U.S. 471, 489, 505 (2023). Otherwise, the Court cautioned, "mostly passive actors like banks [would] become liable for all of their customers' crimes by virtue of carrying out routine

transactions." *Id.* at 491.  Yet the Amended Complaint alleges only that BHL offered routine, generally-available services that were in no sense ***aimed*** at assisting Hamas or any other terrorist group.  That is not sufficient under the law.

The claims brought by 18 of the Plaintiffs should also be dismissed because they lack standing.  As discussed in Section III below, many of the Plaintiffs do not satisfy the requirements of the ATA because they:  (1) do not qualify as relatives of survivors of the Attacks, (2) are remote family members, or (3) are not U.S. nationals.

As discussed in Section IV below, the Amended Complaint also fails to allege personal jurisdiction over either BHL or Mr. Zhao.  There is no basis for general jurisdiction, and Plaintiffs' attempt to plead specific jurisdiction in New York fails.  All the Amended Complaint alleges is that BHL's New York-based users provided liquidity to the BHL exchange, which even if accepted as true, does nothing to tie BHL's or Mr. Zhao's alleged business in New York to the claims in this case.  For these and the other reasons discussed below, the Court should dismiss the Amended Complaint.

## THE AMENDED COMPLAINT'S ALLEGATIONS

Plaintiffs are 40 individuals who allege that they are victims, or representatives of victims of the Attacks.  (AC ¶ 1).  Plaintiffs seek to hold BHL and Mr. Zhao liable for the physical and emotional harm they allegedly suffered from the Attacks based on three theories:  (1) aiding and abetting designated foreign terrorist organizations ("FTOs") in violation of 18 U.S.C. § 2333(d)(2) (Count 1); (2) providing material support to terrorists in violation of 18 U.S.C. §§ 2333(a), 2339A (Count 2); and (3) providing material support to FTOs in violation of 18 U.S.C. §§ 2333(a), 2339B(a)(1) (Count 3).  (*Id.* ¶¶ 1-2, 247-85).

But the Amended Complaint contains no allegations tying either Defendant to the Attacks. Plaintiffs do not allege, for example, that Defendants (1) planned or participated in the Attacks, (2) intended to support the Attacks, (3) had advance knowledge of the Attacks, or (4) had any connection with the Attacks' perpetrators. Nor does the Amended Complaint allege that a single act by BHL or Mr. Zhao, ***nor even a single transaction by a BHL customer***, funded or caused the Attacks. Rather, Plaintiffs allege that between 2019 and 2023, Defendants provided arm's-length services to customers and that, in some instances, those customers had some unspecified ties to Hamas.

Ultimately, the best the Amended Complaint can do is string together a disjointed assortment of allegations that, according to Plaintiffs, suggest (1) Defendants ***must have known*** that individuals associated with Hamas and other terrorists were among the 180 million users transacting on the BHL platform, and (2) Plaintiffs have identified so many transactions with unspecified links to Hamas that, in hindsight, some ***must have been*** connected to the Attacks in some way. These sorts of allegations are clearly insufficient.

### Plaintiffs' Allegations That Defendants Must Have Known Hamas and Other Terrorist Organizations Were Using BHL's Platform

To try to support their speculative assertion that Defendants must have known Hamas-linked customers were using BHL, Plaintiffs rely on four sources of information, which, taken together or separately, are insufficient to support an ATA claim.

***U.S. Regulatory Actions***: Plaintiffs rely most heavily on a 2023 Consent Order between BHL and the Financial Crimes Enforcement Network ("FinCEN"), and similar U.S. regulatory filings, including a complaint by the Commodity Futures Trading Commission, and plea agreements with the Department of Justice. But—as the actual documents, rather than Plaintiffs' cherry-picked excerpts, make clear—the central issue in those matters was that BHL did not have

4

sufficient anti-money laundering and know-your-customer controls, and failed to register with FinCEN as a money services business. None of these regulators alleged that BHL or Mr. Zhao intentionally supported any terrorist group, let alone the Attacks.[2]

Moreover, most of Plaintiffs' out-of-context quotes are from the regulators' backward-looking reviews, which say nothing about whether Defendants knew any transactions were linked to terrorists *at the time those transactions occurred*. (*See, e.g.*, AC ¶ 211 ("Binance user addresses were found" at unspecified times "to interact with bitcoin wallets associated [with various terrorist groups]"); *id.* ¶ 210 (alleging that prior to the November 2023 settlement, FinCEN "had identified to Binance numerous transactions between Binance users and users with Hamas ties"); *id.* ¶ 212

