# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| ADIN GESS, NOACH NEWMAN, MAYA PARIZER, NATALIE SANANDAJI, YONI DILLER, HAGAR ALMOG, LISHAY LAVI, DAVID BROMBERG, and ARIEL EIN-GAL,<br><br>                Plaintiffs,<br><br>        - v. -<br><br>BAM TRADING SERVICES INC. d/b/a BINANCE.US, a Delaware corporation, and BINANCE HOLDINGS LTD. d/b/a BINANCE, a foreign company, and CHANGPENG ZHAO,<br><br>                Defendants. | Civil Action Case No. 24 Civ. 00134<br><br>**ORAL ARGUMENT REQUESTED** |

**FOREIGN DEFENDANTS' MEMORANDUM
OF LAW IN SUPPORT OF THEIR MOTION TO TRANSFER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT .............................................................................................. 1

BACKGROUND ..................................................................................................................... 3

    A.   The *Gess* and First-Filed *Raanan* Complaints Are Substantially Similar ..................... 3

    B.   Plaintiffs Have No Connection to This Forum ................................................................ 5

    C.   The Defendants Have No Meaningful Connection to This Forum.................................. 5

    D.   The Case Has No Connection to This Forum ................................................................. 6

ARGUMENT .......................................................................................................................... 6

I.    THE COURT SHOULD TRANSFER THIS ACTION TO THE SOUTHERN DISTRICT
OF NEW YORK UNDER 28 U.S.C. § 1404(a) .................................................................... 6

    A.   This Action Could Have Been Brought in SDNY ......................................................... 7

    B.   The Balance of Factors Weigh in Favor of Transfer ..................................................... 7

II.   IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THIS ACTION UNDER
THE "FIRST-TO-FILE" RULE ........................................................................................... 12

CONCLUSION..................................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.J. Taft Coal Co.* v. *Barnhart*,
291 F. Supp. 2d 1290 (N.D. Ala. 2003) .....................................................................8

*Cellularvision Tech. & Telecomms., L.P.* v. *Alltel Corp.*,
508 F. Supp. 2d 1186 (S.D. Fla. 2007) .....................................................................8

*Collegiate Licensing Co.* v. *Am. Cas. Co. of Reading*,
713 F.3d 71 (11th Cir. 2013) ...................................................................................12

*Daugherty* v. *Adams*,
2017 WL 5484699 (N.D. Ga. Mar. 22, 2017)...........................................................14

*E.E.O.C.* v. *Outokumpu Stainless, USA, LLC*,
2015 WL 5685240 (M.D. Ala. Sept. 25, 2015) ..........................................................6

*Elliott* v. *Williams*,
549 F. Supp. 3d 1333 (S.D. Fla. 2021) ...................................................................10

*Fuld* v. *Palestine Liberation Org.*,
No. 22-76 (2d. Cir. appeal filed 2022) (Koeltl, J. by designation) ..........................11

*Gould* v. *Nat'l Life Ins. Co.*,
990 F. Supp. 1354 (M.D. Ala. 1998) .........................................................................8

*Kammona* v. *Onteco Corp.*,
587 F. App'x 575 (11th Cir. 2014) ...........................................................................10

*Kesner et al* v. *The Palestinian Auth. et. al*,
No. 18 Civ. 12238 (JGK) (S.D.N.Y. 2018) (Koeltl, J.) ...........................................11

*Lelchook* v. *Lebanese Canadian Bank*,
2024 WL 967078 (S.D.N.Y. Mar. 6, 2024) .............................................................11

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) .........................................................10

*Manuel* v. *Convergys Corp.*,
430 F.3d 1132 (11th Cir. 2005) ...................................................................... *passim*

*Marietta Drapery & Window Coverings Co.* v. *N. River Ins. Co.*,
486 F. Supp. 2d 1366 (N.D. Ga. 2007) ...................................................................12

ii

*Nolte* v. *BellSouth Telecomm., Inc.*,
2007 WL 2253561 (N.D. Ala. June 29, 2007)..............................................................9

*Peterson* v. *Aaron's, Inc.*,
2015 U.S. Dist. LEXIS 4733 (N.D. Ga. Jan. 15, 2015)..............................................12

*Raanan et al.* v. *Binance Holdings Ltd. et al.*,
No. 24 Civ. 00697 (JGK) (S.D.N.Y.) ............................................................ *passim*

*RSUI Indem. Co.* v. *Sealy Realty Co.*,
2012 WL 235520 (M.D. Ala. Jan. 25, 2012) ..............................................................8

*Rudolph and Me, Inc.* v. *Ornament Central, LLC*,
2011 WL 3919711 (M.D. Fla. Sept. 7, 2011) ............................................................13

*Twitter, Inc.* v. *Taamneh*,
598 U.S. 471 (2023)................................................................................................9, 11

*United States* v. *22.58 Acres of Land, More or Less, Situated in Montgomery*
*Cnty., Ala.*, 2010 WL 431254 (M.D. Ala. Feb. 3, 2010) ..........................................13

*Waldman* v. *Palestine Liberation Org.*,
No. 15-3135 (2d. Cir. 2015) (Koeltl, J. by designation)............................................11

*Ward* v. *Family Dollar Stores, Inc.*,
2006 WL 8435017 (N.D. Ala. Sept. 29, 2006) ............................................................9

*Weinberger* v. *Tucker*,
391 F. Supp. 2d 241 (D.D.C. 2005) ..........................................................................10

*Wildman* v. *Deutsche Bank Aktiengesellschaft*,
No. 23-132 (2d. Cir. appeal filed 2023)....................................................................11

*Xpansion Holdings, LLC* v. *Retail Coach, LLC*,
2016 WL 10520950 (N.D. Ala. June 20, 2016)........................................................13

**Statutes**

18 U.S.C. § 2333 ................................................................................................................7

18 U.S.C. § 2334................................................................................................2, 7, 10

28 U.S.C. § 1404(a) ................................................................................................ *passim*

Federal Rule of Civil Procedure 12(b)..............................................................................1

Defendants Binance Holdings Limited ("Binance Holdings") and Changpeng Zhao ("Mr. Zhao") (collectively, the "Foreign Defendants" or "Moving Defendants") respectfully submit this memorandum of law in support of their motion to transfer this case to the United States District Court for the Southern District of New York ("SDNY") pursuant to 28 U.S.C. § 1404(a), or alternatively, under the first-to-file rule.[1]  The sole remaining defendant, BAM Trading Services Inc., does not oppose transfer of the case in its entirety.[2]

## PRELIMINARY STATEMENT

Two sets of plaintiffs have filed substantially similar lawsuits in different courts seeking to hold Binance Holdings and Mr. Zhao financially liable under the Anti-Terrorism Act ("ATA") for the heinous October 7 Attacks.[3]  The (legally deficient) theory of liability is the same in both cases: each group of plaintiffs alleges that Binance Holdings and Mr. Zhao allowed their broadly-available platforms for trading digital assets to be used by someone, somewhere, with some unidentified connection to Hamas or some other terrorist group.  While the Moving Defendants unequivocally condemn all acts of terrorism, and sympathize with the victims and their families, they will nevertheless demonstrate at the appropriate time that both cases should be dismissed under Federal Rule of Civil Procedure 12(b).  At this time, however, the Moving Defendants are asking this Court to transfer this case to the Southern District of New York—where the substantially similar case[4] is pending—for two independent reasons.

