P1UHRaaO

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JUDITH RAANAN, *et al.*,

4                   Plaintiffs,

5              v.                              24 Civ. 697 (JGK)

6    BINANCE HOLDINGS LIMITED, *et
     al.*,
7                                             Oral Argument

8              Defendants.

9    ------------------------------x
                                              New York, N.Y.
10                                            January 30, 2025
                                              11:40 a.m.
11
     Before:
12
                         HON. JOHN G. KOELTL,
13
                                              District Judge
14

15

16                        APPEARANCES

17   SEIDEN LAW, LLP
          Attorneys for Plaintiffs
18   BY:  AMIAD M. KUSHNER
          JENNIFER BLECHER
19        -and-
     PERLES LAW FIRM, PC
20   BY:  EDWARD MacALLISTER

21   CAHILL GORDON & REINDEL LLP
          Attorneys for Defendants
22   BY:  ANIRUDH BANSAL
          SESI V. GARIMELLA
23        IVAN TORRES

24

25

P1UHRaaO

1          (Case called)

2          MR. KUSHNER:  Good morning, your Honor.  My name is

3     Amiad Kushner from Seiden Law, for the plaintiffs.  I'm here

4     with my colleagues at Seiden Law, Jake Nachmani and Jen

5     Bletcher and our cocounsel, Ed MacAllister, from the Perles Law

6     Firm.

7          MR. BANSAL:  Good morning, your Honor.  Anirudh

8     Bansal, Cahill Gordon & Reindel, and with me at counsel table

9     are my partners Sesi Garimella and Ivan Torres.

10         THE COURT:  Good morning.

11         All right.  These are motions to dismiss.  I'll listen

12    to argument.

13         MR. BANSAL:  Judge, since it's my motion, I assume I

14    will go first?

15         THE COURT:  Yes.

16         MR. BANSAL:  Thank you.

17         THE COURT:  I'm familiar with the papers.

18         MR. BANSAL:  Yes, your Honor, I'll assume that.

19         Judge, the allegations against the defendants in this

20    case are, at bottom, exclusively allegations of nonfeasance

21    that at times the plaintiffs have tried to cast or dress up as

22    malfeasance, but, essentially, they're nonfeasance, failure to

23    have an adequate AML program, failure to file SARs.  And the

24    amended complaint is, in that way, in many ways, no different

25    than the actions brought against other financial institutions

P1UHRaaO

1    after they've entered into settlements with government agencies

2    over anti-money laundering and sanctions failures, and in those

3    cases, allegations very similar to the ones here, sometimes

4    allegations that are closer to the lines than the allegations

5    against the defendants here are routinely dismissed.

6           THE COURT:  I thought that some of the recent cases in

7    the Southern District have sustained similar allegations.

8           MR. BANSAL:  Judge, I think the most important case to

9    discuss here is the *Twitter* case, which is a Supreme Court ——

10          THE COURT:  Whoa.  We'll get to *Twitter* in a moment.

11          But when you say these cases are routinely dismissed,

12   I had thought that the two most recent Southern District cases

13   after *Twitter* have sustained similar allegations.

14          MR. BANSAL:  Judge, in terms of the cases with the

15   most similar allegations, we would point you, or point the

16   Court, to —— if you'd just give me a moment, Judge.

17          THE COURT:  *King, Bonacasa.*

18          MR. BANSAL:  So pardon me, Judge.  I'm just trying to

19   find my discussion of the *King* case in the outline.

20          THE COURT:  It's OK.  You can get to it when you get

21   to it.

22          MR. BANSAL:  I will get to it.  I do want to address

23   it.

24          THE COURT:  I just stopped you because I just don't

25   think it's an accurate reflection of the landscape, so to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1UHRaaO

1    speak.

2          MR. BANSAL:  I hope to persuade you otherwise, Judge.

3          THE COURT:  OK.

4          MR. BANSAL:  In the *King* case —— I've now found my

5    notes about it —— the defendants were alleged to have provided

6    banking services for decades to notorious terrorists.  They

7    placed them on white lists so they had reduced scrutiny, and

8    Judge Schofield still dismissed the claims of primary liability

9    because they were not acts of international terrorism, the

10   banking services.

11         But with respect to the aiding and abetting liability

12   —— and we can get to that if ——

13         THE COURT:  Isn't that really the case?  Primary

14   liability is a heavy lift, but secondary liability under the

15   more recent statute, which is what was at issue in *Twitter*, is

16   certainly a more difficult claim to dismiss.  Sure, lots of

17   cases have dismissed primary liability, and this case has three

18   claims —— two on primary liability, one on aiding and abetting

19   liability.  But doesn't the rubber hit the road really on

20   aiding and abetting liability?

21         MR. BANSAL:  I would agree.

22         THE COURT:  So if you simply count up the cases and

23   say, look, here are all the cases that have dismissed primary

24   liability, yes, you have a good claim with respect to two of

25   the three claims, but that leaves aiding and abetting

P1UHRaaO

1    liability.

2            MR. BANSAL:  Judge, with respect to the cases on

3    aiding and abetting liability, the cases most analogous to this

4    one have dismissed aiding and abetting claims.  I'm talking

5    about *O'Sullivan* before Judge Swain, *Freeman*, Waldman in the

6    Eastern District, *Siegel* before Judge Cote that went to the

7    Circuit.  They all involved breaches of anti-money laundering

8    and sanctions duties, just like the plaintiffs allege here and,

9    in some cases, much more egregious.

10            So, for example in the *Siegel* case in front of Judge

11    Cote, the bank there failed to take reasonable steps to ensure

12    that it was not dealing with banks that have links or

13    facilitate terrorist financing.  I'd say that's on all fours or

14    very similar to what the plaintiffs are alleging here, and that

15    they didn't conduct diligence on high-risk accounts.  That's

16    also similar to what the plaintiffs are alleging here.  But

17    more than that, the bank there altered, falsified, or omitted

18    information from payment messages that involved prohibited

19    companies and institutions for the express purpose of

20    concealing the financial activities and transaction from

21    detection or monitoring by United States authorities.

22            Judge, I think that goes further than what the

23    plaintiffs have alleged here, and Judge Cote and then the

24    Circuit found that those allegations were not sufficient to

25    allege aiding and abetting liability, even though in the *Siegel*

P1UHRaaO

1    case the complaint alleged that purchases and expenses directly

2    related to the attack that was at issue there, including

3    travel, including visa costs, that they were underwritten by

4    and funds moved through the customer that was improperly

5    onboarded and whose transactions were allowed to go through.

6           THE COURT:  What was the statute at issue in that

7    case?

8           MR. BANSAL:  Judge, if I'm not mistaken, it would have

9    been JASTA.  Perhaps this was before.  Let me just check for a

10    moment, your Honor.

11           Judge, this may have been —— this was after JASTA, so

12    I believe the aiding and abetting count would have been

13    evaluated under JASTA.

14           THE COURT:  What do you think the best case is for

15    your motion are?  Put *Twitter* aside for a moment.  We'll

16    discuss *Twitter* in a moment.  But what are the cases that you

17    think most support your position?

18           MR. BANSAL:  Sure, Judge.  I would point to

19    *O'Sullivan*.  The defendant was alleged to have violated Iran

20    sanctions by providing financial services to Iran and its

21    agents and proxies and helped Iran fund and support terrorist

22    organizations that carried out the attacks.  Judge Swain

23    recognized that the bank had violated its duties in those

24    regards, in fact, duties that were designed principally to

25    prevent terrorist activity, but she nonetheless dismissed the

P1UHRaaO

1    aiding and abetting account.

2            In the *Waldman* case in the Eastern District, the

3    plaintiff's alleged that the bank there set up laundromats ——

4    so it's much more purposeful —— in Russia and Germany, and it

5    was aware that the services that were provided were being used

6    by organizations to engage in criminal activity.  And, again,

7    the judge in the Eastern District found that —— I think it was

8    Gonzalez, Judge —— found it was insufficient to state an aiding

9    and abetting claim.

10            I pointed to *Siegel* as well.  And, Judge, if you'd

11    like, I can send you a short letter after the argument.

12            THE COURT:  No, I have the briefs.

13            MR. BANSAL:  You have the papers, right?  So those are

14    among the cases.

15            THE COURT:  If there's supplemental authority that's

16    not in the briefs, the parties are welcome to provide it to me.

17    But, no, I've got more than enough briefs.

18            MR. BANSAL:  I think, Judge, the cases before *Twitter*

19    —— even though aiding and abetting cases before *Twitter* came

20    out against the plaintiffs, *Twitter*, if anything, narrowed the

21    class of cases that can be brought as aiding and abetting cases

22    under JASTA.  *Twitter*, importantly, drew a very clear

23    requirement —— or imposed a requirement of a very clear

24    connection between the conduct of the nonfeasance that is

25    alleged and the attack or the injury, the tort, that the

P1UHRaaO

1    plaintiffs are suing over.

2            THE COURT:  I thought that *Twitter* is somewhat

3    equivocal on that.  Depending upon the gravity of the action,

4    the gravity of the results, the more likely —— the more that

5    the comparison is to providing a firearm to a dangerous person.

