# SEIDEN | LAW

August 13, 2025

**VIA ECF AND FEDEX**
Hon. Barbara C. Moses
United States Magistrate Judge
United States District Court, Southern District of New York
500 Pearl Street, New York, NY 10007

**Re:** *Raanan et al. v. Binance Holdings Limited et al.*, 1:24-cv-00697-JGK-BCM

Dear Judge Moses:

We write in further support of Plaintiffs' motion to compel Defendants to produce documents responsive to Plaintiffs' jurisdictional discovery requests (ECF 86; "Motion" or "Pl. Letter") and in reply to the opposition letters by Defendants Binance and Zhao (ECF 87, ECF 90; "Binance Letter" and "Zhao Letter," respectively). As set forth herein and in the Motion, the Court should compel Defendants to produce all responsive documents.[1]

## PRELIMINARY STATEMENT

"It is well settled under Second Circuit law that, even where plaintiff has not made a prima facie showing of personal jurisdiction, a court may still order discovery … when it concludes the plaintiff may be able to establish jurisdiction *if given the opportunity to develop a full factual record*." *Davey v. PK Benelux B.V.*, 2021 WL 3501199, at *1 (S.D.N.Y. Aug. 6, 2021). A court "*should take care to give the plaintiff ample opportunity* to secure and present evidence relevant to the existence of jurisdiction." *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003).

In its February Order, the Court granted jurisdictional discovery and permitted Plaintiffs to test their theories that soliciting market-making and liquidity-generating activities by Defendants' New York-based "VIP" customers, concealing those VIPs from the government, and funding market-making activities by Zhao's foreign entities through a New York bank could establish CPLR 302 jurisdiction over Defendants. February Order at 11-13. Defendants' discovery conduct makes clear that Defendants seek to retroactively limit the February Order and selectively respond to Plaintiffs' relevant discovery requests. On July 31, 2025, the day Plaintiffs filed this Motion, Binance produced a massive amount of purportedly responsive information that Binance maintained satisfied Plaintiffs' Requests and supposedly demonstrated the futility of Plaintiffs' jurisdictional theories. ECF 89-1 at 1-2; Binance Letter at 1-2, 4-5 (as to this production, the "July Production"). Binance now proclaims that no further discovery is necessary. Binance Letter at 7. Zhao, who objects to producing anything, agrees. Zhao Letter at 5-7. Defendants wrongly assert that they can unilaterally cease or limit the scope of jurisdictional discovery on the basis that Plaintiffs' theory of personal jurisdiction is purportedly "unsustainable." Binance Letter at 7. To that effect, it is a fundamental principle of discovery

---

[1] Capitalized terms not defined herein have the same meaning ascribed in Plaintiffs' Motion. All emphasis is added; internal citations and quotations are omitted.

that "each side is entitled to pursue intelligible theories of the case and [neither party can] ... by their sole insistence, declare evidence undiscoverable or irrelevant merely because it does not fit into their own theory of the case." *XChange Telecom Corp. v. Sprint Spectrum L.P.*, 2015 WL 773752, at *3 (N.D.N.Y. Feb. 24, 2015).

Moreover, the July Production is not responsive to Plaintiffs' Requests. Consisting largely of "trading data" based upon Binance's unilaterally-selected criteria, the July Production is a rigged data dump engineered to generate Binance's favored conclusion. The Requests to which the Production purports to respond seek information concerning Binance's self-designated New York-based "VIP" customers that, beginning in 2019, Binance illegally retained on its international platform. Binance knows who these customers are; at all relevant times Binance identified its VIPs and "paid close attention" to them. Ex. A at ¶¶17-18, 29. Rather than provide information about *those* users, Binance appears to have produced the meager results of a clean-up exercise required by FinCEN's 2023 consent order, requiring Binance to identify straggler U.S. users that remained on the U.S. platform long after the VIPs and other U.S. users had likely already been offboarded. Ex. B at VI.B at ¶¶7-8. Whereas Binance maintains that there are only 18 U.S. users responsive to Plaintiffs' Requests and that those users account for only 1.3% of global trading volume (Binance Letter at 1, 5), Binance admitted in its 2023 DOJ plea agreement to having **3,500 U.S. VIPs that generated approximately 23.3% of its overall trading revenue**.

Defendants have wasted critical time and resources and have engaged in impermissible gamesmanship. The Court should compel Defendants to produce all responsive documents.

**I.   DEFENDANTS SHOULD PRODUCE ALL RESPONSIVE DOCUMENTS**

   **A.  Defendants Incorrectly Limit The Scope Of Jurisdictional Discovery**

Defendants misread the February Order. In Defendants' view, jurisdictional discovery is limited to "clarify[ing] the character and extent of the connection, if any, between the alleged market-making activities of Binance's New York-based VIP customers and Binance's ability to provide financial services." Binance Letter at 2; Zhao Letter at 2-3. Defendants are wrong.