---

[2] While the Court is required to accept the allegations as true on this motion, courts "generally do not consider averments taken directly from uncorroborated allegations embedded in a complaint in another action or parroted allegations for which counsel has not conducted independent investigation." *Amorosa* v. *Gen. Elec. Co.*, 2022 WL 3577838, at *1 (S.D.N.Y. Aug. 19, 2022). Those principles also apply to consent orders, including the consent orders referenced in the Amended Complaint, which expressly limit their admissions to the content of Mr. Zhao's and BHL's plea agreements. (*See* Enzer Decl. Exs. 6, 8); *Amorosa*, 2022 WL 3577838, at *1 ("[A] consent judgment between a federal agency and a private corporation" is "not the result of an actual adjudication of any of the issues" and reflects nothing more than "the result of private bargaining[.]"). Should the Court wish to consider these materials in their proper context, Defendants have submitted them. *Byfield* v. *New York City Dep't of Educ.*, 2023 WL 3293644, at *1 (S.D.N.Y. May 5, 2023) ("[T]he Court may consider . . . documents that are integral to the Complaint even if they are not incorporated by reference."). (*See* Enzer Decl. Exs. 2, 5-9).

(FinCEN's investigation identified "dozens of former Binance users with tens of millions of dollars in transactions with an identified [Palestinian Islamic Jihad ("PIJ")] network.")).

Even when the Amended Complaint tries to allege Defendants' contemporaneous knowledge—rather than rely on hindsight—it fails. In Paragraph 213, the Amended Complaint quotes from the FinCEN Consent Order to allege that BHL "received reports from its third-party service provider" in April 2019 identifying "***Hamas-associated*** transactions." (*Id.* ¶ 213). However, this says nothing about whether Defendants were aware of the alleged "Hamas associat[ion]" at the time the transactions were processed. Moreover, neither the FinCEN Consent Order nor the Amended Complaint explains what "Hamas-associated transaction[]" even means. Although Plaintiffs try to dress up their vague and generalized "association" allegation with different words—alleging transactions "tie[d]" to Hamas (*id.* ¶ 210) or having "connections related to" Hamas (*id.* ¶ 218)—they never explain what these words mean, either.

Unable to plead facts actually showing contemporaneous knowledge, Plaintiffs pivot and allege that Defendants "turned a blind eye" by failing to report suspicious transactions. (*Id.* ¶ 218). Yet even if this were true, it would do nothing to indicate that Defendants intentionally and substantially aided terrorists. In fact, the Amended Complaint shows just the opposite: Plaintiffs allege that "[i]n July 2020, after a third-party service provider flagged accounts associated with ISIS and Hamas, [BHL's] former Chief Compliance Officer described it as [e]xtremely dangerous for our company and instructed compliance personnel to [c]heck if he is a VIP account, if yes, to . . . ***[o]ffboard the user*** but let him take his funds and leave. Tell him that third party compliance tools flagged him." (*Id.* ¶ 215). Regardless of whether or not BHL was required to report the users' transactions to FinCEN, BHL's decision to bar the user from its exchange is the antithesis of aiding and abetting terrorism.

6

***Israeli Government Actions***:  Plaintiffs also cite instances in which the Israeli government took action against BHL wallets—for example, that "the Times of Israel reported, in February 2022, eight months before the October 7 Terrorist Attacks, [that] Israel seized ***12 BHL accounts*** linked to Al-Mutahadun Exchange, which reportedly assist[ed] the Hamas terror group, and especially its military wing [the al-Qassam Brigades], by transferring funds." (*Id.* ¶ 225 (emphasis in original)).  Despite Plaintiffs' misleading paraphrasing indicating that BHL accounts were implicated, the article they cite—but do not attach—***does not mention BHL***, but rather refers only to "12 accounts[] owned by an exchange company based in the Gaza Strip." (Enzer Decl. Ex. 1). Moreover, even if the seized accounts were BHL accounts, the FinCEN Consent Order confirms that BHL "cooperated with Israeli law enforcement in numerous seizures related to the al Qassam Brigades," further belying the notion that BHL intentionally assisted terrorists.  (Enzer Decl. Ex. 2 at 46).

The Amended Complaint also alleges that Defendants were aware that terrorist groups were active on BHL's platform because Israeli authorities "blacklist[ed]" approximately 162 "Hamas-affiliated" crypto wallets at various points in the two years preceding the Attacks.  (AC ¶ 226).  Yet the Amended Complaint fails to identify a ***single*** wallet that transacted on the BHL exchange after having been blacklisted, nor does it connect any blacklisted wallet to the Attacks.

***Plaintiffs' Undisclosed Blockchain Analysis***:  Based on an analysis from an unidentified "blockchain analysis firm" (*id.* ¶ 209), Plaintiffs allege that from "October 2020 to September 2023, Hamas and PIJ wallets transferred approximately $30 million to Binance wallets" (*id.* ¶ 194); that "[t]he largest of these transactions (ranging from approximately $150,000 to $200,000) were conducted from March to December 2022, in the months leading up to the October 7 Terrorist Attacks" (*id.*); and that "from October 2020 to September 2023, Binance wallets transferred

approximately $29 million to Hamas and PIJ" (*id.*). The Amended Complaint, however, does not attach this analysis, nor does it (1) identify *how* these wallets are linked to Hamas or PIJ, or (2) explain whether that link would have been apparent to BHL or anyone else *prior* to the transfers.[3]

The *only* specific transaction identified by Plaintiffs' blockchain analysis is a November 2022 transfer from a wallet identified by Israeli authorities as being "PIJ-owned." (*Id.* ¶ 152). And the only alleged link between this transaction and BHL is that the receiving wallet, "*upon information and belief*," was a BHL wallet. (*Id.*). But the Amended Complaint concedes that the PIJ link was reported in a seizure order dated July 4, 2023—several months after the transaction. (*Id.* ¶ 152 n.1).