---

[1] In this submission, unless noted, emphasis is added and internal citations and quotations are omitted.

[2] (*See* ECF No. 15 (May 9, 2024 Joint Stipulation), at 2).

[3] In this submission, "October 7 Attacks" refers to the heinous attacks perpetrated by Hamas and other terrorist groups in the State of Israel on and following October 7, 2023.

[4] *Raanan et al.* v. *Binance Holdings Ltd. et al.*, No. 24 Civ. 00697 (JGK) (S.D.N.Y.).

1

*First*, the Court should transfer this Action to the SDNY under 28 U.S.C. § 1404(a) because (i) transfer would promote "the convenience of parties and witnesses" and would be "in the interest of justice," and (ii) the case "might have been brought" in SDNY. 28 U.S.C. § 1404(a). To begin, the factors that courts consider when analyzing the interests of justice weigh heavily in favor of transfer:

- ***Plaintiffs' forum choice deserves no deference.*** Plaintiffs' choice of forum should be given no deference because no party has any real connection to this jurisdiction, nor are any of the underlying facts alleged to have taken place here.

- ***Efficiency and justice interests favor SDNY.*** Trial efficiency and the interests of justice weigh in favor of litigating this Action and the action filed under civil docket number 24 Civ. 000697 in the SDNY (the "*Raanan* Action") in the same jurisdiction. Both cases name Binance Holdings and Mr. Zhao, have the same theory of liability, assert claims under the ATA, and even cite the same documents and regulatory enforcement actions. Under these circumstances, not only should discovery be coordinated (in order to minimize burden and avoid duplication of efforts), but it would promote the sound administration of justice for the same judge to decide the overlapping legal issues in order to avoid the risk of inconsistent rulings. This is particularly important here, both because the law interpreting and applying the ATA is rapidly evolving, and because Binance Holdings and Mr. Zhao may well advance nuanced personal jurisdiction arguments.

- ***SDNY has more ATA experience.*** While this Court is fully capable of thoughtfully adjudicating this action, SDNY courts have a much deeper familiarity with ATA cases than courts in this jurisdiction. We are not aware of a single civil ATA case that has ever been decided in an Alabama federal court, while there appear to be more than 150 ATA-related decisions in SDNY.

In addition, Plaintiffs' Complaint makes plain that this case might have been brought in New York. One of the Plaintiffs alleges that she resides in New York, and venue is appropriate under the ATA in the jurisdiction "where any plaintiff resides." 18 U.S.C. § 2334(a). Meanwhile, none of the Plaintiffs are alleged to reside in Alabama.

*Second*, in the alternative, the Court should transfer this case to SDNY under the "first-to-file" rule. *Raanan* was filed in SDNY first, which creates "a strong presumption" that this case should be transferred there. *See Manuel* v. *Convergys Corp.*, 430 F.3d 1132, 1135 (11th Cir.

2005).  Plaintiffs cannot rebut that presumption because the other factors that courts consider—

the similarity of the parties and the issues—also weigh strongly in favor of transfer.  Specifically,

the parties and issues are similar because both lawsuits seek to hold Binance Holdings and Mr.

Zhao liable under the ATA for the same terrorist attacks based on similar factual allegations.  Like

Section 1404(a), the first-to-file rule is premised upon the interests of sound judicial administration

and efficiency—both of which would be furthered by transfer.

For these and the other reasons below, this case should be transferred to SDNY, where the

*Raanan* Action is pending.

## **BACKGROUND**

### A.    The *Gess* and First-Filed *Raanan* Complaints Are Substantially Similar

Plaintiffs filed this case on February 26, 2024 (ECF No. 1 (Compl.)), approximately one

month after *Raanan* was filed in SDNY.  (Compl., *Raanan et al.* v. *Binance Holdings Ltd. et al.*,

No. 24 Civ. 00697 (JGK) (S.D.N.Y. Jan. 31, 2024), ECF No. 1; Am. Compl., *Raanan et al.* v.

*Binance Holdings Ltd. et al.*, No. 24 Civ. 00697 (JGK) (S.D.N.Y. May 17, 2024), ECF No. 17).

The complaints in the two cases are quite similar:

- Both are brought by victims of the October 7 Attacks and on behalf of and by their families.

- Both name Binance Holdings and Mr. Zhao as defendants.

- Both assert claims for primary and secondary aiding and abetting liability under the ATA.

- Both are premised on the (legally deficient) theory that Binance Holdings and Mr. Zhao should be held financially liable for the October 7 Attacks because they supposedly failed to prevent individuals or entities somehow associated with Hamas from transacting on Binance's digital asset trading exchange.

Upon closer examination, the similarities only increase.  While the *Gess* Complaint is not

a complete copy-and-paste job, many of its allegations appear to have been taken (sometimes

verbatim) from the *Raanan* Amended Complaint. The overlapping allegations fall into four categories:

- ***Allegations About Processing Suspicious Transactions.*** Both complaints allege that Binance Holdings knowingly processed transactions associated with terrorist organizations. (*Compare Raanan* Am. Compl. ¶ 211 ("[A]s concluded by FinCEN in its consent order against Binance, Binance had processed significant sums on behalf of Hamas, PIJ and other terror groups"), *with* Compl. at 3 ("As has already been established via federal enforcement actions, Defendants knowingly facilitated transfers of money to Hamas over the course of more than five years")). In support of this claim, both complaints quote the same Binance employees as having stated that terrorists often send "small sums" of money because "large sums constitute money laundering" and that Hamas could "barely buy an AK47 with 600 bucks." (*Compare Raanan* Am. Compl. ¶ 216, *with* Compl. at 16). In addition, both rely on a complaint filed by the Commodity Futures Trading Commission ("CFTC") to allege that Hamas transactions appeared on the Binance platform as early as February 2019. (*Compare Raanan* Am. Compl. ¶ 216, *with* Compl. at 19).

- ***Allegations About Circumventing Regulatory Controls.*** Similarly, both complaints allege that Binance Holdings intentionally circumvented various regulatory controls and, as a result, illicit activity allegedly flourished on the Binance exchange. For example, both complaints allege that Binance Holdings failed to file suspicious activity reports (*compare Raanan* Am. Compl. ¶ 214, *with* Compl. at 21), that an employee wrote that Binance needed a "banner" stating "is washing drug money too hard these days – come to Binance we got cake for you" (*compare Raanan* Am. Compl. ¶ 188, *with* Compl. at 3), and that during the relevant period Binance did not have anti-money laundering procedures in place (*compare Raanan* Am. Compl. ¶ 186, *with* Compl. at 9).