6    Even though you don't know that that firearm is going to be

7    used to kill someone, you can be held liable for aiding and

8    abetting the murder of that person.  That seems to weaken

9    substantially the kind of scienter that the Supreme Court

10   requires for an aiding and abetting.

11           MR. BANSAL:  Judge, you are right that the *Twitter*

12   case outlined a sliding scale.  So if the resistance —— the

13   more passive —— sorry, the assistance, the more passive the

14   assistance was, the more there would have to be scienter and

15   something that actually connected the nexus with the attacks.

16   So I'm happy to go through that, Judge, because, in my view ——

17   sorry.

18           THE COURT:  So here you have allegations that the

19   defendants knew that they were providing —— I mean, in

20   construing the allegations in favor of the nonmoving party,

21   that the defendants knew that they were providing financial

22   assistance to Hamas and allowing Islamic Jihad, and they did it

23   in a substantial way, $60 million, they allege, and then the

24   funds end up getting used for a horrific terrorist act.

25           Now, is that, as a matter of law, not sufficient to

P1UHRaaO

 1  allege aiding and abetting the terrorist act?

 2          MR. BANSAL:  Judge, I don't think that the complaint

 3  is fairly read as having the kind of connection that you just

 4  outlined.

 5          THE COURT:  It doesn't allege that the defendants knew

 6  that the money was going to be used for the October 7 attack.

 7  I think — unless the plaintiffs tell me differently, I think

 8  that's common ground.  What the plaintiffs say is they don't

 9  have to allege that.  It's like providing the gun to the person

10  even though you don't know that the gun is going to be used to

11  kill.

12          MR. BANSAL:  Judge, first off, I don't agree with the

13  premise that Binance's services are a gun.

14          THE COURT:  That?

15          MR. BANSAL:  Binance's services are a gun.  I don't

16  agree with the premise that they're inherently dangerous.  I

17  recognize in *Twitter* the Supreme Court left open the

18  hypothetical situation where something was so inherently

19  dangerous, so unusual, that like a gun — or I think the

20  example they gave was morphine, right, a supplier of morphine

21  whose product was misused because they gave an unusual amount

22  of it — they could be held, almost like a coconspirator,

23  accountable for the reasonably foreseeable consequences of that

24  use of the inherently dangerous product.  There is really no

25  plausible allegation that cryptocurrency or Binance's services

P1UHRaaO

1    were inherently dangerous.  The plaintiffs say and acknowledge

2    it is used by 100 million people.  The documents that

3    plaintiffs incorporate cite $9 trillion worth of transactions

4    over the time period that the amended complaint covers.  There

5    are any number of public acknowledgments that cryptocurrency is

6    used for all sorts of legitimate purposes.

7            THE COURT:  But the plaintiffs increase their

8    allegations by a couple of things: first, public statements by

9    the defendants, which suggests that they were at least open to

10   having their services used in furtherance of crime, and the

11   fact that they are, unlike *Twitter*, regulated with

12   know-your-customer anti-money laundering requirements, which

13   they are alleged not to have followed.

14           MR. BANSAL:  Judge, may I address both of those in

15   turn?

16           THE COURT:  Sure.

17           MR. BANSAL:  With respect to the knowledge allegation,

18   Judge, you will see in the paragraphs that the plaintiffs cite

19   in their complaint that the analysis that they've done, which

20   is disclosed to nobody but the plaintiffs ——

21           THE COURT:  I'm sorry?

22           MR. BANSAL:  The analysis that the plaintiffs have

23   done has been disclosed to nobody but the plaintiffs.  It's not

24   outlined in the —— what kinds of conclusions they draw, how

25   solid those conclusions are —— none of that's set out.  I'm not

P1UHRaaO

1    saying it has to be, but there is certainly no allegation that

2    any of the associations that the plaintiffs have found between

3    those $60 million in transactions, those accounts that they

4    have conducted in preparing their analysis for this case, that

5    any of that was evident to Binance at the time that these

6    transactions were going on.

7              They have alleged, Judge, that there is public

8    information that Binance was used by Hamas.  There was a screen

9    that they put in their complaint that you could click on

10   Binance —— you could click on one of six exchanges.  They've

11   also said in their complaint that Hamas also used other

12   exchanges, much like it uses *Twitter* and Google and cell phones

13   and all kinds of other things.  There's nothing special about

14   the relationship between Hamas and Binance.

15             The point I'm trying to make, Judge, the knowledge

16   that they are attributing to Binance is either after the fact

17   or it's this general knowledge of the fact that Hamas was

18   conducting business on Binance's platform.  And to that point,

19   Judge, the *Twitter* court said that it is not enough "as the

20   plaintiffs contend, that a defendant gave substantially

21   assistance to a transcendent enterprise separate and floating

22   above all the actionable wrongs that constituted it.  Rather, a

23   defendant must have aided and abetted by knowingly providing

24   substantial assistance to another person in the commission of

25   the actionable wrong."

P1UHRaaO

1              That's what the plaintiffs —— and I think the Court

2      identified it —— have completely failed to allege, that there

3      is any connection, that Binance had any advance knowledge of

4      any attack, that Binance intended to support any attack.  I

5      think the court used in *Twitter* no act of encouraging,

6      soliciting, or advising the commission of the Reina attack that

7      would normally support an aiding and abetting claim.  I think

8      that's important, Judge.  The Supreme Court said these are the

9      kinds of things that would normally support an aiding and

10     abetting claim.  My position, respectfully, is what's normal in

11     an aiding and abetting case, those allegations are utterly

12     missing in this case.

13             I can go on to the regulated part, Judge.  I'm happy

14     to address that.

15             THE COURT:  Go ahead.

16             MR. BANSAL:  So, Judge, not that issue, it is true

17     that the *Twitter* court said that you might have a better case,

18     plaintiffs, if there was a duty, but then the court actually

19     goes on to assume a duty.  It assumes that a duty existed and

20     says that, even if there were such a duty, a duty to stop

21     transactions —— this is at page 501 —— it would not transform

22     defendant's distant inaction into knowing and substantial

23     assistance that could establish aiding and abetting liability

24     for the attack.

25             I would also point out, Judge, that all of the bank

P1UHRaaO

1    cases that I have discussed — *O'Sullivan*, *Freeman*, *Waldman*,

2    *Siegel* — they all involved breaches of the very came duties

3    that the plaintiffs say that Binance breached through its

4    inaction here, and all of those cases rejected aiding and

5    abetting claims.

6         THE COURT:  Go ahead.

7         MR. BANSAL:  So, Judge, I think that the thing that is

8    most missing from the plaintiffs' complaint really is any

9    allegation of scienter.  And, Judge, to the issue of a sliding

10   scale, I would note that in *Twitter* there was an algorithm that

11   matched ISIS's videos and messages with other users based on

12   those users' information and history; in other words, Twitter

13   was matching with users that were more likely to be ice Is

14   recruits.  There's no such allegation with respect to Binance.

15        Plaintiffs — we talk about knowledge.  Plaintiffs

16   were alleged in *Twitter* — sorry, plaintiffs allege that

17   defendants have known that ISIS has used their platform for

18   years but failed to stop.  The plaintiffs here have alleged no

19   more.  In fact, the plaintiffs say that, well, it was publicly

20   known that Hamas used Binance and other exchanges.  Obviously,

21   it was much more publicly evident with respect to Twitter.

22   Anybody could go on and see an ISIS video.  And whereas a Hamas

23   account, a Hamas wallet is not going to be labeled "Hamas,"

24   ISIS videos are all labeled ISIS videos.  There's no secret.

25   There could have been no secret to Twitter that ISIS had their

P1UHRaaO

1    content on their platform to recruit and fund terrorism.

2            Google went way beyond that.  Google reviewed and

3    approved ISIS videos on what appears to be a systematic basis,

4    and it shared advertising revenue with ISIS.  And the Supreme

5    Court said that was not enough, and the reason the Court said

6    that was not enough is because there was no connection to the

7    actual attack in that case.

8            THE COURT:  By the way, the allegations in the various

9    other complaints, like CFTC and SEC, the plaintiffs rely on the

10   allegations in those complaints.  In considering the motion, I

11   shouldn't disregard those allegations, should I?

12           MR. BANSAL:  I don't think you should, Judge.  I think

13   you should look at them because what they say is nothing about

14   intentionally aiding terrorism.  The DOJ plea agreement, Judge,

15   doesn't mention that.  The FinCEN agreement says that Binance's

16   AML lapses allowed bad actors to access its platform, again, as

17   has happened with so many other financial institutions.  When

18   the plaintiffs describe what was allowed to enter the platform,

19   they will leave ellipses out when it says it allowed blank,

20   blank, blank terrorism, but what you'll see in those blanks is

21   all kinds of other illicit activity — gambling, ransomware,

22   things like that.  So when the plaintiffs, for example, say in

23   their opposition papers that Binance loopholed its diligence

24   intentionally, knowing that it would be used by criminals, what

25   they actually cite to shows in the order.  What they actually

P1UHRaaO

1    cite to shows that that was a loophole that, in that chat that

2    they cited, was for laundering drug money.  Not a good thing.