The February Order authorizes jurisdictional discovery tethered to Plaintiffs' two related sets of allegations: (1) "the relationship between Binance's alleged circumvention of regulatory requirements involving its New York customers and Binance's similar alleged misconduct involving FTOs" (February Order at 11-12) and (2) "the link between Defendants' alleged New York-based transactions and the wrongs alleged by the plaintiffs" and specifically those transactions that provided Binance with necessary liquidity or market-making functions. *Id.* at 12 n.3. The Court also included within the scope of discovery Plaintiffs' theory regarding Zhao's accounts at Signature Bank. *Id.* at 12-13. Contrary to Defendants' assertion, the Court concluded only that Plaintiffs had ***not yet*** established a prima facie showing for their jurisdictional theories. *Id.* at 10 (as to liquidity and market-making allegations); *id.* at 11-12 (as to Defendants' illegally concealing New York VIPs). It was precisely because the Court found that Plaintiffs had "***made a sufficient start***" toward establishing these bases that jurisdictional discovery was warranted – so that Plaintiffs "***may be able to establish jurisdiction if given the opportunity to develop a full factual record***." *Id.* at 13.

**B. Binance's July Production Is Not Responsive To Requests 1-3 And 9-10**

Binance maintains that its July Production purportedly proves that Binance's U.S. users made up only "1.3% of global trading volume" and accordingly that this data rebuts Plaintiffs' liquidity and market-making theory of jurisdiction. Binance Letter at 4. Binance's conclusion and methodology underscore that the Court should order production of all responsive documents.

Binance's July Production is not responsive to these Requests for numerous reasons. *First*, Defendants selected an unduly narrow time period that excludes a massive amount of relevant information. These Requests seek information from July 14, 2017 to October 7, 2023, a period from Binance's inception up to the Attacks ("Plaintiffs' Relevant Period"). These Requests specifically targeted Binance's 2019 decision to mislead U.S. regulators and maintain high-volume customers on its unregulated international platform. In September 2019, when Binance launched its U.S. platform, it "maintained a substantial number of U.S. users on Binance.com, including U.S.-based VIP users that at times conducted virtual currency transactions equivalent to billions of U.S. dollars per day, *helping provide liquidity necessary for Binance*." Ex. A at ¶46. By Binance's *own admission*, the "goal" was to have "US users slowly turn into … other users." *Id.* at ¶39 (cleaned up). By Binance's design, these U.S. users' trading volume relative to Binance's global trading volume would decrease over time. Notably, the time period of the misconduct for which Defendants pled guilty was August 2017 through October 2022. And yet, Defendants provided information from the latest possible portion of this period, September 2022 to October 2023 ("Binance's Relevant Period"), excluding information from 50 relevant months.

Defendants should produce documents from Plaintiffs' entire Relevant Period because Defendants have *admitted* that their jurisdictionally relevant conduct – their seeking, retaining, and concealing 3,500 U.S. VIPs, any of which could be related to New York – *occurred throughout Plaintiffs' Relevant Period*, between "*August 2017 and continuing until at least October 2022*." Ex. A at ¶¶1, 17. In their November 2023 DOJ plea agreement, Defendants admitted that:

- Binance provided incentives to "*higher-volume traders*" because such users "*helped provide liquidity* … *Binance needed individuals or entities willing to 'make markets' in [any] asset* … *To attract market makers, Binance rewarded them with 'VIP' status* [.]" *Id.* at ¶16.

- Binance "*paid close attention*" to its VIP users (*id.* at ¶18) and "*assessed a user's VIP status each month based on the user's prior 30-day trading volume and the user's holdings in Binance's proprietary token* [.]" *Id.* at ¶17.

- Defendants retained a "substantial number of U.S. users to Binance.com – *particularly U.S. VIP users*"; such users "*accounted for an outsized percentage of Binance's revenue and of the trading volume* [.]" *Id.*

- Defendants' U.S. based VIPs included *individual retail users who traded a broad range of virtual assets*. *Id.* at ¶28.

Defendants' admissions directly contradict Defendants' assertion that Binance's VIP users constituted merely "1.3% of global trading volume." Similarly, Defendants admitted to numerous jurisdictionally relevant activities during Plaintiffs' Relevant Period concerning Defendants' illegal concealment of Binance's U.S. VIPs, further demonstrating the relevance of documents from this Period. Ex. A at ¶¶32-48, 51-59 (detailing concealment from 2018-2022).