*Social Media Posts and Advertising*: Plaintiffs also allege that Hamas advertised on social media that it was using cryptocurrency platforms, including the BHL exchange, to fund its operations. For example, the Amended Complaint discusses a 2019 video published on the al-Qassam Brigades's website that "provided the public with an explanation of what cryptocurrency is and how it could be used for donations." (*Id.* ¶ 201). Even if Defendants were aware of this or related posts (and no such awareness is alleged), the 2019 video encourages users to open

---

[3] According to the Amended Complaint, this "analysis" also confirms that BHL processed transactions for Gaza-based money service businesses, including "BuyCash" and "Dubai Co." in the months leading up to the Attacks. (*Id.* ¶¶ 3, 209). However, the Amended Complaint fails to allege any basis to infer that Defendants knew about any such associations at the time of the transactions. The allegation that BuyCash has been designated by the Office of Foreign Assets Control as a terrorist organization does not help Plaintiffs; that designation occurred *after* the Attacks. (Enzer Decl. Ex. 10).

cryptocurrency accounts on one of *six different exchange platforms*, and BHL was only one of the six names listed. (*Id.* ¶ 202).

While the Amended Complaint cites an April 2023 *Reuters* article as reporting on "increased interception of funds" (*id.* ¶ 203), it omits that this article actually reported that "Hamas said on Thursday *it would stop receiving fundraising via the crypto currency bitcoin*, a method it has used for years, citing an increase in hostile activity against donors." (Enzer Decl. Ex. 3 (referring to "increased efforts to prevent people and groups sending it bitcoin funds")). In all events, notice that Hamas used cryptocurrency in general falls far short of showing that BHL intentionally assisted the terrorist group in carrying out attacks.

### Plaintiffs' Allegations Attempting to Link BHL Users' Transactions to the Attacks

In an attempt to establish some link between the Attacks and Defendants, Plaintiffs claim that BHL processed "thousands of transactions valued at nearly $60 million involving crypto wallets of Hamas and other Palestinian terrorist groups which played a major role in the October 7 Terrorist Attacks." (*Id.* ¶ 3). For this sweeping and conclusory allegation, Plaintiffs rely on their blockchain analysis, which Plaintiffs have not even put before the Court. (*Id.*).

The vague and generalized allegation that Hamas and other terrorist groups rely heavily on cryptocurrency to fund their operations cannot bridge this gap. The Amended Complaint asserts that terrorist groups' reliance on digital assets means transactions processed by BHL *must* have been essential to the terror Hamas wrought on October 7. (*See, e.g.*, *id.* ¶¶ 132-33, 223). In support of that conclusion, the Amended Complaint alleges that in the wake of the Attacks, the crypto analysis firm Elliptic told the *Wall Street Journal* that "Hamas has been increasingly using cryptocurrencies to supplement Iran funding because it is much easier than smuggling cash over

Egypt's border." (*Id.* ¶ 133).[4]  But this generic allegation is insufficient:  trying to hold BHL accountable for Hamas's actions because the terrorist group used cryptocurrency is like trying to hold an international bank accountable because Hamas used fiat currency.

## ARGUMENT

**I.   THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR PRIMARY LIABILITY (COUNTS 2 AND 3).**

Plaintiffs' attempt to hold Defendants liable as primary violators under the ATA (Counts 2 and 3) lacks any legal basis.  The Court should dismiss both counts.

In 1992, Congress enacted the ATA to hold terrorists accountable for their actions.  In 2016, Congress amended that statute by enacting the Justice Against Sponsors of Terrorism Act ("JASTA") to create aiding-and-abetting liability for non-terrorists under certain narrow circumstances. *See Linde* v. *Arab Bank, PLC*, 882 F.3d 314, 318 (2d Cir. 2018).  Since JASTA was passed, courts have routinely rejected attempts to bring primary ATA liability claims against non-terrorist organizations. *See King* v. *Habib Bank Ltd.*, 2022 WL 4537849, at \*5 (S.D.N.Y. Sept. 28, 2022) (post-JASTA cases generally "recognize that liability for banking services provided to support a terrorist group's mission more generally are properly analyzed under JASTA's aiding-and-abetting provision").  Asserting primary liability against non-terrorists is

---

[4] This is deeply misleading because Elliptic later published an article seeking to "correct misinterpretations" that arose from that precise *WSJ* interview, clarifying that "***[t]here is no evidence to support the assertion that Hamas has received significant volumes of crypto donations***" and that "[t]errorist groups do make use of cryptoassets for public fundraising, ***but the amounts involved are tiny relative to other funding sources***."  (Enzer Decl. Ex. 4).

precisely what Plaintiffs are trying to do here. Thus, it is not surprising that the Amended Complaint fails to plead a viable ATA claim.