- ***Allegations About Mr. Zhao.*** With respect to Mr. Zhao, both complaints also premise his alleged liability on the same alleged facts, including: his November 21, 2023 guilty plea to violations of the Bank Secrecy Act (*compare Raanan* Am. Compl. ¶ 75, *with* Compl. at 7) and allegations that he encouraged Binance Holdings to assist U.S. customers in circumventing the Binance exchange's Internet Protocol ("IP")-blocking controls, thereby allowing them to access the international exchange instead of the domestic exchange run by BAM Trading Services Inc. d/b/a Binance.US ("Binance.US") (*compare Raanan* Am. Compl. ¶ 180, *with* Compl. at 11).

- ***Regulatory Enforcement Actions.*** Both complaints draw their allegations directly, and it appears, almost exclusively, from recent regulatory enforcement actions, including a suit brought by the Securities and Exchange Commission (*compare Raanan* Am. Compl. ¶ 68, *with* Compl. at 18), a plea agreement with the Department of Justice (*compare Raanan* Am. Compl. ¶ 221, *with* Compl. at 3), a Federal Crimes Enforcement Network ("FinCEN") consent order (*compare Raanan* Am. Compl. ¶ 213, *with* Compl. at 18), and a CFTC complaint (*compare Raanan* Am. Compl. ¶ 154, *with* Compl. at 15).

The overlap goes even further. For the Court's convenience, attached as Appendix A is a more complete side-by-side comparison of the overlapping portions of the *Gess* and *Raanan* complaints. Even a cursory review demonstrates that the factual allegations and legal questions are substantially similar.

### B. Plaintiffs Have No Connection to This Forum

There are nine Plaintiffs in this case, and ***none*** claims to have any connection to Alabama. None is alleged to reside in Alabama, and none is alleged to have suffered any injury in Alabama. Indeed, the ***only*** Plaintiff alleged to reside anywhere in the U.S. resides in New York, where the first-filed *Raanan* Action is pending. (*See* Compl. ¶ 22 (alleging that Plaintiff Sanandaji "resides in New York")).

### C. The Defendants Have No Meaningful Connection to This Forum

The Moving Defendants and Binance.US (collectively, "Defendants") likewise are not alleged to have any relevant connection to Alabama.

***Binance Holdings.*** Plaintiffs allege that Binance Holdings is a "foreign company" that is "incorporated in the Cayman Islands and holds intellectual property for Binance." (Compl. ¶ 29). They do not even try to allege that Binance Holdings has ***any*** contacts with Alabama.

***Binance.US.*** Plaintiffs allege that Binance.US does business in over forty states, including Alabama, but do not even try to allege a connection between any alleged Binance.US business done in Alabama and the facts of the case. (*See* Compl. at 8 ("Binance.us is currently authorized to do business in over forty U.S. states, including Alabama"); *id.* at 8-9 (referring to Binance.US's press release regarding trading in Alabama)). As to Binance.US, this is not an allegation of a meaningful or substantial connection to the forum. And as to Binance Holdings, it is that and worse: a classic group pleading impermissibly imputing that entity's alleged Alabama contacts to

Binance Holdings by lumping the companies together as "Defendants." (*Id.* at ¶ 18 (inappropriately grouping Defendant entities, claiming that "Defendants . . . have a registered agent in Montgomery, Alabama" and that "Defendants solicit and conduct substantial business in the State of Alabama and in September of 2020 promoted their entry into the Alabama market," but linking to articles specifically about Binance.US)).

**Mr. Zhao.** Plaintiffs allege that Mr. Zhao is "a Canadian citizen who, upon information and belief, resides in the United Arab Emirates." (*Id.* ¶ 30). The only nod to Alabama is the vague and conclusory allegation that Mr. Zhao "authorized Defendant to open in Alabama and to do business in Alabama." (*Id.*). But given the rest of the Complaint, that reference to "Defendant" can only relate to Binance.US, which, as discussed above, also does business in the majority of other states (and is a different entity from Binance Holdings).

### D. The Case Has No Connection to This Forum

Given that neither Plaintiffs nor Defendants have any real connection to this forum, it is unsurprising that the Complaint does not contain any factual allegations to support the notion that any of the relevant alleged conduct took place in Alabama.

### ARGUMENT

## I. THE COURT SHOULD TRANSFER THIS ACTION TO THE SOUTHERN DISTRICT OF NEW YORK UNDER 28 U.S.C. § 1404(a)

This Court "may transfer any civil action to any other district or division where it might have been brought" if transfer serves the "interest of justice." 28 U.S.C. § 1404(a). To make this determination, courts consider whether: (i) "the alternative venue [is] one in which the action could originally have been brought by the plaintiff," and (ii) transfer would "promote the convenience of the parties and witnesses and [be] in the interest of justice." *E.E.O.C.* v. *Outokumpu Stainless, USA, LLC*, 2015 WL 5685240, at *1 (M.D. Ala. Sept. 25, 2015) (explaining

that the transfer analysis requires "courts to balance private and public factors to determine if transfer is justified").  Here, the Moving Defendants easily satisfy both prongs.

### A.     This Action Could Have Been Brought in SDNY

The first step in the transfer analysis is satisfied because SDNY is a venue "in which the action could have been brought."  28 U.S.C. § 1404(a).  Under the ATA's venue provision, "[a]ny civil action under section 2333 . . . against any person may be instituted in the district court of the United States for any district where any plaintiff resides."  18 U.S.C. § 2334(a).  And here, the only Plaintiff that is alleged to reside in the United States, Natalie Sanandaji, "resides in New York."[5]  (Compl. ¶ 22).[6]

### B.     The Balance of Factors Weigh in Favor of Transfer

Courts consider nine factors in determining whether transfer would promote the interests of justice:  "(1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances."  *Manuel*, 430 F.3d at 1135 n.1.  Three weigh heavily in favor of transfer, the rest are neutral, and ***none*** points to Alabama.

---

[5] The Complaint does not allege the specific district in which Ms. Sanandaji resides, nor does it even allege (perhaps intentionally) that any other plaintiff resides in the United States.  To the extent there is a factual issue regarding whether any Plaintiff resides in SDNY, limited discovery of the Plaintiffs would likely be appropriate.

[6] By claiming that venue is appropriate in SDNY, Moving Defendants are not conceding that personal jurisdiction is appropriate there.  Rather, as discussed in detail below, personal jurisdiction may well be inappropriate in both *Gess* and *Raanan* in any federal district court in this country, including SDNY.  The point is that one court should resolve this complicated question in order to avoid inconsistent rulings, and SDNY is best-suited to do so here.  *See infra* at 9.

*First*, Plaintiffs' choice of forum (factor 8) is entitled to little or no deference because (i) none of them reside in Alabama, and (ii) there is no allegation of suit-related conduct in Alabama. *See RSUI Indem. Co.* v. *Sealy Realty Co.*, 2012 WL 235520, at *3 (M.D. Ala. Jan. 25, 2012) (deference to plaintiff's choice of forum is substantially lower where plaintiff brings "suit outside its home forum and in a district with no connection to the dispute"); *see also Gould* v. *Nat'l Life Ins. Co.*, 990 F. Supp. 1354, 1358 (M.D. Ala. 1998) (explaining that "when the operative facts underlying the cause of action did not occur within the forum chosen by the Plaintiff, the choice of forum is entitled to less consideration"); *Cellularvision Tech. & Telecomms., L.P.* v. *Alltel Corp.*, 508 F. Supp. 2d 1186, 1189 (S.D. Fla. 2007) ("[W]here a plaintiff has chosen a forum that is not its home forum, only minimal deference is required, and it is considerably easier to satisfy the burden of showing that other considerations make transfer proper.").