3    No excuse for it, but it's not about supporting terrorism.

4    There's no intention to support terrorism specifically.  It's

5    just a lapse of AML controls that allowed —— allowed, did not

6    encourage, but allowed —— all manner of activities to occur.

7              THE COURT:  All manner of criminal activities

8    including terrorism.

9              MR. BANSAL:  Judge, again, no different than any other

10   bank case.  No different than Twitter.  I just do want to point

11   out ——

12             THE COURT:  Oh, but Twitter has no know-your-customer

13   anti-money laundering requirements under the law.

14             MR. BANSAL:  Judge, like I was just saying, the Court

15   assumed that, even if such a duty existed, it wouldn't be

16   enough.  And then I went through the bank cases where there was

17   exactly that duty, right?

18             THE COURT:  But we're talking about Twitter just for a

19   moment.  Twitter is under none of those obligations, right?

20             MR. BANSAL:  Correct.

21             THE COURT:  OK.  Go ahead.

22             MR. BANSAL:  But Twitter —— in the *Twitter* opinion,

23   the Court assumed that, even if such a duty existed, there

24   would be —— it would not transform what happened in that case

25   into aiding and abetting.

P1UHRaaO

1          THE COURT:  It's a question of the number of

2     additional factors, if you will.  And, certainly, a regulatory

3     scheme, which includes know-your-customer rules, to avoid

4     making your system available to known criminals or terrorists

5     is a factor that would support aiding and abetting liability.

6     Not saying that it's enough.  It simply is one of the factors

7     that distinguishes this case from *Twitter*.

8          MR. BANSAL:  It is a factual factor, Judge, that does

9     ─── that is not present in *Twitter*, but it is present in all of

10    the cases ─── the *O'Sullivan* case, the *Freeman* case, the *Waldman*

11    case, *Siegel*.  Again, not only the same duties, but the duties

12    stemming from the same statutes, from IEEPA and the Bank

13    Secrecy Acts, were the one that were breached in those cases,

14    and they do not create aiding and abetting liability.

15          Can I just ─── before we move on, I do want to talk

16    about the plaintiffs' allegations of scienter.  Apart from the

17    allegations that, broadly speaking, the plaintiffs say, broadly

18    speaking, that the defendants knew because there was notice

19    that Hamas was transacting on the platform ─── which, again, the

20    *Twitter* court says was not sufficient.  Separate, hovering over

21    the actual attacks, that's not sufficient ─── apart from that,

22    they do try to cobble together some other allegations that they

23    characterize as showing some intent to assist Hamas.

24          But, I would say, Judge, I want to point out is just

25    mischaracterization of the source materials.  So, for example,

P1UHRaaO

1    in paragraph 28 of the amended complaint, the plaintiffs says

2    that Mr. Zhao "admitted at his sentencing that he realized the

3    seriousness of his crimes in allowing, facilitating, and

4    encouraging terror groups and other criminals to freely operate

5    on the Binance platform."  Quite a statement.  But when you

6    look at the sentencing transcript, Judge — and we can make it

7    available to you.  We'll send to the plaintiffs as well — in

8    the entire proceeding, Mr. Zhao says not one more word about

9    terrorism, let alone facilitating.

10           Page 71 of the transcript, which we'll get to, Judge,

11    in terms of what he recognized the seriousness of, Mr. Zhao

12    said:  I failed to implement an adequate anti-money laundering

13    program in the company I founded.  I recognize the importance

14    of having a robust KYC/AML program, and that is why I directed

15    Binance to fully cooperate with the U.S. government's

16    investigation, which has been done.  OK.  So that's one

17    mischaracterization.

18           Then in their motion papers at page 10, plaintiffs'

19    counsel says, "Moreover, Mr. Zhao admitted the connection

20    between defendant's assistance and a future terror attack."

21    Again, quite a statement.  They cite paragraph 221 of the

22    amended complaint, but you go to paragraph 221, and there is

23    nothing about that.  There's no such admission.  The only

24    admission in that paragraph is from the plea agreement in which

25    Mr. Zhao admitted to failing to implement and maintain an

P1UHRaaO

1    effective AML program.

2           In the same papers, plaintiffs' counsel point to the

3    fact that Binance mischaracterized users' locations, advised

4    users on how to install IP-blocking software, and falsify KYC.

5    It's on jumbled into how the defendants supposedly

6    intentionally supported terrorism.  When you look at that, it

7    cites paragraph 180 of the amended complaint, you go there and

8    look at that paragraph and look at the source material for that

9    paragraph, it's all about keeping U.S. users on the platform.

10   There's this whole other part of this case that was concealing

11   the fact that there was U.S. users so they didn't have to

12   shoulder the burdens of an American money service business.

13          THE COURT:  So your contention is that there's nothing

14   in the CFTC, SEC, DOJ, FinCEN complaints that the government

15   entities there charged that Binance knew that its failure to

16   follow know-your-customer anti-money laundering practices was

17   making its site available to terrorists.  Is that the argument?

18          MR. BANSAL:  That there is nothing that makes ——

19          THE COURT:  No allegations by the government in any of

20   those documents that says that the defendant's knowing

21   violation of the Bank Secrecy Act, know your customer,

22   anti-money laundering process was making its site available to

23   terrorists?

24          MR. BANSAL:  And any number of other —— it was nothing

25   special about terrorists.  That's important, Judge.

P1UHRaaO

```
1              THE COURT:  No, no, no, just ——

2              MR. BANSAL:  I'm not arguing that.

3              THE COURT:  You're not arguing that?

4              MR. BANSAL:  No, I'm not, Judge.

5              THE COURT:  OK.  Then to say that in their brief they

6   overstated by not referring to the correct portions of the

7   government's complaints that specifically made the allegation

8   that the defendants knowingly violated the Bank Secrecy Act and

9   know-your-customer and anti-money laundering requirements in

10  such a way that they knew that the site was being used by

11  terrorists.  I mean, I had thought that there were government

12  allegations precisely about that.  You say in a couple of cases

13  they overstated, they jumbled together the illegal use of their

14  site.  OK.  Maybe they did on a couple of occasions.  But what

15  I want to find out is, is there nowhere in any of those

16  complaints that the government actually made those allegations

17  against the defendant?

18             MR. BANSAL:  Judge, they have said nothing more than

19  your description of the regulatory settlements just now.  It's

20  nothing more than what's said in the complaint.

21             THE COURT:  I'm sorry?

22             MR. BANSAL:  It's nothing more than what is said in

23  the complaint by the plaintiffs themselves.  There's, by the

24  way, nothing in those orders and settlements that shows

25  knowledge that the platform was being used in that way during
```

P1UHRaaO

1    2023 or 2022, not contemporaneous knowledge.  The knowledge

2    that is alleged is this broad knowledge that Binance was open

3    to the use by bad actors.  Now, that's important, Judge.

4           And by the way, before I forget, there's also

5    information in those orders that belies any intent to advance

6    terrorism as opposed to just kind of negligence.  And, again,

7    the motive was profit.  If you look at those orders, the motive

8    was to have exalted profits over compliance.  The defendant

9    prioritized growth and profits over compliance with U.S. law.

10   The purpose of the conspiracy —— this is from the DOJ plea

11   agreement —— the purpose of the conspiracy was to allow Binance

12   to operate as a virtual currency exchange and gain market share

13   and profit as quickly as possible.  Nobody alleges, Judge ——

14          THE COURT:  If you sell a gun to someone and it's used

15   to kill someone else, the fact that you were selling the gun

16   for profit rather than to facilitate the person's use of the

17   gun would not be a defense.

18          MR. BANSAL:  It's not a gun, Judge.  It's just a

19   banking service.  It's a financial service that both

20   administrations, the new one and the old one, acknowledged are

21   in some ways the future of online transactions.  So there's

22   nothing inherent —— a gun is dangerous.  A gun can only be used

23   for one thing, right?  Targets and crime.  This is something

24   that is generally available to 100 million users.  And that's

25   important, Judge.  There's nothing that the plaintiffs have

P1UHRaaO

1   alleged that says that anyone associated with any terror group

2   got any special treatment, and that's important, Judge.

3          THE COURT:  It's certainly an important issue.

4   There's a distinction between products or services that don't

5   have some inherent danger and those that do.  At least at this

6   point the government has acknowledged that there is the

7   possibility of danger under some circumstances, and that's why

8   there's a Bank Secrecy Act and anti-money laundering laws and

9   know-your-customer requirements, all of which Twitter and

10  Google don't have.

11         So, yes, it's necessary to draw distinctions, and you

12  correctly point out one of those distinctions.

13         MR. BANSAL:  And, Judge, again, I don't want to keep

14  on coming back to this, but I wouldn't want it to be lost that,

15  in the bank cases that I cited, the same duty existed from the

16  same statutes.