*Second*, Defendants' set of cherry-picked, purported "VIP" users—a tiny subset of the actual number of VIPs—is unresponsive to Plaintiffs' Requests. Plaintiffs seek the names, physical and digital addresses, and trading volumes of those users Defendants designated as VIPs during Plaintiffs' Relevant Period. ECF 86-1 at Requests 1-3, 9-10. However, Binance produced only those users still operating on the international platform as of September 2022. This meager number conflicts with Defendants' admissions that between August 2017 and October 2022:

- Binance experienced "[r]apid user growth" such that "***in its first forty-five days of operation … more than 23% of Binance's 122,729 users were from the United States, a greater share than from any other country***." Ex. A at ¶29.

- ***In June 2019***, "Zhao sought and requested information regarding the number of U.S. VIPs on Binance.com … his assistant informed him that Binance had more than ***1,100 U.S. KYC VIP users***. On a ***June 9, 2019*** recorded call … [a Binance officer] stated that Binance had more ***than 3,500 VIPs from the United States*** … and the total number of U.S. and non-U.S. VIP and enterprise users accounted for more than 70% of Binance's revenue. On a ***June 25, 2019*** call … [a Binance officer] further noted that Binance's approximately ***11,000 VIPs accounted for more than 70% of its trading revenue. Of that 70% of trading revenue, U.S. VIPs accounted for about one-third***." *Id*.

- "***U.S. users conducted trillions of dollars in transactions on the platform between August 2017 and October 2022-transactions that generated approximately $1,612,031,763 in profit for Binance***." *Id.* at ¶48.

Binance's mini-set of 18 users excludes those already offboarded, a population constituting the bulk of the thousands of U.S. VIPs that accounted for approximately ***23 percent of Binance's trading volume in 2019*** and that, during Plaintiffs' Relevant Period, accounted for ***trillions of dollars in transactions.*** *Id.* at ¶¶37, 48; Ex. C at ¶¶8(f)(xii), (xv); Ex. D.[2]

And *third*, in the few days that Plaintiffs have had to analyze the July Production, Plaintiffs have already identified what appear to be critical gaps in the production data such that Defendants' objections to production based upon the purported results of the July Production should be rejected. In addition to the issues identified above, Plaintiffs identified that:

---

[2] Binance's assertion that Plaintiffs did not previously raise an issue with its user-selection methodology is nonsense. Prior to Plaintiffs' Motion and the July Production, Binance never provided any information about its methodology.

- The date range for each data set varies, with some sets covering the period of September 1, 2022 to October 31, 2023 and one that covers only eighteen minutes on September 13, 2022.

- Whereas Binance represented that the July Production consisted of trading data for 18 users, Binance produced trading data for *only 15 users*.

- For these 15 users, Binance provided *only limited trading data*: (i) margins for only 3 users; (ii) futures for only 8 users; and (iii) spots for only 12 users.

- The data is for activity for *only corporate entities* and not individual/retail users even though Defendants admitted the latter were U.S. VIPs. Ex. A at 28.

- The July Production's volume calculations do not explain whether volume is based on the number of transactions or the value of those transactions.

- Instead of calculating global trading volume based on all currencies transacted on Binance, the July Production appears to establish value *based on transactions involving only one currency pairing – Tether (USDT)*, which during this time was not even the most valuable crypto currency.

- While the 15 users have transactions for 1,362 symbols, each representing a commodity transaction, Binance provided valuations for just a small selection.

This preliminary analysis demonstrates that Defendants' data set is at best inconclusive and at worst an act of bad faith. Because of these critical omissions in the Production, the actual trading volume cannot be assessed. Defendants' objections to production and their attempts to cut off jurisdictional discovery based on their highly curated July Production should be rejected.[3]

Zhao also maintains that he should not be compelled to produce responsive documents because they are outside of his possession, custody, or control. Zhao Letter at 5. On the contrary, Zhao has admitted that he communicated about the matters at issue on his personal devices. Pl. Letter at 2. Moreover, Zhao has a legal right to obtain responsive documents from his prior counsel. *Id.* at 4. Similarly, whether Binance should be compelled to produce all responsive documents does not alleviate Zhao of his independent discovery obligations. And finally, Binance's assertion that Plaintiffs have offered no explanation for why the users' names are relevant (Binance Letter at 5) ignores Plaintiffs' numerous compelling reasons about which Your Honor agreed. Pl. Letter at 3-4; ECF 79 at 16:17-25 ("I think it's going to be very difficult going through this process for you to try to shield their identities."); *see also McConkey v. Churchill Sch. & Ctr.*, 2025 WL 1928552, at *2 (S.D.N.Y. July 14, 2025) (party could not redact names of individuals on produced communications because names "may help provide context for the communication or may suggest avenues of investigation for Plaintiff.").

---

[3] Given the Court-ordered schedule for Defendants' July Production and the limited time Plaintiffs had to analyze the Production, Plaintiffs request the Court's permission to update the Court on Plaintiffs' continued analysis of the Production and, if necessary, to provide further bases for why the Production is unresponsive.