### A. The Amended Complaint Fails to Adequately Allege That Defendants Committed an Act of International Terrorism.

As an initial matter, Plaintiffs cannot state a primary ATA liability claim against either Defendant because the Amended Complaint fails to plausibly allege that either committed an act of international terrorism.

The ATA provides a private right of action for any U.S. national (or certain of his or her representatives) who is injured by "an act of international terrorism." 18 U.S.C. § 2331. Section 2331(1) of the statute defines acts of international terrorism as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended—
>
>> (i) to intimidate or coerce a civilian population;
>>
>> (ii) to influence the policy of a government by intimidation or coercion; or
>>
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries . . . .

*Id.* § 2331(1). Plaintiffs do not and cannot plausibly allege that Defendants' provision of routine transaction services qualifies under Subsections (A) or (B) of Section 2331(1).

*First*, the Amended Complaint falls short on Subsection (A) because it does not adequately allege that Defendants committed either (1) violent acts or acts dangerous to human life, or (2) the requisite criminal violation—let alone both.

***No Violent or Dangerous Acts.***  Plaintiffs do not even try to allege that Defendants[5] committed any violent acts.  Instead, Plaintiffs allege only that Defendants provided transaction services to individuals or entities later identified as having some unspecified connection to Hamas or the PIJ.  The law in this Circuit is clear that providing ordinary business services to a terrorist organization is not sufficient to plead a violent act.  *See Weiss* v. *Nat'l Westminster Bank, PLC*, 993 F.3d 144, 162-63 (2d Cir. 2021) (explaining that providing banking services to a known terrorist actor is not sufficient to trigger ATA liability); *see also Stutts* v. *De Dietrich Grp.*, 2006 WL 1867060, at *2 (E.D.N.Y. June 30, 2006) ("The plain language of the ATA compels the conclusion that, by engaging in commercial banking activity, the Bank Defendants were not involved in violent acts or acts dangerous to human life.").

***No Criminal Law Violations.***  Plaintiffs also fail to adequately allege a criminal act by either Defendant.  Plaintiffs assert in conclusory fashion that Defendants violated 18 U.S.C. § 2339A (making it a crime to provide material support or resources "***knowing or intending*** that they are to be used in preparation for, or in carrying out a violation of" specified criminal statutes) (Count 2) and 18 U.S.C. § 2339B (making it a crime to "***knowingly*** provide[] material support or resources to a [FTO]") (Count 3).  The Amended Complaint comes nowhere close to pleading the requisite *mens rea* for either.  At best, Plaintiffs allege that Defendants' customers transacted with individuals or entities somehow associated with Hamas or the PIJ, and that Defendants ***at some point*** became aware of those transactions.  Those allegations do not plausibly suggest that

---

[5] Although the statute does not expressly provide that the defendant must be the one to commit the act of terrorism, that is the only logical reading and, as shown from the cases above, the reading that courts routinely have adopted.

12

Defendants knew—at the time they provided those services—that any particular transaction was connected to Hamas or the PIJ, or their acts of terror.  In any event, even if the allegations were sufficient to plead a criminal violation, Plaintiffs' failure to plead a violent act would still be fatal. *See Linde*, 882 F.3d at 326 ("The provision of material support to a designated terrorist organization in violation of § 2339B can certainly satisfy that ***part*** of the statutory definition.  Still, to qualify as international terrorism, a defendant's act must ***also*** involve violence or endanger human life." (emphasis in original)).

*Second*, the Amended Complaint fails to satisfy Subsection (B) because it lacks any factual allegations (as opposed to conclusory assertions) showing that either Defendant acted with an objective terroristic intent (*i.e.*, an intent to intimidate or coerce a civilian population or influence a government).  The law is clear that providing routine business services to persons or entities "with connections" to terrorist organizations—as opposed to the organizations themselves—would be insufficient. *See, e.g.*, *O'Sullivan* v. *Deutsche Bank AG*, 2019 WL 1409446 at *7-8 (S.D.N.Y. Mar. 28, 2019) (no terroristic intent where defendants allegedly provided financial services to Iranian banks and businesses "with connections to terrorist organizations," as opposed to providing services directly to terrorists).  That is the extent of the allegations here.  (*See, e.g.*, AC ¶ 213 (alleging that BHL received reports that identified "Hamas-***associated*** transactions" on the platform); *id.* ¶ 211 (alleging that FinCEN's investigation culminating in a 2023 Consent Order identified "Binance user addresses" that "were ***found to interact*** [at unspecified times] with bitcoin wallets associated with" FTOs)).