The only connection to Alabama that Plaintiffs can muster is that Binance.US has a "registered agent in Alabama" and "conduct[s] substantial business in the State of Alabama." (Compl. ¶ 18). But Plaintiffs essentially concede that they are using these minimal, garden-variety contacts as a hook to forum shop by admitting (as they must) that Binance.US is "authorized to do business in over forty U.S. states." (*Id.* at 8). Plaintiffs make no effort to try to tie Binance.US's alleged Alabama conduct to the factual allegations in the Complaint (because they cannot), and so it seems they just cherry-picked the one out of those forty states that they liked best and filed there. This obvious tactical maneuver weighs heavily in favor of transfer. *See, e.g.*, *A.J. Taft Coal Co.* v. *Barnhart*, 291 F. Supp. 2d 1290, 1309 (N.D. Ala. 2003) (explaining that forum shopping is historically disfavored and that "a Plaintiff's obvious forum shopping merely adds weight to the other considerations favoring transfer under § 1404(a)").

*Second*, trial efficiency and the interests of justice (factor 9) strongly favor litigating this case and the *Raanan* Action in the same forum. As discussed above, the allegations in both cases overlap significantly: both cases have the same theory of liability and rely on many of the same alleged facts—for example, quoting statements from the same employee witnesses and the same emails and documents. (*See supra* Background, Part A; *see also* Appendix A). To promote efficiency, discovery in these two actions should be coordinated so that (i) the same witnesses are not deposed twice (or at a minimum can be deposed by two sets of lawyers in a coordinated way); (ii) the same emails and documents are not searched for (and produced) twice; and (iii) one judge can decide any discovery disputes without the risk of inconsistent rulings. *See, e.g.*, *Nolte* v. *BellSouth Telecomm., Inc.*, 2007 WL 2253561, at *3 (N.D. Ala. June 29, 2007) ("[I]nterests of justice would be served by transferring this action to [the transferee court because] claims asserted in this action are based upon the same facts as the claims asserted by the plaintiff in [the related action].""); *Ward* v. *Family Dollar Stores, Inc.*, 2006 WL 8435017, at *3 (N.D. Ala. Sept. 29, 2006) ("Transferring a case to a court in which a case involving substantially similar facts is currently pending promotes judicial economy by preventing the duplication of judicial effort and avoiding the possibility of inconsistent results.").

Beyond the overlapping factual allegations, the legal issues will be substantially similar, too. Both cases assert claims for primary and secondary aiding and abetting liability under the ATA, a complex and important statute with rapidly developing law around it—particularly as courts must interpret and apply a recent and seminal Supreme Court decision, *Twitter, Inc.* v. *Taamneh*, 598 U.S. 471 (2023). Having two different courts decide ATA-related issues in cases with substantially similar factual allegations against the same defendants "would squander judicial

resources and would run the risk of inconsistent judgments." *Weinberger* v. *Tucker*, 391 F. Supp. 2d 241, 245 (D.D.C. 2005).

The same is true with respect to the Moving Defendants' anticipated personal jurisdiction arguments. Given that Binance Holdings and Mr. Zhao are not alleged to have any contacts with Alabama (or New York), Plaintiffs may try to establish jurisdiction over them in both cases under the ATA's nationwide service of process provision. 18 U.S.C. § 2334 (providing for nationwide service of process); *see also Kammona* v. *Onteco Corp.*, 587 F. App'x 575, 579-80 (11th Cir. 2014) ("[A] nationwide service-of-process provision grants district courts nationwide personal jurisdiction over any defendant that has minimum contacts with the United States."). In response, the Moving Defendants may well argue that any supposed contacts with the U.S. as a whole are not enough because neither complaint ties any alleged contacts with the U.S. to any suit-related conduct. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2019 WL 1331830, at *22 (S.D.N.Y. Mar. 25, 2019) ("[I]n evaluating the existence of personal jurisdiction for federal claims arising from statutes with nationwide service of process provisions, we would make a minimum contacts inquiry and examine a defendant's suit-related contact with the entire United States, rather than just the forum state."). It would promote the interests of justice to have one court decide these similar issues, rather than risk inconsistent orders on this important topic. *See Elliott* v. *Williams*, 549 F. Supp. 3d 1333, 1341 (S.D. Fla. 2021) ("[W]here one court lacks personal jurisdiction over the defendant—or where the case presents difficult questions of personal jurisdiction—courts sometimes transfer under § 1404 rather than dismiss.").

*Third*, SDNY courts' extensive experience in ATA cases, like this one, also favors transfer (factor 7). *See Weinberger*, 391 F. Supp. 2d at 245 ("One of these [interest of justice related] factors is whether one circuit is more familiar with the same parties and issues or related issues

than other courts."). Moving Defendants are not aware of a single ATA case that has ever been decided in an Alabama federal court. Meanwhile, a Westlaw search for the phrase "Anti-Terrorism Act" produced more than ***150 decisions*** in SDNY.

There is, of course, no question that this Court is entirely capable of deciding ATA issues. Nevertheless, the standards for deciding ATA cases are rapidly evolving, and SDNY courts' ample experience in ATA litigations makes SDNY judges particularly adept in efficiently handling these matters. For example, SDNY is one of the few courts across the country to have weighed in on standards for adjudicating ATA liability in the wake of the Supreme Court's recent *Twitter* ruling. In fact, just two months ago, an SDNY judge issued one of the few post-*Twitter* ATA decisions in the country. *See Lelchook* v. *Lebanese Canadian Bank*, 2024 WL 967078 (S.D.N.Y. Mar. 6, 2024). Meanwhile, issues regarding the Supreme Court's guidance in *Twitter* are currently pending before the U.S. Court of Appeals for the Second Circuit, and that court is expected to issue a decision within the next few months. *See Wildman* v. *Deutsche Bank Aktiengesellschaft*, No. 23-132 (2d. Cir. appeal filed 2023). Beyond that, SDNY Judge Koeltl, who is currently presiding over *Raanan*, has presided over multiple ATA cases.[7]

*Finally*, all the remaining factors (the convenience of the parties and witnesses, location of relevant documents, the locus of operative facts, availability of process, and relative means of the parties) are neutral at worst. Because this case lacks any nexus to Alabama, this forum is no more convenient than New York for any witness. Similarly, there is no suggestion that Alabama is more convenient for Binance.US than any of the forty other states in which it allegedly has some presence. And there is no reason to believe that documents or sources of proof would be more

---

[7] *See Kesner et al* v. *The Palestinian Auth. et. al*, No. 18 Civ. 12238 (JGK) (S.D.N.Y. 2018) (Koeltl, J.); *Waldman* v. *Palestine Liberation Org.*, No. 15-3135 (2d. Cir. 2015) (Koeltl, J. by designation); *Fuld* v. *Palestine Liberation Org.*, No. 22-76 (2d. Cir. appeal filed 2022) (Koeltl, J. by designation).