17         Before I move on from the orders, Judge, I was

18  reminded by my colleague that there are other parts of those

19  orders that, again, belie the intent that the plaintiffs are

20  trying to ascribe to the defendants.  In the consent order with

21  the ── with FinCEN, excuse me, at page 46, speaking about the

22  Al-Qassam Brigade, which is the military wing of the

23  Palestinian Hamas organization, the order says that, while

24  Binance filed no SARs, Binance had proactively cooperated with

25  the global law enforcement to combat terrorist financing and

P1UHRaaO

1    blockchain vendor to combat terrorist financing and cooperated

2    with Israeli law enforcement in numerous seizures related to

3    the Al-Qassam Brigade.

4            So where there is intentionality, where there is

5    action, it is actually to stop terrorism.  The inaction allows,

6    like every other time there are AML failures, any number of

7    illicit —— types of illicit conduct to occur, it is not

8    directed at terrorism, Judge.  And the reason, Judge, that I

9    say that is important —— and maybe the Court already knows

10   enough about this, and you can cut me off if you do —— but the

11   *Twitter* court did find it very important that *Twitter* treated

12   everybody the same.  There was no preferential treatment given

13   to ISIS in that case, and there's no preferential treatment of

14   Hamas.  In fact, what plaintiffs' main complaint is here is

15   that Binance treated transactions and wallets that the

16   plaintiffs now associate with terror groups, Binance treated

17   those wallets like they did all other wallets; that they

18   treated them the same by doing nothing, by filing no SARs, by

19   not doing KYC, by not stopping the transactions, by just

20   letting the transactions go through uncritically.  And that's

21   exactly the type of nonpreferential treatment that the *Twitter*

22   court said was insufficient.  The *Twitter* court said, by the

23   plaintiff's own allegations, those platforms appear to transmit

24   most content without inspecting it.  I recognize there are

25   distinctions, including there's the Bank Secrecy Act, so

P1UHRaaO

1    there's an obligation.

2            THE COURT:  It is, on one level, somewhat breathtaking

3    to take the position that it's OK for a regulated entity to

4    say, sure, we accept terrorist accounts which allow the

5    transmission of funds to terrorists because we treat terrorists

6    just like anyone else, and if you want to use our account to

7    finance what you do, that's OK.  We're open, and in fact, we

8    advertise that crime can be committed on our site.

9            MR. BANSAL:  Judge, I don't think it was ever

10   advertised.  That's not part of —— that's not the messaging.

11   There's no advertisement that says crime can be committed on

12   our site.  The plaintiffs are referring to internal messages

13   which were, you know, gallows humor, jokes by people about the

14   lapses in AML control.  But there's no advertising.  There's no

15   holding the company out as this is a place where crime can be

16   committed.  Absolutely not.  It's an exchange, right?

17           Judge, it's not OK.  I'm not saying —— no one is

18   saying it's OK to have an insufficient anti-money laundering

19   program that allows illicit activity to go unreported in

20   violation of Bank Secrecy Act and IEEPA obligations.  In fact,

21   the company paid $4 billion and Mr. Zhao went to jail for it.

22   So it's not OK.  It's not OK.  What we're talking about is

23   whether ——

24           THE COURT:  Hold on.  So there's an acknowledgment

25   that it's not OK, but this case is about what the consequences

P1UHRaaO

1    of doing something that's not OK are in the civil context,

2    right?

3                MR. BANSAL:  Judge, it was also not OK for Google to

4    share revenue with ISIS, inspect their videos, and put them

5    online even though they were being used to recruit people for

6    horrific things.  Not OK.  Not OK for Wall Street banks,

7    household name banks, to have stripped wires, to have changed

8    payment messages, to have told customers how to say don't say

9    Iran, say Dubai across the sea, use code words.  All of that is

10    not OK, and those banks paid their fines for it.  They settled

11    with the government.  They encountered all kinds of collateral

12    consequences, but they didn't have to pay plaintiffs who were

13    not injured by their conduct, and that's our point.  That's the

14    argument, not that it's OK.

15                THE COURT:  Which leads us, then, to issues of

16    personal jurisdiction and the standing of all of the

17    plaintiffs, unless there's something else that you wanted to

18    say on *Twitter* and the general subject.

19                MR. BANSAL:  I could, but I want to anticipate, so as

20    not to waste the Court's time, something that I very much

21    expect my adversary to raise when they stand up, and that is

22    paragraph 215 of the complaint.

23                THE COURT:  I'm sorry?

24                MR. BANSAL:  Paragraph 215, 215, of the complaint,

25    which is, in my view, the closest that the amended complaint

P1UHRaaO

comes to any conscious conduct that is directed at anyone with

Hamas, with a Hamas association.  And the plaintiffs cite it

many, many times in their papers, and I do assume they're going

to talk about it today.

That is a 2020 incident, July of 2020 incident.  And

in the amended complaint, it says that in July of 2020, a

third-party service provider flagged a user's account as having

an association with ISIS and Hamas.  And the company's chief

compliance officer said in an internal chat:  "This is very

dangerous for the company, but if he is a VIP, offboard him,

and let him take his funds and leave.  Tell him he was flagged

by third-party compliance tools."

Plaintiffs repeatedly say:  There it is.  That's the

smoking gun.  That is the instance in which there is

intentionality directed at somebody who is flagged to have an

unidentified ISIS and Hamas association.  But that single

incident which plaintiffs can come up with over the course of

however many years of a particular account's Hamas association

was July 2020, three years before the October 7, 2023, attacks.

The person who was offboarded is not alleged to have any

connection with the October 7 attacks.  Even his association

with Hamas is unclear.

And he was offboarded, Judge.  He was no longer

permitted to be on the platform.  So once this Hamas

association —— that's what I meant.  Once there were identified

P1UHRaaO

1    Hamas associations, once that was flagged, he was not permitted

2    to conduct transactions on the platform anymore.  That's not

3    substantial assistance.

4         The plaintiffs will say, well, the compliance officer

5    said he could take his funds and leave, and they tell him you

6    were flagged.  But there's no suggestion that the funds that he

7    took were used in any way to further the attacks, not even any

8    suggestion that the person involved was involved in the

9    attacks.  And, again, that is much less than what was done in

10   *Google*.  If you look at the *Twitter* case, the court said we

11   don't know how much money that was that Google's taken in in ad

12   revenue.  It's not connected to any attacks.

13        THE COURT:  The plaintiff can correct me if I'm wrong,

14   but I didn't think that the complaint was alleging that the

15   defendants knew that their money was being used directly for

16   the October 7 attack.  I don't think that they make that

17   specific allegation.  I think that what they attempt to do is

18   to say that the defendants knew that their money was being

19   routed through the defendant exchange, and it was being used by

20   Hamas and Palestinian Islamic Jihad for what they do:

21   terrorism.

22        A specific connection to the October 7 attack, I don't

23   think the plaintiffs have made that allegation.  They can make

24   it when they get an opportunity in a moment.  But I think what

25   they say is you have to look at all of the circumstances.  What

P1UHRaaO

1  was the knowledge on the part of the defendants with respect to

2  who they were dealing with, whether what the general use of

3  those funds was for terrorism actions, not the specific

4  terrorist act.

5       MR. BANSAL:  Judge, I'm comfortable with that

6  description of their complaint.

7       THE COURT:  Maybe they'll tell me, no, I've missed it.

8       MR. BANSAL:  All I would say is that's plainly

9  insufficient under the Supreme Court's decision in *Twitter*

10  because they do say that support for an organization hovering

11  above the attacks is not sufficient.  I agree with you, Judge,

12  that there is a sliding scale.  Where that is the case, there

13  must be a stronger showing, they said, of scienter, and they

14  have not made it here is our point.

15       So, I'm happy to move on to personal jurisdiction,

16  Judge, unless the Court has any more questions on substantial

17  assistance.

18       THE COURT:  No.

19       MR. BANSAL:  Judge, the plaintiffs have, generally,

20  three groups of jurisdictional allegations:  The first is that

21  the defendants deliberately solicited and did business with VIP

22  market maker customers in New York that provided Binance with

23  liquidity necessary to function, Binance's efforts to hide

24  their New York activities were tailored to what they say is

25  criminal and terrorist usage, and then the plaintiffs attempt

P1UHRaaO

1    to link this activity to the claims in the amended complaint by

2    just saying that there was an AML failure.

3              Judge, these allegations are not sufficient.  Under

4    CPLR 302, the plaintiffs have to allege a nexus between their

5    claims and the defendants' transaction of business in New York,

6    and the plaintiffs haven't done that.  What they have alleged

7    was done in New York are things that are necessary for Binance

8    to run at best —— at best —— because they're not really ——

9    because the plaintiffs say that it was about 15 percent of the

10   revenue, New York.  But even accepting, Judge, their claim that

11   New York customers provided liquidity necessary for Binance to

12   function, that doesn't do it.

13             I'll let you ask your question.

14             THE COURT:  There's no question that they meet the

15   first part, an allegation that the defendants were doing

16   business in New York, right?

17             MR. BANSAL:  Correct, there's some business here.

18             THE COURT:  Then there's the question whether the

19   claims in the case arise out of the doing business in New York.