### C. Defendants Should Produce Documents Responsive To The Remaining Requests

*Requests 4-8: Defendants' Efforts to Retain VIPs and VIP Incentives and Benefits*

Defendants object to producing documents responsive to these Requests because the Requests are purportedly based on Defendants' "motives" and thus supposedly outside the scope of the February Order. Binance Letter at 5; Zhao Letter at 5. Not so.

These Requests fall squarely within the February Order, as they go directly to the basis for Binance's retention of U.S. VIPs and Defendants' deceptive practices in maintaining those VIPs. February Order at 11-12; Pl. Br. at 5; ECF 79 at 25:1-7 (Plaintiffs set forth that the "actual reason [to maintain the VIPs] was because [Defendants] had an understanding that these high-volume traders were necessary to provide liquidity to the exchange."). Responsive information would also illuminate whether the trading volume generated by the VIPs was necessary for Binance's platform and its illegal scheme. Indeed, underscoring these Requests' relevance, Defendants have pointed to the purported amount of revenue from U.S. user fees as supposed evidence for the lack of jurisdiction. ECF 58 at 10. Moreover, Defendants ignore that such purposeful activity as to New York VIPs constitutes cognizable jurisdictional activity. *See Capitol Recs., LLC v. VideoEgg, Inc.*, 611 F. Supp. 2d 349, 357 (S.D.N.Y. 2009). Likewise, Defendants ignore Your Honor's statements that these Requests would be relevant if narrowed – which Plaintiffs have done. ECF 79 at 25:14-18, 25:21-23; ECF 86-4.

*Requests 11-13: Binance's Operations and Internal Processes*

Defendants maintain that these Requests are outside the scope of discovery. Binance Letter at 6; Zhao Letter at 6. However, in the intentionally opaque, highly technical space of a cryptocurrency exchange, Plaintiffs are entitled to documents that will allow them to understand how Binance makes markets, retains and leverages liquidity, and how Binance concealed it users. The July Production's biases and omissions underscore Plaintiffs' need for these documents.

*Requests 14-19: Zhao-Owned Entities, Trade Volume, Signature Bank Statements and Funds*

Defendants assert that these Requests are purportedly outside the scope of discovery because the Court purportedly rejected Plaintiffs' jurisdictional theory concerning Zhao's reliance on Signature Bank accounts or funds. Binance Letter at 6; Zhao Letter at 6. Defendants are wrong.

Defendants mischaracterize the February Order. Judge Koeltl stated that "the relationship between the accounts maintained by Zhao at Signature Bank and the plaintiffs' claims is not apparent from the Amended Complaint's allegations[,]" (February Order at 12-13) and immediately followed this sentence with his grant of jurisdictional discovery (*id.* at 13), explicitly recognizing this as a potential jurisdictional basis. *Id.* at 12 ("Zhao also owned and controlled multiple offshore entities that maintained accounts at Signature Bank in New York, which were the counterparties to many large transactions with Binance." To that effect, Defendants ignore Your Honor's indications that these Requests were relevant. ECF 79 at 26:6-8 (as to Requests 14-17); *id.* at 26:12-15 (as to Request 18); *id.* at 26:16-22 (as to Request 19, noting that it "does go

**SEIDEN | LAW**

to the heart … of one of Plaintiffs' theories of jurisdictional discovery."). In accordance with Your Honor's guidance, Plaintiffs substantially narrowed these Requests. ECF 86-4.

************

For the reasons set forth herein and in Plaintiffs' Opening Letter, the Court should order Defendants to produce all documents responsive to Plaintiffs' Requests.[4]

Respectfully submitted,

*/s/ Jake Nachmani*
**SEIDEN LAW LLP**
Robert W. Seiden
Amiad Kushner
Jake Nachmani
Jennifer Blecher
Dov Gold
322 Eighth Avenue, Suite 1200
New York, NY 10001
(212) 523-0686

**PERLES LAW FIRM, P.C.**

Steven R. Perles
(*pro hac vice motion to be filed*)
Joshua K. Perles
(*pro hac vice motion to be filed*)
Edward B. MacAllister
(*pro hac vice*)
816 Connecticut Avenue, NW
12th Floor
Washington, D.C. 20006
(202) 955-9055

*Attorneys for Plaintiffs*

cc: All counsel of record (via ECF)

---

[4] Plaintiffs were unable to identify a word limit for a letter-motion reply in Your Honor's Individual Practices. Accordingly and because Defendants filed two separate opposition letters, each approximating 3000 words despite Defendants' representing that they would file one "opposition" of 3000 words (ECF 85 at 2), Plaintiffs relied on their previously permitted limit of 3000 words for this consolidated Reply. ECF 81.