### B.  The Amended Complaint Fails to Adequately Allege That Defendants Proximately Caused Plaintiffs' Alleged Injuries.

The Amended Complaint's failure to plausibly allege proximate cause is an independent basis for dismissal. *See In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 125 (2d Cir. 2013)

("[T]he [ATA] restricts the imposition of such liability to situations where plaintiffs plausibly allege that defendants['] actions proximately caused their injuries.").

To satisfy this element, Plaintiffs must make plausible allegations that they were injured "by reason of" an act that *Defendants*—not Hamas or the PIJ—committed. *See Rothstein* v. *UBS AG*, 708 F.3d 82, 91, 95 (2d Cir. 2013) ("proximate cause" requires showing that defendant's "acts were a substantial factor in the sequence of responsible causation" and that the alleged "injury was reasonably foreseeable or anticipated as a natural consequence").

The Amended Complaint does not come close to this standard. It lacks any factual allegations to support Plaintiffs' conclusory assertion that Defendants' alleged provision of services caused the Attacks, let alone caused Plaintiffs' injuries. Courts routinely dismiss ATA claims that rest on such flimsy allegations. *See, e.g.*, *In re Terrorist Attacks*, 714 F.3d at 124 ("We also are not persuaded that providing routine banking services to organizations and individuals said to be affiliated with al Qaeda—as alleged by plaintiffs—proximately caused the September 11, 2001 attacks or plaintiffs' injuries."); *Kaplan* v. *Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 532-33 (S.D.N.Y. 2019) (plaintiff's "conclusory allegations" that actions of a bank, in "intentionally and/or recklessly provid[ing] extensive banking services to Hizbollah, which caused the terrorist rocket attacks," failed to plausibly allege proximate cause), *vacated in part on other grounds*, 999 F.3d 842 (2d Cir. 2021); *Zapata* v. *HSBC Holdings PLC*, 414 F. Supp. 3d 342, 355-58 (E.D.N.Y. 2019) (no proximate cause where plaintiffs failed to allege "any relationship between [defendant] HSBC's money laundering and the acts of violence perpetrated against them").

The best Plaintiffs can muster is that Hamas and other terrorists rely on cryptocurrency to fund their operations. This is plainly insufficient, and as explained above, Plaintiffs' own sources debunk that speculative (and, in any event, attenuated) theory.

14

## II.    THE AMENDED COMPLAINT FAILS TO STATE A CLAIM FOR AIDING-AND-ABETTING LIABILITY (COUNT 1).

Plaintiffs also fail to adequately plead a secondary ATA liability claim.  JASTA imposes secondary civil ATA liability against "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed" an "act of international terrorism."  18 U.S.C. § 2333(d)(2).  As the U.S. Supreme Court has held, to adequately plead an aiding and abetting violation under JASTA, a plaintiff must (among other things) allege that the defendant (1) "[was] generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance"; and (2) "knowingly and substantially assist[ed] the principal violation."  *Twitter*, 598 U.S. at 486.  The Amended Complaint falls far short on both.

### A.  The Amended Complaint Does Not Allege That Defendants Knowingly and Substantially Assisted the Attacks.

In its recent decision in *Twitter*, the U.S. Supreme Court established a more demanding standard for the knowing and substantial assistance element—which the Amended Complaint does not come close to meeting.  *Id.* at 489, 505.

In *Twitter*, the plaintiffs were victims of a terrorist attack committed by ISIS at a nightclub in Istanbul.  *Id.* at 478-79.  They alleged that various social media companies aided and abetted ISIS by knowingly permitting ISIS to use their platforms and algorithms to target and recruit new members and fundraise.  *Id.* at 480-81.  In explaining why the plaintiffs had failed to state a claim, the Court distilled the "conceptual core" of the knowing and substantial assistance element to two prongs:  (1) conscious, voluntary, and culpable participation, and (2) a nexus between that participation and the plaintiff's injuries.  *Id.* at 493-95, 506.  Plaintiffs satisfy neither.

1.   The Amended Complaint Fails to Plausibly Allege That Defendants Engaged in "Conscious, Voluntary, and Culpable" Conduct.

The *Twitter* Court explained that "conscious, voluntary, and culpable participation in another's wrongdoing" requires plausible allegations that the defendants actively participated in the relevant attack "as something that they wished to bring about, or sought by their action to make [] succeed." *Id.* at 498.  For that reason, the Court found it was insufficient for the plaintiffs to allege merely that the social media company defendants ***knew*** that ISIS was using their platforms to further terrorism. *Id.* at 478.  It was likewise insufficient to allege "omissions, inactions or nonfeasance." *Id.* at 489; *compare id.* at 490 (aiding-and-abetting liability requires affirmative misconduct such as "inducing, encouraging, soliciting, or advising the commission of the offence"), *with id.* at 499, 500 ("passive assistance" or a defendant's "failure to stop" terrorists from using its services is not enough).  That is why the *Twitter* plaintiffs' theory of liability—that the social media companies ***failed to stop*** ISIS from using their platforms—was insufficient.  *Id.* at 499-501.  The Court stressed that a focus on ***affirmative*** misconduct is necessary because otherwise, "mostly passive actors like banks" would be "liable for all of their customers' crimes by virtue of carrying out routine transactions."  *Id.* at 491.