11

accessible in Alabama than in New York.  If anything, New York is more convenient for (i) Plaintiff Sanandaji, because she resides in New York; (ii) the Moving Defendants, so that the burden of duplicative document production can be reduced (or eliminated); and (iii) any overlapping witnesses, so that they can be deposed in both *Raanan* and *Gess* in a coordinated manner.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THIS ACTION UNDER THE "FIRST-TO-FILE" RULE

The Court also should transfer this case to SDNY for the independent reason that the "first-to-file" rule applies.  The law in this Circuit is clear that when a complaint has been filed here, but another complaint involving overlapping parties and issues has already been filed in another federal district, there is "a strong presumption" in favor of transfer to the court in which the first-filed case is pending.  *See Manuel*, 430 F.3d at 1135; *see also Collegiate Licensing Co.* v. *Am. Cas. Co. of Reading*, 713 F.3d 71, 78 (11th Cir. 2013) ("The first-filed rule provides that when parties have instituted competing or parallel litigation in separate courts, the court initially seized of the controversy should hear the case.").  Like Section 1404(a), "[t]he policy behind the [first-to-file] rule is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Peterson* v. *Aaron's, Inc.*, 2015 U.S. Dist. LEXIS 4733, at *4 (N.D. Ga. Jan. 15, 2015); *see also Marietta Drapery & Window Coverings Co.* v. *N. River Ins. Co.*, 486 F. Supp. 2d 1366, 1369 (N.D. Ga. 2007) ("The rule rests on principles of comity and sound judicial administration and serves to maximize judicial economy and minimize embarrassing inconsistencies by prophylactically refusing to hear a case raising issues that might substantially duplicate those raised by a case pending in another court.").  Here, for many of the same reasons discussed in Section I above, these principles favor transfer.

12

Indeed, all three factors that courts consider—(1) "the chronology of the actions"; (2) "the similarity of the parties involved"; and (3) "the similarity of the issues at stake" (*Goldsby* v. *Ash*, 2010 WL 1658703, at *4 (M.D. Ala. Apr. 22, 2010) (finding that "the case is due to be transferred under the first-filed rule"))—weigh heavily in favor of transfer.

*First*, there is no dispute that *Raanan* was filed first.

*Second*, the similarity of the parties favors transfer because both complaints assert claims against both Moving Defendants on behalf of victims of the October 7 Attacks. While the named plaintiffs are different, and there is an additional Defendant in this case, some disparity between the parties does not make the first-to-file rule inapplicable. *See United States* v. *22.58 Acres of Land, More or Less, Situated in Montgomery Cnty., Ala.*, 2010 WL 431254, at *5 (M.D. Ala. Feb. 3, 2010); *Rudolph and Me, Inc.* v. *Ornament Central, LLC*, 2011 WL 3919711, at *2 (M.D. Fla. Sept. 7, 2011). And despite the minimal disparity, the crux of both cases is the same: an attempt by October 7 Attack victims and their families (Plaintiffs) to hold Binance Holdings and Mr. Zhao (Defendants) liable under the ATA for the same attacks.

*Third*, the similarity of the issues also favors transfer because both cases involve substantially similar legal and factual issues. As discussed above, the complaints have the same theory of liability and include nearly identical factual allegations on several topics. (*See* Appendix A). Although not all of the causes of action overlap, both complaints assert claims under the ATA for both primary and secondary aiding and abetting liability. "Under the first-filed rule, the cases need not be identical; rather, the crucial inquiry is one of substantial overlap." *Xpansion Holdings, LLC* v. *Retail Coach, LLC*, 2016 WL 10520950, at *3 (N.D. Ala. June 20, 2016) ("It is important to note that the issues need not be identical, but rather the issues between the two cases should substantially overlap."). Here, the substantial overlap is undeniable.

13

Plaintiffs no doubt will quibble around the edges by pointing to certain differences between the parties and causes of action in the two cases. But the presumption in favor of transfer requires "that the party objecting to jurisdiction in the first-filed forum *carry the burden of proving compelling circumstances to warrant an exception* to the first-filed rule." *Manuel*, 430 F.3d at 1135; *see also Daugherty* v. *Adams*, 2017 WL 5484699, at *9 (N.D. Ga. Mar. 22, 2017) ("In the Eleventh Circuit, the First Filed Rule is the rule, not an exception. As such, the First Filed Rule should not be disregarded lightly."). Plaintiffs cannot do so. Not only are the differences in the cases relatively minor, but there are *no* compelling circumstances to warrant an exception to the first-filed rule—because neither the case nor the parties have *any* real connection to this forum.

## CONCLUSION

For these reasons, the Court should transfer this case to the Southern District of New York.

Date: May 23, 2024

*/s/ Harlan I. Prater IV*
Harlan I. Prater IV
Lightfoot, Franklin & White, LLC
400 20th Street North
Birmingham, AL 35203
(205) 581-0720
hprater@lightfootlaw.com

CAHILL GORDON & REINDEL LLP
Samson A. Enzer
Anirudh Bansal
Sesi Garimella
Lauren A. Riddell
32 Old Slip
New York, NY 10005
(212) 701-3125
SEnzer@cahill.com
ABansal@cahill.com
SGarimella@cahill.com
LRiddell@cahill.com

*Attorneys for Defendants Binance
Holdings Limited d/b/a Binance and
Changpeng Zhao*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been filed with the Court and

served by the Court's ECF system, on this the 23rd day of May, 2024, on:

David I. Schoen (ASB-0860-O42D)
David I. Schoen, Attorney at Law
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
(334) 395-6611
schoenlawfirm@gmail.com

Mark Goldfeder
National Jewish Advocacy Center, Inc.
1718 General George Patton Drive
Brentwood, TN 37027
(800) 269-9895
mark@jewishadvocacycenter.org

Ben Schlager (*pro hac vice forthcoming*)
Goldfeder and Terry, LLC
666 Harless Place
West Hempstead, NY 11552
(917) 495-5790
ben@goldfederterry.com

*Attorneys for Plaintiffs*

Kenneth D. Sansom (SAN 047)
Michael T. Sansbury (SAN 054)
SPOTSWOOD SANSOM & SANSBURY LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, AL 35203-3329
(205) 986-3620
Msansbury@spotswood.com
Ksansom@spotswood.com