20   Why doesn't that create, at best, an issue of fact to open up

21   discovery with respect to the nature of the activities in

22   New York and whether that has a sufficient connection?  There's

23   been no discovery with respect to that, so I just have to

24   decide it on the allegations in the complaint.  Don't the cases

25   indicate that, under those circumstances, at the very least, I

P1UHRaaO

1    need discovery to determine whether the allegations of a

2    connection between the business and the complaint are

3    sufficient?

4            MR. BANSAL:  Judge, if there is an indication that

5    something could be gained by personal —— by jurisdictional

6    discovery, then it's within the Court's discretion to grant it.

7    Maybe my colleague is going to stand up here and say that there

8    were terrorists in New York whose business was somehow

9    supporting the attacks, but there's no such allegation.  And

10   the only way, Judge, for them to make their argument that the

11   activity in New York was somehow connected to the attack is to

12   say that the activity in New York is connected to everything

13   that Binance does.  It's connected because it's essential to

14   the running of the company.  And, essentially, what they're

15   doing is they're transforming 302 into a general jurisdiction

16   statute.  They're not making that argument, Judge.  They're

17   making a specific jurisdiction argument, and they don't have it

18   because there's no connection between what they say occurred in

19   New York and anything having to do with the overseas attacks.

20   Maybe they'll draw some connections, but they haven't through

21   rounds and rounds of briefing before the magistrate court.

22           THE COURT:  That assumes that what they have to show

23   is the connection between doing business in New York and the

24   October 7 attack rather than simply financing of terrorism,

25   part of which ends up being the October 7 attack.

P1UHRaaO

1          MR. BANSAL:  But that's the claim, Judge.  The claim

2     that they have made and the claim that they must make for it to

3     survive is that Binance's conduct substantially assisted in the

4     commission of the attacks; that Binance was a culpable

5     participant in the attacks and wanted to bring them about

6     through its actions —— I'm paraphrasing slightly *Twitter* ——

7     through its actions wanted to bring the attacks about.  They

8     haven't come close to making that allegation.

9          I think everything the Court has said is correct on

10    that.  They're not making any allegation of a connection.

11    They're basically trying to say that because there was support

12    on the platform, at best —— right, at best, giving them every

13    benefit of the doubt —— because the platform was used by Hamas

14    and Binance had some notice of that, then Binance is just

15    responsible for everything Hamas does.  And that's not what

16    *Twitter* says.  *Twitter* says that that can happen in a situation

17    like Halberstam wife.  Halberstam's wife was his accountant.

18    She didn't do anything else.  So when he went and committed his

19    robberies, she was responsible for these because she was

20    essentially his coconspirator.  It was a common enterprise.

21    They have not made the allegation, and there's no plausible

22    allegation that it's that kind of relationship.  There's no

23    relationship between Binance and Hamas.

24          THE COURT:  OK.

25          MR. BANSAL:  So that's what they have to allege,

P1UHRaaO

1    Judge, in order to sustain their claim.  That is their claim,

2    and there's no relationship between that claim, which is the

3    only sustainable claim, and New York.

4         THE COURT:  Let me ask you another question.  I don't

5    know if you were going to get to it.

6         You alleged that there are reasons for about 18 of the

7    40 plaintiffs to be dismissed because they're not U.S.

8    nationals or because they're not the immediate family of a U.S.

9    citizen.  And my question is, the case plainly —— if I decide

10   the other parts of the motion, if the case were going forward,

11   why is it necessary to reach the standing of each of the

12   plaintiffs?  Some of them might have issues of fact as to

13   whether they're sufficiently connected, whether they're part of

14   the immediate family, whether they're sufficiently connected to

15   be considered like the immediate family.  Why should I decide

16   that part of the motion as part of the initial motions in the

17   case?

18         MR. BANSAL:  Judge, there is an Article III standing

19   requirement.  The plaintiffs have had an opportunity, and they

20   did submit affidavits from some of their clients, and we have

21   no objection to the Court considering those affidavits.

22   Ostensibly, if there was more factual matter to say about any

23   of the other plaintiffs, they would have raised it.

24         I should pause here to say —— I meant to —— I have

25   nothing but sympathy for these people.  I have nothing but

P1UHRaaO

 1    sympathy for these people, right, as a person.  But the law

 2    imposes requirements, and it would ——

 3            THE COURT:  OK.

 4            MR. BANSAL:  —— broaden the case, Judge, if we had to

 5    do discovery against them and they get deposed.  Why do that if

 6    there's no case?

 7            THE COURT:  OK.  I understand the argument.

 8            MR. BANSAL:  Judge, I don't have anything else, and I

 9    won't take up the Court's time with some sweeping conclusion.

10    I suppose if you have other questions after the plaintiffs'

11    case ——

12            THE COURT:  I'll give you the opportunity to reply.

13            MR. BANSAL:  Thank you, Judge.

14            THE COURT:  Thank you.

15            MR. KUSHNER:  Your Honor, I share your reaction that

16    some of the arguments from defendants' counsel were

17    breathtaking.

18            THE COURT:  Well, before we get to that, the papers

19    indicate that there's a motion to transfer the *Gess* case from

20    Alabama to this Court.  What's the status of that motion at

21    this point?

22            MR. KUSHNER:  I actually don't know the status of that

23    motion.

24            MR. BANSAL:  I can speak to it, Judge.

25            THE COURT:  OK.

P1UHRaaO

1           MR. BANSAL:  Because it's our motion.

2           THE COURT:  Yes.

3           MR. BANSAL:  It has been argued —— and I'll be

4    corrected if I'm wrong —— but we told the court that your Honor

5    is having argument and will likely decide this motion ——

6           THE COURT:  In due course.

7           MR. BANSAL:  Due course, good term, yeah.  So,

8    therefore, that there's no reason to decide that motion until

9    this Court has decided its motion.

10          THE COURT:  OK.

11          MR. BANSAL:  One second, your Honor.  Your Honor, I

12   might have mistaken something.

13          (Counsel conferred)

14          MR. BANSAL:  We told them that we would inform the

15   court within two days of a decision.  That's the only

16   amendment.

17          THE COURT:  Two days of a decision by me?

18          MR. BANSAL:  By you, Judge.

19          THE COURT:  Thank you.

20          Go ahead, Mr. Kushner.

21          MR. KUSHNER:  Thank you, your Honor.

22          So we've heard defendants' counsel, I think, minimize

23   some of the alleged misconduct by his clients here.  He said

24   there's only a single incident that we've alleged involving

25   affirmative assistance to Hamas.  He characterized some of the

P1UHRaaO

1   internal communications where Binance's senior leadership is

2   mocking the regulations as "gallows humors," and he also

3   attempted to minimize the significance of Mr. Zhao's plea

4   agreement.

5       I think when Mr. Zhao is sentenced to several months

6   in prison and Binance is fined over $4 billion, it's not

7   something that can be minimized.  The fact is that defendants

8   pled guilty to criminal conduct which bears directly on the

9   allegations of this case.  They admitted to knowingly failing

10  to register as a money services business, willfully violating

11  the Bank Secrecy Act by failing to implement and maintain an

12  effective anti-money laundering program.  They admitted to

13  willfully causing violations of U.S. economic sanctions issued

14  pursuant to the International Emergency Economic Powers Act.

15  And Mr. Zhao —— and this is critical —— he admitted to causing

16  Binance to commit these crimes, and he went to prison for that.

17      Now, your Honor, the critical point here is that the

18  statutes that Binance and Zhao admitted to violating are

19  expressly designed to prevent money laundering by terrorists

20  and criminals.

21      THE COURT:  The argument that your adversary was

22  making was that there are some specific allegations in your

23  complaint that combine, if you will, what the anti-money

24  laundering, know-your-customer requirements of the Bank Secrecy

25  Act were intended to prevent, which are criminal activities

P1UHRaaO

1    that include money laundering, to facilitate criminal

2    activities including drug transactions and money laundering, to

3    facilitate the laundering of funds used in a variety of

4    criminal activities, and you allied all of that with terrorism.

5         So some paragraphs of your complaint were not accurate

6    because they put in terrorism where the unredacted, unellipsed

7    original didn't include terrorism.  That was the argument, or

8    at least the implication of the argument.  But Mr. Bansal said

9    he was not trying to make the argument that there are no

10   allegations in the complaint that one of the purposes of the

11   anti-money laundering provisions is to prevent the facilitation

12   of terrorism.  Then he said that there's no allegation that the

13   defendants knew that their violations of law were facilitating

14   the October 7 attack, and I said I didn't think that the

15   complaint was making that allegation.  So it's your turn to

16   tell me whether the complaint is making that allegation.