Plaintiffs' allegations here are on all fours with those dismissed in *Twitter*.  The Amended Complaint alleges nothing but routine transactional services and, ***at most***, Defendants' (1) knowledge that Hamas or PIJ-associated accounts were using BHL, and (2) failure to stop that use. (AC ¶¶ 185-87, 211-14).  That simply is not enough under *Twitter*.  598 U.S. at 500 ("To show that defendants' failure to stop ISIS from using these platforms is somehow culpable with respect to the Reina attack, a strong showing of assistance and scienter would thus be required.").  Moreover, the *Twitter* Court explained that "defendants' [social media] platforms are global in scale and allow hundreds of millions (or billions) of people to upload vast quantities of information

16

on a daily basis.  Yet, there are no allegations that defendants treated ISIS any differently from anyone else."  *Id.*  The same is true here:  Plaintiffs allege that BHL's platform "was reported to have amassed over half of the global market share for digital asset exchange activity as of the end of 2022" and that "[i]n 2021 and 2022, Binance reported approximately $20 billion and $12 billion in revenue, respectively."  (AC ¶ 139).  Yet there are no allegations to suggest that Defendants gave special treatment to Hamas or the PIJ.

2.  Plaintiffs Do Not Allege a Sufficient Nexus Between Defendants' Alleged Assistance and the Attacks.

Plaintiffs come nowhere close to pleading the requisite "definable nexus between the defendants' assistance and the attack."  *Twitter*, 598 U.S. at 498 (explaining that "plaintiffs never allege[d] that ISIS used defendants' platforms to plan or coordinate" the specific nightclub attack at issue).  Instead, the Amended Complaint contains only the vague and conclusory assertions that Defendants somehow enabled the Attacks by generally facilitating Hamas's or the PIJ's access to funds or the U.S. market.  (*See* AC ¶¶ 11, 253).  But alleging that a defendant gave "assistance to [the terrorist group's] activities in general" is not enough.  *Twitter*, 598 U.S. at 503.

Without allegations connecting the defendant's alleged assistance to the specific terrorist act, plaintiffs face a "drastically increase[d] . . . burden" to establish that the defendant "so systemically and pervasively assisted" the terrorist, that it "could be said to aid and abet every single . . . attack" the group committed.  *Id.* at 501, 503.  Plaintiffs here do not meet this high bar.  At most, they allege several transactions with Hamas or PIJ-linked accounts.  That does not mean Defendants provided such extensive assistance to Hamas or the PIJ that they should be deemed responsible for every attack these terrorist organizations committed anywhere in the world.

3.    The *Halberstam* Factors Confirm That the Amended Complaint Does Not State an Aiding-and-Abetting Claim.

When it enacted JASTA, Congress pointed to the D.C. Circuit's decision in *Halberstam* v. *Welch*—which lists six factors that "determine whether a defendant's assistance was substantial"—as the proper framework for analyzing aiding-and-abetting liability. *Twitter*, 598 U.S. at 486; *Halberstam*, 705 F.2d 472, 488 (D.C. Cir. 1983). *Twitter* confirms that these factors remain relevant because their point "is to help courts capture the essence of aiding and abetting." 598 U.S. at 504. They all favor Defendants in this case.

- **Nature of the Act**: The Amended Complaint does not plead any facts to suggest that the routine services Defendants are alleged to have provided were critically important to Hamas/PIJ.

- **Amount of Assistance**: Plaintiffs do not allege that Defendants processed any transactions, let alone a substantial volume, that are linked to the Attacks.

- **Defendants' Presence**: Plaintiffs have not and cannot plead any facts to show that Defendants were present during the Attacks.

- **Defendants' Relationship to Hamas/PIJ**: Plaintiffs allege that Defendants processed transactions by users with unspecified links to Hamas or the PIJ, but they do not tie those transactions to the Attacks or allege any relationship between Defendants and Hamas/PIJ.

- **Defendants' State of Mind**: The Amended Complaint alleges no "affirmative act" that Defendants undertook with the ***intent*** of facilitating the Attacks.

- **Duration of the Assistance**: Plaintiffs fail to connect any specific services to the time period shortly preceding any of the Attacks.

**B. The Amended Complaint Does Not Allege That Defendants Were Generally Aware of Their Role in the Relevant Terrorist Activity.**

Because Plaintiffs have failed to allege knowing and substantial assistance, the Court need not reach the element of general awareness. In any event, Plaintiffs also fail to meet this element.