*Attorneys for Defendant BAM Trading*
*Services, Inc. d/b/a Binance.US*

16

**Appendix A[8]**

| *Gess* | *Raanan* |
|---|---|
| **Allegations Regarding Knowing Processing of Terrorist-Associated Transactions** | |
| "***As has already been established via federal enforcement actions, Defendants knowingly facilitated transfers of money to Hamas over the course of more than five years*** and its Chief Executive Officer, Chief Compliance Officer, compliance personnel and rank-and-file employees knew that its operations were being used to fund Hamas, as well as other FTO's." (Compl. at 3). | "Moreover, and since no later than 2019, through evidence presented directly to Binance by governmental entities and its third-party service provider, ***Binance knew that it been providing services to Hamas, which had been using its exchange to solicit donations, fund itself, and transfer money***. Indeed, Hamas publicly admitted well before October 7, 2023 that it was using Binance to fund its activities." (*Raanan Am. Compl. ¶ 4*). |
| "***According to the CFTC complaint, upon being informed by colleagues of HAMAS transactions in a chat, Binance's then-chief compliance officer Samuel Lim explained to a colleague that terrorists often send small sums of money because large sums constitute money laundering. The colleague responded that Hamas could barely buy an AK47 with 600 bucks.*** The modest size of each remittance minimized Binance's risk of detection by U.S. enforcement agencies." (Compl. at 16). | "***The CFTC has also made clear that Binance knew that Hamas had transacted on its exchange***. Specifically, the CFTC in its March 2023 complaint against Binance and Zhao set forth that, Binance, in February 2019 received information regarding HAMAS transactions. ***In response to this information, Binance's then-CFO knew so much about terrorists' transacting on cryptocurrency platforms that he explained to a colleague that terrorists usually send small sums as large sums constitute money laundering. A Binance colleague replied that one can barely buy an AK47 with 600 bucks.***" (*Raanan* Am. Compl. ¶ 216). |
| "Using the example of the Binance employee who stated that ***Hamas could barely buy an AK47 with 600 bucks***, an extremely low remittance amount, that average remittance across 1.5 million transactions would be $900 million to be divided between criminals and terrorists including Hamas." (Compl. at 21). | |

---

[8] Unless otherwise noted, internal citations and quotations are omitted and emphasis is added.

| *Gess* | *Raanan* |
|---|---|
| "According to a Commodity Futures Trading Commission (CFTC) lawsuit. . . remittances in support of Hamas via Binance date back to at least February of 2019. . ." (Compl. at 16). | "Specifically, the CFTC in its March 2023 complaint against Binance and Zhao set forth that, Binance, in February 2019 received information regarding HAMAS transactions." (*Raanan* Am. Compl. ¶ 216). |
| "From around January 2018 to May 2022, Binance processed 1.1 million crypto transactions worth at least $898.6 million between US customers and those who lived in Iran." (Compl. at 6).<br><br>"Crypto wallets at Binance were found to interact with bitcoin wallets associated with groups designated as terrorist organizations by the US and several other countries, including the Islamic State and al-Qaeda as well as the armed wing of Iran-backed Hamas, and another Iran-funded militia, the Palestine Islamic Jihad (PIJ), the US said." (Compl. at 18). | "To that effect, OFAC identified more than $600 million worth of transactions between U.S. persons and crypto wallets located in or otherwise connected with Iran, a significant funding source for Hamas, and tens of millions of dollars of additional transactions between U.S. persons and crypto wallets located in or otherwise connected with Syria, another funding source." (*Raanan* Am. Compl. ¶ 223). |
| "Defendants provided material support in its most straightforward form to Hamas and Islamic Jihad – ***cash and cash equivalents which could be converted to U.S. Dollars***." (Compl. ¶ 51). | "The substantial assistance that Defendants Binance Holdings Limited and Changpeng Zhao knowingly provided to Hamas and PIJ included . . . ***providing Hamas and PIJ with access to U.S. dollars and the U.S. banking system*** . . ." (*Raanan* Am. Compl. ¶ 253). |
| "Such remittances provided the necessary material support, military and tactical enablement and acquisition capacity and assets necessary for Hamas to train for and to carry out terrorist activities, including the complex, multipronged and highly sophisticated attack against civilians in Israel on October 7, 2023." (Compl. at 16). | "The material assistance that Defendants Binance Holdings Limited and Changpeng Zhao provided to Hamas was dangerous to human life because that assistance provided material support to Hamas and PIJ in financing their violent attacks and recruit individuals to carry out those attacks. The financial assistance that Defendants provided to Hamas and PIJ also provided material support for them to expand their purported charitable activities, and thereby attract additional donors and recruits for terrorist operations." (*Raanan* Am. Compl. ¶ 266). |

| *Gess* | *Raanan* |
|---|---|
| "According to the Treasury Department, Binance enabled a range of illicit actors to transact freely on the platform, and specifically named Hamas, Al Qaeda, Palestinian Islamic Jihad and the Islamic State of Iraq and Syria as terrorist organizations that received funds through the exchange." (Compl. at 16-17). | "Likewise and as concluded by FinCEN . . . Binance user addresses were found to interact with bitcoin wallets associated with the Islamic State of Iraq and Syria (ISIS), Hamas' Al-Qassam Brigades, Al Qaeda, and the Palestine Islamic Jihad (PIJ)." (*Raanan* Am. Compl. ¶ 211). |
| "Employees at Binance were engaged in a wide array of misconduct, and many were aware of the consequences of allowing millions of illegal transactions, according to the Justice Department and FinCEN." (Compl. at 18). | "For example, prior to entering into its settlement with FinCEN in November 2023, FinCEN had identified to Binance numerous transactions between Binance users and users with Hamas ties, including the Al-Qassam Brigades and PIJ. Indeed, senior Binance employees and compliance personnel were aware that entities officially designated as terrorist groups were transacting on the Binance.com platform." (*Raanan* Am. Compl. ¶ 210). |
| **Allegations Regarding Intentional Circumvention of Regulatory Controls** | |
| ". . . *Defendants did not file a single suspicious activity report (SAR)* with the Financial Crimes Enforcement Network (FinCEN)." (Compl. at 3). | ". . . *Binance did not file any SARs as it was required to do so to alert U.S. regulators*." (*Raanan* Am. Compl. ¶ 214). |
| ". . . a message from one of Binance's compliance employees sent in February 2019 joked that the crypto exchange should get a banner that says: *Is washing drug money too hard these days? Come to Binance, we got cake for you.*" (Compl. at 3). | "As set forth by the U.S. Attorney for the Western District of Washington in its complaint against Binance, one compliance employee wrote, we need a banner *is washing drug money too hard these days - come to binance we got cake for you*." (*Raanan* Am. Compl. ¶ 188). |
| ". . . *Binance did not have protocols to flag or report transactions for money laundering risks*, and its employees were well aware that such a compliance failure would invite criminals to the platform." (Compl. at 9). | "For example and as detailed by the U.S. Attorney's Office for the Western District of Washington, in a September 2018 chat conversation, a senior Binance employee learned that *Binance had [n]othing ... in place to review high-volume accounts for suspicious activity*. In the same chat, he listed types of transactions that, in [the] aml world, would be |