17        MR. KUSHNER:  Your Honor's absolutely correct.  The

18   complaint does not allege that the defendants intended to bring

19   about the October 7 attacks.  It does not allege that the

20   defendants intended to bring about any act of terrorism.  The

21   allegation is, as your Honor correctly pointed out, when you're

22   knowingly providing financial services to terrorists, you can't

23   be held liable for aiding and abetting.  Your Honor also

24   correctly drew the analogy with some of the other cases,

25   including the *Halberstam* case, which the Supreme Court

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1UHRaaO

1    discussed extensively in *Twitter*.  The defendant in that case

2    was providing, essentially, financial services to her live-in

3    partner who was the one that was out there committing

4    burglaries.  So this defendant was doing tax forms, counting

5    money.  There's no allegation that the defendant in the

6    *Halberstam* case intended to commit a murder, but the Supreme

7    Court says, and *Halberstam* says, you don't need to allege that

8    as long as you can show that someone knowingly provided

9    substantial assistance to someone committing a wrongful act, in

10   this case burglary —— in the *Halberstam* case, it's burglary ——

11   and you can show that a murder is a foreseeable consequence of

12   a burglary, that's aiding and abetting.  OK?  And that's in a

13   nutshell what we're saying here.  We're saying that the

14   defendants knowingly provided financial services to Hamas and

15   Palestine Islamic Jihad, PIJ.  There are cases which uphold

16   that type of liability.

17          And, your Honor, you asked the defendants about what

18   their best cases were.  I think, on our side, *Twitter* is one of

19   our best cases, but the Second Circuit's decision in *Kaplan*,

20   which is from 2021, is also very on point because, there, you

21   have the Second Circuit upholding aiding and abetting liability

22   for a bank where the bank is accused of providing financial

23   services to the Hezbollah terrorist group.  And just as we

24   allege here, the allegation in that case is that the bank is

25   aware that it has certain customers that are part of Hezbollah.

P1UHRaaO

1    Again, there's no allegation in that case that the bank —— and

2    this was Lebanese Canadian Bank —— there was no allegation that

3    the bank intended to bring about a Hezbollah terrorist attack.

4    There's no allegation that the bank had any knowledge of a

5    terrorist attack.  Rather, as the Second Circuit held, the bank

6    can be liable for aiding and abetting because it's knowingly

7    providing financial services to Hezbollah.  And that is one of

8    our best cases.  And, your Honor, I note that the *Kaplan* case

9    was not even cited in the other side's briefing.

10          Your Honor, with respect to the issue of whether our

11   allegations involve nonfeasance or malfeasance or active or

12   passive, I think that the defendants essentially are

13   disregarding the facts pled.  We do allege plenty of active

14   assistance, so it's not simply —— it's not simply that Binance

15   is apprised by its own third-party vendor that there's a

16   Hamas-linked user on the platform, and Binance is affirmatively

17   going out and telling this user, hey, you've been flagged.

18   It's not just that.  That is one instance, it's true, but it's

19   not just that.

20          By the way, your Honor, let me just pause on that

21   because it's breathtaking the way that they're trying to

22   minimize this.  Here, you have a money transfer business, OK,

23   and the very idea that a money transfer business is going to

24   move money for people without asking them who they are, to do

25   absolutely no verification of the customer, don't even ask any

1    questions, when a money transfer business knowingly does that,

2    to say that they're not enabling illegal activity is just not

3    credible.  But that's not even what we're alleging here.  We're

4    alleging that they are told by their third-party service

5    provider that, hey, Hamas is on the platform.  PIJ is on the

6    platform.  And in this specific instance, OK, a money transfer

7    business, which is supposed to be registered — in this case it

8    was not — when a money transfer business is told there is a

9    specially designated global terrorist that is transacting on

10    your platform, the regulatory obligation is to seize — seize

11    — the account of the specially designated global terrorist.

12    You've got to seize those funds.  You've got to block those

13    transactions.

14         So not only did Binance not immediately seize the

15    terrorists' funds, they said:  Take your funds.  You can take

16    your money and leave.  Not only do they do that, they said:

17    Guess what, you've been flagged.  So they affirmatively

18    assisted this user to evade regulatory scrutiny.  So that's

19    pretty significant.

20         But, your Honor, moving money for terrorists is

21    active.  Processing transactions is active.  That's the heart

22    of this case.  And, again, your Honor was, I think, correctly

23    pointing out that the *Twitter* case involved social media

24    companies, and the social media context is different than the

25    context of regulated entities that have KYC requirements and a

P1UHRaaO

1    whole regulatory framework.  I think your Honor hit the nail on

2    the head.  There's a very big difference between a video that

3    is posted by a terrorist group on social media versus money

4    going to terrorists.  There's no regulatory obligation to seize

5    videos, to block postings, right?  That is a completely

6    separate context.

7          So when *Twitter* is —— what *Twitter* is dealing with is

8    a completely different context.  I would respectfully submit ——

9    I think your Honor may have been thinking this —— if the

10   *Twitter* court was presented with these facts, they would have a

11   very different discussion of duty.  I think that the notion

12   that a regulated entity is just going to allow, knowingly

13   allow, terrorists to transact on their platform and the idea

14   that somehow that duty doesn't trigger aiding and abetting is

15   just —— it's not credible.  I think the more appropriate

16   analogy is the *Kaplan* case where the regulated entity is

17   knowingly permitting transactions with terrorists and is liable

18   for aiding and abetting.

19         Your Honor mentioned that ——

20         THE COURT:  Could I stop you there.

21         MR. KUSHNER:  Sure.

22         THE COURT:  You've been addressing, so far, aiding and

23   abetting, which is Count Three of the complaint.  As I told

24   your colleague, primary liability under Counts One and Two is

25   far more problematic, and it's questionable whether you could

P1UHRaaO

1    make the necessary allegations for primary liability,

2    particularly when you concede that you're not arguing that

3    there was any knowing facilitation of the specific October 7 —

4    I don't want to overstate your position, but you don't appear

5    to be alleging scienter with respect to the specific October 7

6    attack.

7           MR. KUSHNER:  Your Honor's absolutely right that

8    primary liability is a more difficult claim.

9           THE COURT:  Do you want to just withdraw Counts One

10   and Two?

11          MR. KUSHNER:  Well, Count One is the secondary

12   liability.  Counts Two and Three are primary.

13          THE COURT:  Ahh, I'm sorry.

14          MR. KUSHNER:  Well, I don't want to withdraw Counts

15   Two and Three, but I do want to make my best argument for

16   keeping them in, while conceding that they're perhaps not as

17   strong as counsel one.  The argument is this, your Honor:

18   There is case law —

19          THE COURT:  There is what?

20          MR. KUSHNER:  There is case law which suggests that

21   knowingly giving money to a terrorist group does meet the

22   definition of international terrorism in 18 U.S.C.

23   Section 2331.  So your Honor already mentioned, I think, the

24   quote about giving money to Hamas is an act dangerous to human

25   life, or your Honor may have said something similar to that.

P1UHRaaO

1   That is a quote from the Seventh Circuit's decision in *Boim*,

2   and that decision is an *en banc* decision by the Seventh

3   Circuit.  It was written by Justice Posner.

4           THE COURT:  Judge Posner.

5           MR. KUSHNER:  He in that decision upholds a claim for

6   primary liability.

7           THE COURT:  Judge Posner.

8           MR. KUSHNER:  Judge Posner, sorry, yes.

9           The *Boim* decision has been cited with approval in

10  district courts in the Second Circuit, and I think the Second

11  Circuit also cited it without passing upon whether it was

12  correct or not.  But it was cited with approval in

13  *Schansman v. Sberbank*, which is a Southern District decision

14  from 2021.  And *Boim* affirmed judgments against charities that

15  donated money to Hamas under a primary liability theory.

16  Again, in those cases, there was no allegation that the

17  charities intended to bring about terrorist attacks.

18          So let me just quote you something from *Boim* on this

19  point.  *Boim* wrote:

20          "Donations to Hamas, by augmenting Hamas's resources,

21  would enable Hamas to kill or wound or try to kill or conspire

22  to kill more people in Israel.  And given such foreseeable

23  consequences, such donations would appear to be intended to

24  intimidate or coerce the civilian population or to affect the

25  conduct of a government by assassination as required by

P1UHRaaO

 1    Section 2331, paragraph 1."

 2                THE COURT:  Was that before JASTA?

 3                MR. KUSHNER:  Yes, it was before JASTA, so that can be

 4    read in two ways.  One might say that, after JASTA, the same

 5    type of allegations would only sound in secondary liability and

 6    would not state a primary liability claim, but Judge Posner

 7    actually discusses this issue extensively in his opinion.  And

 8    he notes that Congress has not enacted an aiding and abetting

 9    —— at least at that time.  He goes through that analysis and ——

10                THE COURT:  So the Anti-money Laundering Act was the

11    only alternative to find liability because Congress had not yet

12    passed secondary liability.

13                MR. KUSHNER:  Correct.  Look, that is one issue with

14    that case because it is a pre-JASTA case.  Your Honor's

15    absolutely right.  But the *Schansman* case in the Southern

16    District from 2021 is post-JASTA, and it does kind of reach the

17    same conclusion.  That was a decision by Judge Carter.  And

18    what he said in that case was:  "When banks route payments and

19    maintain accounts for terrorist organizations to enhance their

20    ability to commit terrorist attacks, they are committing acts

21    dangerous to human life."