To plead general awareness, a plaintiff must allege that the defendant was "generally aware that it was thereby playing a role in [a designated FTO's] violent or life-endangering activities."

18

*Linde*, 882 F.3d at 329.  The most Plaintiffs can allege is that Defendants permitted transactions on the BHL platform where one side was an individual or entity that Defendants learned, at some unspecified time, had some unidentified "link" or "association" with Hamas or the PIJ.  But the Amended Complaint falls short because to plead general awareness when the alleged assistance travelled through an intermediary, a plaintiff must allege that "(1) the defendant was aware of the intermediary's connection to the terrorist organization, and (2) the intermediary is so closely intertwined with the terrorist organization's illegal activities as to give rise to an inference that the defendant was generally aware of its role in the organization's terrorist activities."  *Bernhardt* v. *Islamic Republic of Iran*, 47 F.4th 856, 867-68 (D.C. Cir. 2022), *cert. denied sub nom. Bernhardt* v. *HSBC Holdings PLC*, 144 S. Ct. 280 (2023).  Not only do Plaintiffs fail to adequately plead Defendants' contemporaneous (as opposed to after-the-fact) knowledge, but they fail to plead who the intermediaries even are, let alone how they are supposedly connected to a terrorist organization.

## III.    NEARLY HALF THE PLAINTIFFS LACK STANDING.

Even if any Plaintiff could state a claim—and none can—the claims of 18 of the Plaintiffs should be dismissed because they lack standing.  The ATA limits recovery to "any national of the United States" or "his or her estate, survivors, or heirs."  As set forth more fully in the attached Appendix A, at least 18 Plaintiffs lack standing.  For example:

- **Relatives of Survivors of the Attacks Lack Standing**:  Plaintiff Uri Raanan seeks to recover for injuries sustained by Judith and Natalie Raanan (AC ¶ 21), but both women survived the Attacks.  Similarly, Plaintiff H.B. is the child of Plaintiffs Adi and Dorian Bosi, both of whom survived the Attacks.  (*Id.* ¶¶ 55-59).  Thus, Ranaan and H.B. lack standing.  *See Brown* v. *Nat'l Bank of Pakistan*, 2022 WL 1155905, at *2 (S.D.N.Y. Apr. 19, 2022) ("[U]nder the ATA, someone who survived the attack . . . has no survivors or heirs that can recover for his injuries on his behalf.").

- **Remote Family Members Lack Standing**:  Plaintiffs Eran Shani, Susan Troen, Hadassah Troen, Revital Mathias, Amos Semama, and Jeffrey Ludmir—as the alleged in-laws, aunts, and uncles of Attack victims—are too far removed from the victims to have standing.  (*Id.* ¶¶ 31, 33, 35, 40, 42, 53).  Courts routinely limit ATA standing to

those who can demonstrate a close "familial relationship such as that of child, parent, spouse, or sibling." *Weiss* v. *Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 620 (E.D.N.Y. 2006); *see Brown*, 2022 WL 1155905, at *1 (same).

- **<u>Non-U.S. Nationals Lack Standing</u>**:  Foreign nationals who happen to be related to U.S. nationals killed or injured in terrorist attacks lack ATA standing.  *See, e.g.*, *Lelchook* v. *Lebanese Canadian Bank*, 2024 WL 967078, at *9 (S.D.N.Y. Mar. 6, 2024) ("The language [of the ATA] does not include as eligible for relief any injury suffered by any non-American national . . .   The language his or her estate, survivors, or heirs instead represents a subclass who may, in a representative capacity, bring a claim on the injured American national's behalf."); *Averbach for Estate of Averbach* v. *Cairo Amman Bank*, 2020 WL 1130733, at *2 (S.D.N.Y. Mar. 9, 2020) ("Judge Parker correctly read 18 U.S.C. § 2333(a) as precluding claims by foreign nationals (who just so happen to be survivors and heirs of U.S. nationals killed in the terrorist attacks at issue in this case) for personal damages such as physical injury, pain and suffering, loss of companionship, and emotional distress.").  Plaintiffs Dorian Bosi, Yosef Ben Aderet, Sanda Mathias, Yeshayahu Mathias, Tzafrir Mathias, Revital Mathias, Meira Semama, Amos Semama, Y.G., Oren Glisko, Ori Glisko, and Liat Rasel Glisko do not allege that they are U.S. nationals and, thus, lack standing.  (AC ¶¶ 37-42, 44-47, 56, 61).

We are immensely sympathetic to the horrors that each of these Plaintiffs has faced—but they nevertheless lack legal standing to assert the claims in this case.

## IV.   THE AMENDED COMPLAINT FAILS TO ESTABLISH PERSONAL JURISDICTION.

### A. Plaintiffs Fail to Plead a Basis for Personal Jurisdiction Over BHL.

This Court lacks personal jurisdiction over BHL.