| *Gess* | *Raanan* |
|---|---|
| | flagged for money laundering risks, while noting that as of now[,] there is no regulation for .com to play by." (*Raanan* Am. Compl. ¶ 185). |
| "The multiyear investigation revealed that Binance allowed criminal elements onto the platform, thereby enabling transactions linked to child sex abuse, narcotics and terrorist financing." (Compl. at 17). | "As FinCEN concluded in its consent order against Binance, Binance's knowing failure to implement an effective AML program led to the exchange being used to process transactions related to . . . unregistered convertible virtual currency mixing services used to launder illicit proceeds, high-risk jurisdictions, individuals listed on OFAC's SDN List, [and] terrorist financing." (*Raanan* Am. Compl. ¶ 190). |
| "According to Treasury Secretary Janet Yellen, FinCEN, OFAC, and IRS Criminal Investigation's investigation has found that Binance was allowing illicit actors to transact freely, supporting activities from child sexual abuse to illegal narcotics to terrorism, across more than 100,000 transactions." (Compl. at 20-21). | |
| "The Treasury Department formally has said that Binance ***willfully failed to report more than 100,000 suspicious transactions*** involving a host of sanctioned groups, including Hamas military arm, Qassam Brigades, Al Qaeda, the Islamic State terrorist group, a litany of criminal ransomware hackers and users in countries facing U.S. sanctions, including North Korea and Iran." (Compl. at 19). | "FinCEN determined that Binance's ***willful failure to report hundreds of thousands of suspicious transactions*** inhibited law enforcement's ability to disrupt the illicit actors . . ." (*Raanan* Am. Compl. ¶ 190). |
| "At the direction of Zhao and other senior leaders at Binance, employees encouraged their high-volume U.S. users to conceal their U.S. connections, including by creating new accounts that obscured their locations. Zhao wrote privately to his employees that this was so Binance could continue to grow and that it was ***better to ask for forgiveness than permission***." (Compl. at 8). | ". . . Zhao nevertheless told Binance employees that, when it came to compliance with U.S. law, it was ***better to ask for forgiveness than permission***." (*Raanan* Am. Compl. ¶ 181). |
| "At the same time, Binance, Zhao, and Binance's then-chief compliance officer Samuel Lim each knew that Binance's | "Indeed, and as admitted by Binance's Chief Compliance Officer (CCO), per Zhao, Binance would engage in the |

A-4

| *Gess* | *Raanan* |
|---|---|
| solicitation of customers located in the United States subjected Binance to registration and regulatory requirements under U.S. law." (Compl. at 10). | international circumvention of KYC, so that Binance could reduce the losses to ourselves, and at the same time to make the U.S. regulatory authorities not trouble us." (*Raanan* Am. Compl. ¶ 177). |
| "Binance and its officers, employees, and agents even instructed U.S. customers to use VPNs to obscure their location; allowed customers that had not submitted proof of their identity and location to continue to trade on the platform long after announcing such conduct was prohibited; and directed VIP customers to open Binance accounts under the name of newly incorporated shell companies to evade Binance's own compliance controls." (Compl. at 10). | "On a June 2019 Binance conference call, Binance employees and executives confirmed to Zhao that they were implementing his scheme. As concluded by the U.S. Attorneys' Office for the Western District of Washington in its criminal information against Binance, these employees told Zhao that they had been contacting U.S. VIP users offline, through direct phone calls, leav[ing] no trace. If a U.S. VIP user owned or controlled an offshore entity, i.e., located outside of the United States, Binance's VIP team would help the VIP user register a new, separate account for the offshore entity and transfer the user's VIP benefits to that account, while the user transferred its holdings to the new account. On the same call, an employee described a script that Binance employees could use in communications with U.S. VIPs to encourage them to provide non-U.S. KYC information to Binance by falsely suggesting that the user was purportedly misidentified in Binance's records as a U.S. customer." (*Raanan* Am. Compl. ¶ 178). |
| "As Zhao explained in a June 9, 2019 weekly meeting of senior Binance officials: *We don't want to lose all the VIPs which actually contribute to quite a large number of volume. So ideally we would help them facilitate registering companies or moving the trading volume offshore in some way – in a way that we can accept without them being labeled completely U.S. to us.*" (Compl. at 12). | "Likewise, Zhao directed Binance to implement a plan to encourage customers to circumvent U.S. IP-blocking controls. Moreover, *Zhao directed Binance employees to encourage certain U.S.-based VIP customers, including VIPs located in New York, to circumvent KYC restrictions by submitting updated KYC information that deleted any U.S. nexus.* An internal document titled VIP handling makes clear that Zhao directed this scheme." (*Raanan* Am. Compl. ¶ 180). |

A-5

| *Gess* | *Raanan* |
|---|---|
| "With respect to its thousands of other VIP U.S. customers, Zhao explained in a June 24, 2019 meeting with other Binance senior officials: *We do need to let users know that they can change their KYC on Binance.com and continue to use it. But the message, the message needs to be finessed very carefully because whatever we send will be public. We cannot be held accountable for it.*" (Compl. at 13). | "Binance entered into concurrent settlements with OFAC, FinCEN, and the CFTC for various willful violations of IEEPA, *the Bank Secrecy Act*, and related regulations, including *for failing to implement a Customer Identification Program, Know Your Customer (KYC) policies and procedures, and AML program* . . ." (*Raanan* Am. Compl. ¶ 232). |
| "At all relevant times, Binance *knowingly failed to register as a money service business, willfully violated the Bank Secrecy Act* by failing to implement and maintain an effective anti-money laundering program and willfully caused violations of US economic sanctions." (Compl. at 14). | ". . . Zhao directed Binance personnel to categorize U.S. users as unknown, for a total of 2.83 million unknown customers, or 17 percent of its userbase." (*Raanan* Am. Compl. ¶ 15). |
| "In its 2023 suit, the SEC asserted that *an owner of another crypto exchange in the U.S. advised Binance on setting up its own entity in the region and suggested two approache*s, including a moderate plan to establish a second Tai Chi entity that would reveal, retard, and resolve built-up enforcement tensions while protecting the main exchange from liabilities." (Compl. at 18). | ". . . [I]n a September 2018 chat conversation, a senior Binance Employee learned that Binance had [n]othing ... in place to review high-volume accounts for suspicious activity. In the same chat, he listed types of transactions that, *in [the] aml world, would be flagged for money laundering risks, while noting that as of now[,] there is no regulation for .com to play by*." (*Raanan* Am. Compl. ¶ 185). |
| "Zhao agreed that Binance's PR messaging was critical, explaining in a meeting the next day that we need to, we need to finesse the message a little bit . . . . And the message is never about Binance blocking US users, because our public stance is we never had any US users. So, we never targeted the US. We never had US users." (Compl. at 11). | "The material assistance that Defendants Binance Holdings Limited and Changpeng Zhao provided to Hamas was dangerous to human life because that assistance provided material support to Hamas and PIJ in financing their violent attacks and recruit individuals to carry out those attacks. The financial assistance that Defendants provided to Hamas and PIJ also provided material support for them to expand their purported charitable activities, and thereby attract additional donors and recruits for terrorist operations." (*Raanan* Am. Compl. ¶ 266). |