22                So, your Honor, there is some case law that supports

23    the primary liability theory under the facts we've alleged

24    here, but I acknowledge that the primary liability claim is not

25    nearly as strong as the aiding and abetting claim and also that

P1UHRaaO

1    there are perhaps cases going the other way on this primary

2    liability.

3        I'd like to go back to address the point about

4    malfeasance versus nonfeasance, I think, and also the related

5    point that defendants did not have contemporaneous knowledge

6    that Hamas or PIJ were transacting on the platform.  I think

7    that, to a large extent, they're disputing the facts pled

8    because there are numerous factual allegations that establish

9    that facts, if taken as true, that they were very much on

10   notice that Hamas and PIJ were transacting on the platform.  So

11   they were on notice not only from media reports that Binance

12   wallets are being used by Hamas to solicit donations, but there

13   are allegations that their third-party service provider told

14   them that Hamas was on the platform, that PIJ was on the

15   platform.

16       So what they really seem to be arguing, your Honor, is

17   that the complaint hasn't alleged that for every single

18   transaction involving a Hamas or PIJ wallet, that we have to

19   show that Binance knew that somehow that wallet was associated

20   with a terrorist group.  But at the pleading stage, we don't

21   have to make that kind of showing.  Knowledge can be alleged

22   generally, and I would submit that we put in much more than we

23   need to at the pleading stage to establish knowledge.

24       When you look at all the facts pled in totality, the

25   sheer volume of Hamas and PIJ transactions, when you look at

P1UHRaaO

```
1    what Binance was told by its own third-party service provider

2    about Hamas and PIJ transactions on the platform, when you look

3    at ──

4              THE COURT:  The total amount alleged in the complaint

5    is 60 million, is that correct?

6              MR. KUSHNER:  60 million ── that they moved 60 million

7    in funds related to Hamas and PIJ.  There's another 40 million

8    or so from the Gaza-based money services business.  And, your

9    Honor, that's just a drop in the bucket.  That's just what our

10   own expert was able to identify from public information, and

11   it's also a drop in the bucket compared to what the government

12   found.  The government found ── and this is in paragraph 16 of

13   our complaint ── Binance processed over 1.6 million

14   transactions involving U.S. users and users who were blocked

15   persons or users in sanctioned jurisdictions.  That's over

16   1.6 million.  So we're handicapped because ──

17             THE COURT:  But you don't know what relationship that

18   has to Hamas and PIJ.

19             MR. KUSHNER:  Well, we don't know the details of those

20   1.6 million because it's nonpublic, and our allegations are

21   based on what is public or what we've been able to adduce from

22   public information.  We have alleged enough just from what's

23   public to show that there is a staggering amount of Hamas and

24   PIJ activity on Binance.  We allege thousands of transactions.

25   You know, the 60 million is thousands of transactions, your
```

P1UHRaaO

 1    Honor.  And just the scale of the defendants' misconduct is
 2    staggering when you look at it not only in terms of its scope,
 3    in terms of the number of transactions, but the duration ——
 4    it's over many, many years —— and in its deceptive nature.  All
 5    these are relevant to the analysis of knowing and substantial
 6    assistance because, as the Supreme Court said in *Twitter*,
 7    knowing whether assistance is —— the scienter component and the
 8    assistance component are part of a single inquiry.  You've got
 9    to look at everything, at the totality.
10        So, here, you have a money transfer business that for
11    years, years, is operating without asking any questions about
12    who its customers are, totally disregarding the regulations.
13    And not only are they not following the regulations, but when
14    they're apprised that terrorists are on the platform, they do
15    nothing.  They, in some cases, help them evade the regulators.
16    It's not surprising that terrorists and criminals are attracted
17    to the platform because word gets around that Binance is open
18    to anybody.
19        Your Honor, I think this is one reason why this case
20    is so different from probably just about any other ATA case.  I
21    don't think there's any other case in which you have such
22    pervasive, willful, company-wide disregard of United States
23    laws designed to prevent the financing of terrorists, and it's
24    directed from the very top of the company and its senior
25    leadership, and it went on for years.

P1UHRaaO

1          For example, just to take one example, Binance's chief

2    compliance officer wrote in an internal message that, as

3    instructed by Mr. Zhao, Binance would engage in the

4    "international circumvention of KYC to make the U.S. regulatory

5    authorities not trouble us."  Now, they point to some other

6    cases where banks may have gotten off or have been found not

7    liable for aiding and abetting, but I don't think there's any

8    other case with this type of pervasive criminal conduct

9    directed from the very top, this kind of willful flouting of

10   regulations and circumventing the regulators.  For the chief

11   compliance officer to say we are going to engage in the

12   international circumvention of KYC, that's active, your Honor.

13   What you're doing is you're kneecapping law enforcement.

14          THE COURT:  But this case is not about general

15   criminal conduct, but rather about terrorism.  So the argument

16   on the other side is, as I said before, some of the statements

17   on which you rely are not specifically related to terrorism.

18          MR. KUSHNER:  Some are not, but many are.  So, your

19   Honor, paragraphs 214 and 215 of our complaint, we say that ——

20          THE COURT:  I know.  We've discussed that.

21          MR. KUSHNER:  Yeah.

22          THE COURT:  Can I ask you another question.  You can

23   go back to this, but what connection did the business that the

24   defendants did in New York have to the allegations in the

25   complaint sufficient for personal jurisdiction in New York?

P1UHRaaO

1          MR. KUSHNER:  So, your Honor, first of all, I want to

2     just follow up on that, on your comment regarding discovery.  I

3     think that discovery is necessary to determine whether or not

4     defendants processed transactions in New York that are directly

5     related to this case.  And, your Honor, I note that in

6     Binance's criminal plea agreement, in their statement of facts,

7     they admitted that they processed transfers between users in

8     the District of Washington and Iran, which is a blocked

9     jurisdiction.  And I think, to draw an analogy, it's very

10    possible that Binance could have processed transactions between

11    users in the state of New York and Hamas wallets, and that

12    could only be discovered in discovery.  So if such transactions

13    existed — and I think it's very likely they did — it would

14    provide a direct nexus between New York and the allegations in

15    this case.

16          But setting that aside, your Honor, setting that

17    aside, the facts pled do give rise to an alternative theory of

18    personal jurisdiction in New York, and that theory is that

19    because Binance's business depended on these market makers in

20    New York, the only way that they were able to operate at all is

21    by knowingly directing conduct to the market makers in

22    New York.  And I think that what's critical here is that U.S.

23    users, including in New York, were critical to Binance's

24    business.  It's a substantial part of their business.

25          And their variability to operate depends on having

P1UHRaaO

1   liquidity, and liquidity in turn depends on having these market

2   makers.  And our theory of the case is that the platform was

3   opened up to anybody, including terrorists and criminals.  One

4   of the reasons why Binance had liquidity is because they were

5   able to open up the platform to anybody.  So there is some

6   nexus between creating a market in New York and the fact that

7   anybody was able to use the platform.  It may not be as direct

8   a nexus compared to the scenario in which a New York-based user

9   is sending money to a terrorist group and using the Binance

10  exchange, but it nevertheless is a nexus.

11          Now, your Honor, we also say that jurisdiction is

12  proper under Rule 4(k)(2) of the federal rules, and perhaps

13  that's even more clear because the defendants filed a waiver of

14  service.  And I didn't hear defendants' counsel say that

15  Binance is amenable to general jurisdiction in any state, and

16  in those types of circumstances where the defendant files a

17  waiver of service and the defendant is not subject to

18  jurisdiction in any state, the court can exercise personal

19  jurisdiction.  And so that's exactly the type of situation in

20  which the rule was designed to address.

21          THE COURT:  I would have thought that, given the

22  contacts between Binance and the United States, there must be

23  some state in which Binance could be sued, whether it's Alabama

24  or some other state.

25          MR. KUSHNER:  But they have not said that, and they've

P1UHRaaO

1    been given opportunities.  It wasn't in their briefs and it

2    wasn't in the argument today.  So if they're willing to stand

3    up before your Honor today and represent that Binance is

4    subject to general jurisdiction in some state, then this

5    argument would fall away, but they haven't done that, your

6    Honor.

7                THE COURT:  OK.

8                MR. KUSHNER:  Your Honor, with regard to the

9    plaintiffs' standing, we agree that the Court does not need to

10    meet that issue at the motion to dismiss stage, and it can be

11    dealt with later.

12                THE COURT:  The defendants make a fair argument that

13    it's Article III standing, and I have to do it.

14                MR. KUSHNER:  OK.

15                THE COURT:  Go ahead.

16                MR. KUSHNER:  With respect to standing, does the Court

17    have any particular questions about any particular plaintiffs?

18                THE COURT:  No, no.  OK.  I mean, there are some

19    plaintiffs who plainly don't seem to qualify or who are not

20    United States citizens or survivors of deceased U.S. citizens.

21    So I have to go through each of the allegations.  There are

22    about 15 disputed plaintiffs, and I'll do that.