*First*, Plaintiffs' reliance on the New York long-arm statute is misplaced.  (*Id.* ¶ 11).  Under the long-arm statute, a court may exercise personal jurisdiction where (1) "the defendant transacts any business in New York" and, if so, (2) the cause of action "aris[es] from such a business transaction." *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d. Cir. 2012); *see also* N.Y. C.P.L.R. § 302(a).  Plaintiffs allege in conclusory fashion that their claims "arise from [BHL's] conduct and operations in New York, including . . . the fact that several of Binance's key market makers were headquartered in and directed trading from New York."  (AC ¶ 11). However, Plaintiffs do not tie *any* of BHL's business in New York, nor any New York customers,

to their claims. They do not allege, for example, that any transaction originating in New York or even involving a U.S. user funded the Attacks. Nor do they allege that the BHL-operated exchange was managed from or based in New York. That pleading failure is fatal. *See, e.g.*, *Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) (holding that to satisfy the long-arm statute "the selection and repeated use of New York's banking system" must be "as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress"); *see also Waldman* v. *Palestine Liberation Org.*, 835 F.3d 317, 342 (2d Cir. 2016) (deeming irrelevant to personal jurisdiction activities in the U.S. "that are not proscribed by the ATA and are not connected to the wrongs").

*Second*, Plaintiffs cannot avail themselves of Federal Rule of Civil Procedure 4(k)(2) because they have not satisfied its plain terms, which provide that "[f]or a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if":

(A)     the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and

(B)     exercising jurisdiction is consistent with the United States Constitution and laws.

Fed. R. Civ. P. 4(k)(2).

To begin, Plaintiffs have not served a summons or filed a waiver of service in this action. Instead of proceeding with a waiver form, the parties entered into a stipulation under which Defendants agreed to waive service on the express condition that "Plaintiffs agree not to argue that the waiver affects any of the Stipulating Defendants' other rights, defenses, or objections [] ***including but not limited to defenses based upon lack of personal*** or subject matter ***jurisdiction***" (ECF No. 12). Indeed, Defendants had personal jurisdiction on top of mind at the time.

21

Moreover, Rule 4(k)(2) does not apply because it "was adopted to provide a forum for federal claims in situations where a foreign defendant lacks substantial contacts with any single state but has sufficient contacts with the United States as a whole to satisfy due process standards and justify the application of federal law." *Albany Int'l Corp.* v. *Yamauchi Corp.*, 978 F. Supp. 2d 138, 145 (N.D.N.Y. 2013) (quoting *Merial Ltd.* v. *Cipla Ltd.*, 681 F.3d 1283, 1293-94 (Fed. Cir. 2012)). Here, Plaintiffs have expressly alleged that Defendants *do* have substantial contacts with a single state: New York.

### B. Plaintiffs Fail to Plead a Basis for Personal Jurisdiction Over Mr. Zhao.

Searching for any tangential ties to New York, Plaintiffs try to assert personal jurisdiction over Mr. Zhao under the state's long-arm statute because (1) "agents acting at Zhao's direction engaged in overt acts in New York on Zhao and Binance's behalf, including aiding New York-based trading firms circumventing technological controls in order to supply liquidity"; and (2) "[b]etween 2019 and 2023, Zhao" allegedly "owned and controlled multiple offshore entities that maintained accounts at Signature Bank in New York and were the counterparties to many large transactions with Binance totaling in the hundreds of millions of dollars." (AC ¶ 17). Again, these allegations have no nexus to the claims in this case. *Licci ex rel. Licci*, 673 F.3d at 60 n.9 (exercise of specific jurisdiction "depends on an affiliation between the forum and the underlying controversy"). Absent such a nexus, Mr. Zhao—a Canadian citizen and resident of the United Arab Emirates (*see* AC ¶ 74)—is not subject to personal jurisdiction in New York.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should dismiss the Amended Complaint with prejudice.

Date: June 14, 2024                          Respectfully submitted,

                                             */s/ Samson A. Enzer*
                                             **CAHILL GORDON & REINDEL LLP**
                                             Samson A. Enzer
                                             Anirudh Bansal
                                             Sesi Garimella
                                             Lauren A. Riddell
                                             32 Old Slip
                                             New York, NY 10005
                                             (212) 701-3125

                                             *Attorneys for Binance Holdings Limited and Changpeng Zhao*

## CERTIFICATION OF COMPLIANCE

Pursuant to Paragraph II-D of the Individual Practices of Judge John G. Koeltl, Defendants Binance Holdings Limited and Changpeng Zhao have complied with all of the formatting rules contained therein.  The total number of words contained herein, exclusive of the cover page, certificate of compliance, table of contents, and table of authorities, is 6,913 words.

Date: June 14, 2024

> */s/ Samson A. Enzer*
> **CAHILL GORDON & REINDEL LLP**
> Samson A. Enzer
> Anirudh Bansal
> Sesi Garimella
> Lauren A. Riddell
> 32 Old Slip
> New York, NY 10005
> (212) 701-3125
>
> *Attorneys for Binance Holdings Limited and Changpeng Zhao*