A-6

| *Gess* | *Raanan* |
|---|---|
| "According to a press release from the Justice Department, Binance's compliance employees internally noted that ***the company didn't even have protocols to flag transactions that were money laundering risks.***" (Compl. at 19-20). | "***Binance did not file any SARs as it was required to do so to alert U.S. regulators.***" (*Raanan* Am. Compl. ¶ 214). |
| "As a result of the material support and aid knowingly provided by Defendants to Hamas and Palestine Islamic Jihad, Hamas and Palestine Islamic Jihad (aka Islamic Jihad) were able to carry out the violent terrorist attack in which Plaintiffs suffered severe injury." (Compl. at 21). | "As set forth by the U.S. Attorney for the Western District of Washington in its complaint against Binance, one compliance employee wrote, we need a banner ***is washing drug money too hard these days - come to binance we got cake for you.***" (*Raanan* Am. Compl. ¶ 188). |
| **Allegations Regarding Zhao's Culpability** | |
| "Zhao in fact not only oversaw the platform but also coordinated and initiated a process whereby Binance customers could bypass Binance's internal controls and disregard U.S. regulatory law by engaging in conduct to actively conceal their locations as being in the U.S." (Compl. at 7). | "Likewise, Zhao directed Binance to implement a plan to encourage customers to circumvent U.S. IP-blocking controls. Moreover, Zhao directed Binance employees to encourage certain U.S.-based VIP customers, including VIPs located in New York, to circumvent KYC restrictions by submitting updated KYC information that deleted any U.S. nexus. An internal document titled VIP handling makes clear that Zhao directed this scheme." (*Raanan* Am. Compl. ¶ 180). |
| "Those settlements stipulate that Binance, under the leadership and direction of Zhao, failed to place and utilize legally required internal tools and infrastructure and thereby enabled remittances to Hamas and other FTOs from the United States." (Compl. at 7). | "Criminal plea agreements and civil settlements that were announced in late 2023 by the U.S. Department of Justice (DOJ) and various U.S. regulators disclosed that for years Binance and its cofounder and at-the-time Chief Executive Officer, Defendant Zhao, permitted terrorists and illicit actors to transact on Binance's exchange, invited such activity, and intentionally avoided putting into place the legally-mandated infrastructure used to identify, report, and prevent terrorism financing – all in violation of U.S. law." (*Raanan* Am. Compl. ¶ 7). |

A-7

| *Gess* | *Raanan* |
|---|---|
| "***On November 21, 2023, Zhao pled guilty to willful violations of the Bank Secrecy Act***." (Compl. at 7). | "***On November 21, 2023, Zhao pled guilty to willful violations of the Bank Secrecy Act***." (*Raanan* Am. Compl. ¶ 75). |
| "As would be later discovered upon investigation by the SEC, Zhao and Binance secretly controlled the Binance.us platform's operations behind the scenes and permitted U.S. customers to utilize its less regulated Binance platform in lieu of the Binance.us platform which was intended to be compliant with U.S. law." (Compl. at 8). | "Behind the scenes and as referenced above, Binance engaged in a scheme to retain its most valuable U.S. customers on the Binance.com platform without disclosing these customers' U.S. locations. When the Binance.US platform launched in 2019, Binance announced that it was implementing controls to block U.S. customers from the Binance.com platform. In reality, Binance did the opposite. As both the CFTC and the SEC concluded in their respective complaints against Binance a Zhao, in March and June 2023, respectively, Zhao directed a scheme by which Binance would assist high-value U.S. customers in circumventing those controls and to do so surreptitiously because—as Zhao himself acknowledged—Binance did not want to be held accountable for these actions." (*Raanan* Am. Compl. ¶ 176). |
| **Reliance on Prior Enforcement Actions** | |
| "In its 2023 suit, **the SEC asserted** that an owner of another crypto exchange in the U.S. advised Binance on setting up its own entity in the region and suggested two approaches, including a moderate plan to establish a second Tai Chi entity that would reveal, retard, and resolve built-up enforcement tensions while protecting the main exchange from liabilities." (Compl. at 18; *see also, e.g.*, *id.* at 8). | "***According to the SEC's June 2023 complaint against Binance and Zhao in the District of Columbia***, Zhao has publicly dismissed traditional mentalities about corporate formalities . . ." (*Raanan* Am. Compl. ¶ 142; *see also, e.g.*, *id.* ¶¶ 11, 72, 177). |
| "In fact, **according to the United States Department of Justice**, a message from one of Binance's compliance employees sent in February 2019 joked that the crypto exchange should get a banner that says: Is washing drug money too hard these days? | "***In his plea agreement with the DOJ***, Zhao agreed that starting at least as early as August 2017 and continuing to at least October 2022, [he] violated the Bank Secrecy Act . . . by willfully causing [Binance] to fail to implement and maintain |

| *Gess* | *Raanan* |
|---|---|
| Come to Binance, we got cake for you." (Compl. at 3; *see also, e.g., id.* at 6, 19-20). | an effective [anti-money laundering] program." (*Raanan* Am. Compl. ¶ 221; *see also, e.g., id.* at ¶¶ 7, 15). |
| "***According to the Treasury Department***, Binance enabled a range of illicit actors to transact freely on the platform, and specifically named Hamas, Al Qaeda, Palestinian Islamic Jihad and the Islamic State of Iraq and Syria as terrorist organizations that received funds through the exchange." (Compl. at 16-17; *see also, e.g., id.* at 4-5). | "On January 22, 2024, **the U.S Treasury Department** further exposed the close financial ties between Iran and Hamas's terrorist activities when it sanctioned, among others, Gaza-based moneychanger Zuhair Shamlakh for, among other things, facilitating the transfer of tens of millions of dollars between Iran, Hamas, and other terrorist organizations." (*Raanan* Am. Compl. ¶ 111; *see also, e.g., id.* at ¶¶ 135, 138). |
| "Employees at Binance were engaged in a wide array of misconduct, and many were aware of the consequences of allowing millions of illegal transactions, ***according to*** the Justice Department and **FinCEN**." (Compl. at 18; *see also, e.g., id.* at 3, 19). | "These terrorist-related sums included tens of millions of dollars in transactions with accounts tied to PIJ, **with FinCEN concluding in its consent order against Binance that:** FinCEN's investigation identified dozens of former Binance users with tens of millions of dollars in transactions with an identified [Palestinian Islamic Jihad] network. Binance failed to file a SAR with FinCEN on this activity some of which occurred [between July 14, 2017 to July 30, 2023]." (*Raanan* Am. Compl. ¶ 212; *see also, e.g., id.* at ¶¶ 5, 157, 190). |
| "***According to a Commodity Futures Trading Commission (CFTC)*** lawsuit filed in March of 2023 against Binance, remittances in support of Hamas via Binance date back to at least February of 2019, and Binance was found to have failed to report more than 100,000 suspicious transactions involving terrorist groups and organizations including, among others, Hamas, Al Qaeda, and the Islamic State of Iraq and Syria." (Compl. at 16; *see also, e.g., id.* at 15). | "**As the CFTC detailed** in a December 2023 consent order against Binance and Zhao in the Northern District of Illinois, Binance's largest and most important users has included three trading firms headquartered or otherwise based in New York . . ." (*Raanan* Am. Compl. ¶ 69; *see also, e.g., id.* at ¶¶ 176, 187). |