23                MR. KUSHNER:  Your Honor, let me, then, briefly

24    address some of the arguments.  And for some of the plaintiffs,

25    we are going to withdraw them.

P1UHRaaO

1          THE COURT:  No, I'll rely on the briefs with respect

2    to each of the plaintiffs.

3          MR. KUSHNER:  OK.  But, just for clarity, the two are

4    Dorian Bosi and Yosef Ben Aderet.  The other 16 are in dispute

5    and do have standing.

6          THE COURT:  I'm sorry.  You're conceding that a few of

7    the plaintiffs should be dismissed?

8          MR. KUSHNER:  Two.

9          THE COURT:  Two.  Which two?

10         MR. KUSHNER:  Dorian Bosi and Yosef Ben Aderet.

11         THE COURT:  OK.

12         MR. KUSHNER:  Unless your Honor has any further

13   questions.

14         THE COURT:  No, thank you.

15         Mr. Bansal, at the outset, is jurisdiction possible

16   here under 4(k)(2) because the defendant is not subject to

17   jurisdiction in any state's court of general jurisdiction?

18         MR. BANSAL:  Judge, I don't think we have to reach it

19   because I don't think we've been served and —— we have not been

20   served.

21         THE COURT:  I thought you had agreed to service

22   without waiving any defenses that you had, but I thought that

23   what you were waiving was that you had been served.

24         MR. BANSAL:  Well, the plaintiffs signed a stipulation

25   that says that the plaintiffs agree not to argue that the

P1UHRaaO

1    waiver affects any of the stipulating defendants' other rights,

2    defenses, or objections including but not limited to defenses

3    based upon lack of personal or subject matter jurisdiction.  So

4    they're arguing something that they agreed not to.

5         THE COURT:  But it's hard to read that as including a

6    defense of lack of service.  I mean, lack of personal

7    jurisdiction, you didn't waive, didn't waive other defenses.

8    But what's the purpose of agreeing to receive service if you're

9    going to turn around and say, aha, we weren't served?

10         MR. BANSAL:  The purpose of this stipulation was to be

11   able to join issue before the Court, not have to come here in

12   make a 12(b)(5) argument that we weren't served, which would be

13   inefficient because we wouldn't have to take up all of the more

14   substantive issues.

15         THE COURT:  Right.

16         MR. BANSAL:  So it was an effort to try to streamline

17   the proceeding, preserving our right to challenge personal

18   jurisdiction, obviously, under 4(k)(2).

19         THE COURT:  Personal jurisdiction, but I wouldn't

20   think it covered lack of service when you agreed to service.

21         I know that that's an argument, but are the defendants

22   subject to jurisdiction in any state courts of general

23   jurisdiction, or you're not authorized to answer that question?

24         MR. BANSAL:  You are correct, Judge, and I don't think

25   the Court has to reach it because, regardless, the plaintiffs

P1UHRaaO

1    have not met the due process requirements that they would have

2    to meet in order to show personal jurisdiction even under

3    4(k)(2).  Even if you ignored the service issue, even if you

4    were to find a company is not subject to jurisdiction anywhere

5    else in the United States, so therefore you would go to the

6    third prong, which is does personal jurisdiction comport with

7    the Constitution, it doesn't because there are no sufficient

8    contacts between the jurisdiction and the conduct alleged.  It

9    is a tort-specific test, and the plaintiffs have not met it for

10   the very same reason that they have not met their burden of

11   establishing jurisdiction in New York.

12            THE COURT:  OK.

13            MR. BANSAL:  So, Judge, while we're on the issue of

14   personal jurisdiction, I just wanted to point out that when the

15   Court asked my colleague what connections are there with

16   New York, I heard the words "very possible," and then I heard

17   the words "very possible" turn into "very likely."  And I think

18   that's based on nothing, Judge.  I think that's just not a

19   basis to grant jurisdictional discovery that something is very

20   possible.  So many things are very possible.

21            Judge, going back to the substantial assistance point,

22   my colleague said the word "willfully" many, many times when he

23   started.  I'm not sure what he meant.  I think the Court

24   identified it, but to make sure that the record's clear,

25   willfulness in the context of the Bank Secrecy Act is that one

P1UHRaaO

1    knew that they were supposed to have an effective AML program

2    and didn't have it.  It's not willfulness with respect to

3    anything else.  So when my adversary comes up and says that the

4    company and Mr. Zhao admitted to willfulness, that's all the

5    willfulness that they admitted to.  It has nothing to do with

6    the allegations in this complaint.

7            I think, very importantly, my colleague said —— and I

8    tried to get it down as close to quoting as possible —— the

9    complaint does not allege that the defendant intended to bring

10   about any act of terrorism.  That is what I heard; that's what

11   I wrote down.  The transcript will say what it says, but that's

12   what I heard.  In *Twitter*, the Court held that the allegations

13   were insufficient because the allegations do not suggest that

14   defendants —— I'm quoting now —— "culpably associated

15   themselves with the Reina attack, participated in it as

16   something that they wished to bring about or sought by their

17   action to make it succeed."

18           So not only have plaintiffs now conceded that my

19   clients did not intend to bring about the terrible attack that

20   resulted in the tragic injuries to their clients, but that my

21   client did not intend to bring about any act of terrorism.  So

22   then all it is is what *Twitter* again found exactly

23   insufficient.  It is an allegation that, at best, is an

24   allegation of assistance to the organization floating above any

25   specific act, any act, and that is plainly insufficient.  It

P1UHRaaO

1    helps streamline the case a lot, and I credit my colleague for

2    making the concession because it's clear from the complaint,

3    and I think it ends the case.

4         I do want to talk about *Kaplan* because my colleague

5    did.  The *Kaplan* decision was before *Twitter*, but there was

6    much more assistance that was found to have sustained that

7    claim.  In that case, in *Kaplan*, the defendant was alleged to

8    have helped a customer called Shahid.  Shahid was known to

9    subsidize the families of Hezbollah suicide bombers and,

10   indeed, to provide financial reassurance to prospective suicide

11   bombers.  That's a direct connection, direct connection between

12   the assistance given and the attacks, which my colleagues have

13   conceded was not present in this case.

14        Also in *Kaplan*, the bank granted special exceptions to

15   Hezbollah-related customers, special exceptions to

16   Hezbollah-related customers.  Again, my colleague has said that

17   there were terrible AML failures.  He has said they were

18   pervasive AML failures.  There is no allegation of any special

19   treatment.  And, again, that is very important under *Twitter*

20   because it bespeaks an utter lack of intent.

21        When my colleague was addressing the pervasiveness,

22   when he was addressing the outrageousness, supposedly, of the

23   conduct and the intent, he mentioned one incident.  The one

24   incident that he mentioned was the one in July of 2020 in

25   paragraph 216, which we talked about at length.  So I don't

P1UHRaaO

 1   take much from that.

 2           Judge, I do want to address the cases that the Court

 3   raised, because I had a little time to look up when I was

 4   sitting.  We talked about the *King* case, the *Bonacasa* case was

 5   a case where the assistance that was provided was a structured

 6   loan that was specifically so that this company that made

 7   fertilizer —— which, again, that's a gun, Judge.  That's closer

 8   to a gun.  These are just regular financial services —— *Zobay*

 9   similarly, that was over the provision of embargoed technology,

10   something that was intended to stay out of the hands of

11   terrorists.  It's not money.  Money is —— that's closer to a

12   gun.  It's not exactly a gun, but it's way closer to a gun.

13   This is just money.  Not to say that that's not —— that that's

14   not significant, but it is not something that is specifically

15   directed at assisting Hamas.

16           THE COURT:  Thank you.

17           MR. BANSAL:  I don't have anything else, Judge.  Thank

18   you.

19           MR. KUSHNER:  Your Honor, can I respond briefly?

20           THE COURT:  Yes, very briefly.

21           MR. KUSHNER:  I'll just respond very briefly on the

22   due process point.  So the defendants, they didn't raise this

23   argument that somehow the application of Rule 4(k)(2) would

24   violate due process.  They didn't raise it in their opening

25   brief, so it was waived.

P1UHRaaO

1          But, in any event, your Honor, the test, the due

2     process test, is a nationwide test.  It's whether the defendant

3     has contacts with the entire United States, has minimum contact

4     with the entire United States.  It's not just New York.  The

5     notion that they don't have minimum contact with the U.S., it's

6     really not credible.

7          Let me just read one quote on this point.  So in their

8     guilty plea, paragraph 27 of Binance's guilty plea, it said,

9     "It intentionally sought and served millions of customers

10    located in the United States."

11         In paragraph 48 of their guilty plea, Binance admitted

12    that, according to its own transaction data, U.S. users

13    conducted trillions of dollars in transactions on the platform

14    between August 2017 and October 2022, transactions that

15    generated approximately 1.6 billion in profit for Binance.

16         Unless your Honor has further questions. . .

17         THE COURT:  No.  OK.

18         MR. BANSAL:  Thank you, your Honor.

19         THE COURT:  Thank you, all.  I'll take the motion

20    under submission.

21         (Adjourned)

22

23

24

25