UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDITH RAANAN, et al.,

                Plaintiffs,

           -against-

BINANCE HOLDINGS LIMITED, et al.,

                Defendants.

24-CV-697 (JGK) (BCM)

**MEMORANDUM AND ORDER**

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   03/27/26**

**BARBARA MOSES, United States Magistrate Judge.**

For the reasons that follow, plaintiffs' motion to compel additional jurisdictional discovery (Pl. Mot.) (Dkt. 86) will be granted in part and denied in part.

## I.      BACKGROUND

Plaintiffs in this action are United States citizens, or the family members of United States citizens, who were killed or injured during the October 7, 2023 terrorist attacks perpetrated by Hamas and Palestine Islamic Jihad (PIJ) in Israel. Plaintiffs allege that defendants Binance Holdings Limited (BHL or Binance), which operates a cryptocurrency platform, and Changpeng Zhao, BHL's founder, majority owner, and former Chief Executive Officer, are liable to them under the Justice Against Sponsors of Terrorism Act (JASTA), which prescribes civil liability for "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism." 18 U.S.C. § 2333(d)(2). According to plaintiffs, "defendants knew, or at least willfully disregarded, that Hamas and PIJ were using Binance to finance their terrorist activities." *Raanan v. Binance Holdings Ltd.*, 2025 WL 605594, at *2 (S.D.N.Y. Feb. 25, 2025).

### A.      The FinCEN Consent Order

Plaintiffs' Amended Complaint, filed on May 17, 2024 (Am. Compl.) (Dkt. 17), relies in part on a November 2023 Consent Order between BHL and the Financial Crimes Enforcement

Network (FinCEN Consent Order) (Dkt. 91-2), which assessed a $3.4 billion civil monetary penalty on BHL for willful violations of the Bank Secrecy Act (BSA) and its implementing regulations. *See* Am. Compl. ¶¶ 5, 132, 158-61, 190, 211-22, 229-30, 232-41. The FinCEN Consent Order describes a pattern of misconduct by BHL from July 2017 through July 2023, including – as relevant here – doing business in the United States through its "main platform," Binance.com, without registering as a money services business, *see* FinCEN Consent Order at 7-30; failing to maintain an effective Anti-Money Laundering program, *see id*. at 3, 30-43; and failing to file Suspicious Activity Reports, *see id*. at 43-52, with respect to, *inter alia*, "significant sums being transmitted to and from entities officially designated as terrorist organizations by the United States and United Nations," including Hamas and PIJ. *Id*. at 45-46.[1]

FinCEN found that BHL "catered to higher volume, commercially important users through its 'VIP Program,' which offered favorable trading fees and higher limits on the number of orders that users could submit." FinCEN Consent Order at 10. In 2019, these VIP users "consistently accounted for between two-thirds and three-quarters of both trading volume and trading revenue on Binance.com." *Id*. at 11. Moreover, "U.S[.] users represented a crucial element of the VIP userbase, at times accounting for roughly 15 to 20% of Binance's transaction fees. In October 2020, a single U.S. VIP user was responsible for 12% of all trading volume on Binance.com." *Id*.

---

[1] In addition to accepting a civil monetary penalty, BHL agreed to retain an independent compliance monitor, off-board U.S. users of its main platform, and take other remedial steps. *See* FinCEN Consent Order at 59-71. The FinCEN Consent Order was part of a package that also included a consent order with the Commodity Futures Trading Commission (CFTC) and criminal plea agreements by both BHL and Zhao. In his personal plea, Zhao admitted to willful violations of the BSA, for which he was assessed a substantial fine and sentenced to four months in prison. Am. Compl. ¶¶ 8, 67, 75, 181, 235. On October 21, 2025, Zhao was pardoned. *See* U.S. Dept. of Justice, Office of the Pardon Attorney, "Clemency Grants by President Donald J. Trump (2025-Present)," available at https://perma.cc/E25V-RVBT.

In 2019, through an affiliate, BHL launched "a second platform focused on the U.S. and accessible to U.S. customers through the Binance.us website," which offered "a more limited suite of products" and did register with FinCEN. FinCEN Consent Order at 4. However, not only did BHL continue to do business with U.S. persons on Binance.com; it developed a campaign to retain its U.S.-based VIP users on that platform by, among other things, encouraging them to execute new KYC (know your customer) documents "showing that the entity was in an offshore jurisdiction," or to "change their IP," that is, to "us[e] a VPN to give the false impression that the user was located in a different jurisdiction, even though Binance would know that the user was, in fact, located in the United States." *Id*. at 11-12. According to FinCEN, "[t]hese users were so valuable to Binance that personnel were instructed not to off-board them." *Id*. at 12. Instead, BHL attempted to conceal its "retention of U.S. VIP users" by, among other things, changing its internal database to list the country code of U.S. users as "UNKWN," *id*. at 14, and changing "how it defined U.S. users." *Id*. As a result, BHL "continued to allow VIP users with material, commercially relevant ties to the U.S. to remain on Binance.com." *Id*. at 15.

The FinCEN Consent Order provides specific examples of U.S.-based VIP users (identified as "Customer A" through "Customer E") that should have been offboarded from Binance.com but instead were retained, in some instances into 2022 or even later. *See* FinCEN Consent Order at 15-26. For example, Customer A, which was "a subsidiary of a well-known, U.S.-based trading firm" and was majority-owned by a U.S. citizen, was also "one of the top 10 overall spot market makers and liquidity providers on the Binance.com platform." *Id*. at 15-16. Although BHL knew that Customer A was a U.S. person, it helped Customer A "circumvent" what geofencing controls it did have (by, among other things, transferring its account to "a 'new' entity Customer A" that was "registered in the British Virgin Islands" but maintained a "material presence" in the United States),

3

and BHL did not offboard that entity until it applied the "enhanced policies, procedures, and internal controls" that it "implemented as part of its resolution with FinCEN." *Id*. at 16-18.

### B.    Plaintiffs' Jurisdictional Allegations

BHL is registered in the Cayman Islands and claims that it does not have any corporate headquarters. *Raanan*, 2025 WL 605594, at *1. Zhao is a citizen of Canada who resides in the United Arab Emirates. *Id*. Plaintiffs contend that both defendants are nonetheless subject to New York's long-arm jurisdiction under, *inter alia*, N.Y.C.P.L.R. (CPLR) § 302(a)(1), which permits a court to exercise personal jurisdiction over a non-domiciliary defendant where (1) the defendant "transacts any business in New York," and (2) the plaintiff's cause of action "arises from such a business transaction." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 60 (2d Cir. 2012) (cleaned up) (quoting *Best Van Lines, Inc. v. Walker,* 490 F.3d 239, 246 (2d Cir. 2007)). Specifically, plaintiffs allege that BHL's transactions with "certain VIP 'market maker' customers based in New York 'provided necessary liquidity' to the Binance platform," without which "there would have been no viable Binance platform for Hamas and PIJ to use to finance their terrorist activities." *Raanan*, 2025 WL 605594, at *4 (record citations omitted). As to Zhao, plaintiffs allege that he "supervised and controlled Binance's New York-based activity." *Id*. at *5. They further allege that Zhao "owned and controlled multiple offshore entities that maintained accounts at Signature Bank in New York" and that were "the counterparties to many large transactions with Binance." *Id*. (record citations omitted).

### C.    The Motion to Dismiss

Defendants moved to dismiss plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(2), for lack of personal jurisdiction, and 12(b)(6), for failure to state a claim upon which relief can be granted. (Dkt. 18.) With respect to personal jurisdiction, defendants did not dispute that BHL transacted business in New York and that Zhao "exercised control over these transactions."

*Ranaan*, 2025 WL 605594, at \*4. Instead, defendants argued that the Amended Complaint "fail[ed] to tie these New York-based transactions to the plaintiffs' claims," *id*., and hence that plaintiffs' allegations failed to satisfy CPLR § 302(a)(2).

On February 25, 2025, the Hon. John G. Koeltl, United States District Judge, denied the Rule 12(b)(2) motion, "without prejudice to renewal following jurisdictional discovery." *Ranaan*, 2025 WL 605594, at \*24. As to BHL, the district judge explained: "[P]laintiffs' contention that Binance's alleged provision of financial services to Hamas and PIJ depended on Binance's transactions with VIP customers in New York is unsupported by specific facts." *Id*., at \*4. As to Zhao, the district judge explained: "[T]he relationship between the accounts maintained by Zhao at Signature Bank and the plaintiffs' claims is not apparent from the Amended Complaint's allegations." *Id*. at \*5. However, the district judge continued, plaintiffs "have 'made a sufficient start' toward establishing personal jurisdiction," *id*. (quoting *Strategem Dev. Corp. v. Heron Int'l N.V.*, 153 F.R.D. 535, 547 (S.D.N.Y. 1994)), warranting "limited jurisdictional discovery." *Id*. In particular, the district judge wrote, "[d]iscovery may clarify the character and extent of the connection, if any, between the alleged market-making activities of Binance's New York-based VIP customers and Binance's ability to provide financial services to Hamas and PIJ." *Id*.

In the same opinion, the district judge dismissed several of plaintiffs claims pursuant to Rule 12(b)(6), but permitted them to proceed on their claim for aiding and abetting liability under JASTA. *Raanan*, 2025 WL 605594, at \*24.

## II.    JURISDICTIONAL DISCOVERY

### A.    Plaintiffs' RFPs

On April 2, 2025, plaintiffs served Requests for Production on both defendants. *See* Pl. Mot. Ex. A (Dkt. 86-1) (RFPs). Plaintiffs' RFPs, which seek documents dating from July 14, 2017 to October 7, 2023, *see id*. at 6, can be roughly divided into the following subsets:

5

| RFPs | Topic |
|------|-------|
| 1-3 | The identity, physical addresses, and IP and MAC addresses of BHL's "Retained VIPs" (that is, the U.S. Enterprise Users in BHL's VIP Program that it retained on the Binance.com platform following the launch of Binance.us in 2019) |
| 4-6 | BHL's decision and efforts to retain VIPs and/or "high-volume trading customers" on Binance.com following the launch of Binance.us, and Zhao's knowledge of those efforts |
| 7-8 | BHL's marketing materials, policies, and procedures regarding its VIP program, including incentives offered to VIPs |
| 9 | The trade volume of each Retained VIP, "compared to the volume of all trades" on Binance.com |
| 10 | The identity of the "single U.S. VIP user" who according to the FinCEN Consent Order, was responsible for "12% of all trading volume on Binance.com" in October 2020 |
| 11-13 | BHL's operations and internal processes for executing, processing, settling, recording, and reconciling exchange, over-the-counter, and crypto-to-fiat transactions on Binance.com |
| 14-17 | The identity of all non-Binance entities owned by Zhao that maintained accounts at Signature Bank in New York *and* on the Binance platform (the Zhao Entities), their Signature Bank statements, and their contracts with BHL |
| 18-19 | The trade volume of the Zhao Entities ("as compared to all trades on the Binance Platform") and communications to or from Zhao related to the "use of funds held at Signature Bank" in New York in connection with trading on the Binance Platform |

*See* RFPs at 12-14. On April 23, 2025, Judge Koeltl denied defendants' motions for reconsideration of his February 25, 2025 decision and/or for leave to file an interlocutory appeal. (Dkt. 70.) On May 21, 2025, the district judge referred the case to me for general pretrial management. (Dkt. 73.)

**B.    Defendants' Supplemental Responses and Production**

On July 1, 2025 – at which point neither defendant had produced any documents – I held a pre-motion conference with respect to plaintiffs' anticipated motion to compel. During the conference, counsel for BHL advised that it would produce documents in response to some of

6

plaintiffs' RFPs – specifically, those going to the connection, if any, between BHL's New York-based VIPs and its ability to provide financial services to Hamas and PIJ. *See* 7/1/25 Tr. (Dkt. 78) at 6-7. However, as to plaintiffs' remaining RFPs (including those seeking information about the Zhao Entities), counsel advised that BHL intended to "stand on [its] objections." *Id*. at 8.

I then explored – principally with plaintiffs' counsel – whether the RFPs could be narrowed so as to focus more tightly on the jurisdictional theories pled in the Amended Complaint, *see* 7/1/25 Tr. at 22-27, and advised plaintiffs, "[Y]ou're going to have to make some concrete narrowing proposals, if this is going to work." *Id*. at 28. At the conclusion of the conference, I directed defendants to update their written responses to plaintiffs' RFPs by July 11, 2025, and to produce the documents responsive to plaintiffs' RFPs ("except those as to which defendants are standing upon their objections") by July 31, 2025. (Dkt. 77 ¶¶ 1, 2.)

The parties continued to meet and confer after the July 1 conference. On July 11, 2025, BHL served supplemental written responses, in which it took the position that "the scope of jurisdictional discovery is limited to: (1) with respect to BHL, 'the character and extent of the connection, if any, between the alleged market-making activities of Binance's New York-based VIP customers and Binance's ability to provide financial services to Hamas and [Palestine Islamic Jihad]' (February 25 Order at 13); and, (2) with respect to Mr. Zhao, whether '[Mr.] Zhao supervised and controlled Binance's New York-based activity . . . []sufficient . . . to establish personal jurisdiction over [Mr.] Zhao.' (February 25 Order at 12)." Pl. Mot. Ex. B (Dkt. 86-2) (BHL RFP Resp.), at 2 (quoting *Raanan*, 2025 WL 605594, at *4) (alterations in original). BHL then refused to produce any documents in response to fourteen out of the nineteen RFPs propounded by plaintiffs (RFPs 4-8 and 11-19), on the ground that they seek information that is "irrelevant to" or "goes beyond" the narrow issue as to which (according to BHL) jurisdictional

discovery was authorized: "whether and to what extent 'New York-based VIP customers' contributed to BHL's ability to provide the services of which Plaintiffs complain." BHL RFP Resp. at 12-13, 14, 15, 16, 17, 20, 21, 22, 23, 24, 25, 27.

With respect to RFPs 1-3 and 9-10, which seek documents concerning BHL's Retained VIPs, BHL agreed to produce:

> . . . trading data concerning the connection between the alleged market-making activities of BHL's New York-based VIP customers and BHL's ability to provide the financial services of which the Plaintiffs complain. BHL will also produce to Plaintiffs a description of the criteria that it used to determine that users were *New York*-based VIPs.

BHL RFP Resp. at 9, 11, 12, 18, 19. However, BHL stated that it would not identify any individual VIP, because, in its view, "the narrow jurisdictional issue for which the Court authorized discovery" is simply "whether and to what extent 'New York-based VIP customers' *overall* contributed to BHL's ability to provide the services of which Plaintiffs complain." *Id*. at 9, 10.

Defendant Zhao also served supplemental responses on July 11, 2025. *See* Pl. Mot. Ex. C (Dkt. 86-3) (Zhao RFP Resp.). Zhao refused to produce any documents at all. As to RFPs 1-3 and 9-10, Zhao objected on the ground that they sought documents "beyond the permissible scope of jurisdictional discovery as so limited" by *Ranaan*, such as documents concerning VIPs "outside of New York." *See* Zhao RFP Resp. at 7, 8, 9, 16, 17. Zhao further advised that because "BHL will be producing documents and information in response to" RFPs 1-3 and 9-10, "Mr. Zhao will not be producing any documents in response to th[ese] RFPs." *Id*. at 8, 9, 10, 17, 18.

As to RFP 6, seeking documents concerning "Zhao's direction or knowledge of efforts to maintain VIPs or other high-volume trading customers on the Binance Platform," Zhao RFP Resp. at 12-13, Zhao objected on multiple grounds, including that the request is "beyond the permissible scope of jurisdictional discovery" as limited by *Ranaan*. *Id*. at 13. As to RFPs 14-19, which seek information concerning the Zhao Entities, he made the same objection, adding for RFPs 14-18 that

8

"[p]laintiffs seek this information to support a theory of personal jurisdiction not alleged in their Complaint." *Id*. at 21-26.

On July 23, 2025, plaintiffs offered to narrow RFPs 4-8 and 14-17. *See* Pl. Mot. Ex. D (Dkt. 86-4) at 1. Specifically, plaintiffs offered to limit RFPs 4 and 5 to "documents relating to liquidity and/or trading volume for the VIPs as a factor in retaining VIPs" on Binance.com; to limit RFP 6 accordingly; to limit RFPs 7 and 8 to "documents concerning incentives and fee structures for customers based on liquidity and high-volume trading"; and to limit RFPs 14-17 to "contracts concerning market-making activities, settlement or clearing, or capitalization." *Id*.

On July 30, 2025 (the day before plaintiffs' deadline to file their motion to compel), defendants submitted a letter to the Court advising that they "intend[ed] to produce" the following documents:

> (1) a list of users potentially responsive to Plaintiffs' requests identified by User ID, along with information regarding the volume of trading for each of those users during the period September 2022 through October 2023 and a comparison of each user's trading volume to the global trading volume on the Binance platform during the same time period; (2) the underlying trading data for those users; (3) redacted copies of BHL's Know Your Business Records that confirm the addresses associated with those users; and (4) operation logs, which include all logged IP addresses associated with those users' activity on the Binance platform during the foregoing time period.

(Dkt. 83 at 1.) The next day, BHL confirmed that its production totaled 338 pages, concerning 18 Enterprise VIP users. *See* BHL Prod. Letter (Dkt. 96-1) at 1-2. BHL selected those Enterprise VIP users by applying the "U.S. Nexus Review" methodology that it developed for identifying and offboarding U.S. users, "with extensive input from FinCEN and the CFTC," in connection with the "resolutions with U.S. authorities" that it entered into on November 21, 2023. *Id*. at 2. Specifically, BHL explained, it was providing information from September 2022 through October 2023 "concerning users: (1) with an offboard reason related to the U.S. Nexus Review (*i.e.,* users identified as U.S. persons, or users that failed to supply documentation requested to confirm that

they were *not* U.S. persons), (2) holding corporate accounts (as opposed to retail accounts), and (3) with VIP status. There are 18 such users for the relevant time period." *Id.*[2]

## III.     THE PARTIES' POSITIONS

Plaintiffs seek an order compelling both defendants to produce documents going well beyond the "curated, self-selected information" offered by BHL on an anonymized basis. Pl. Mot. at 4. With respect to the documents actually produced (in response to RFPs 1-3 and 9-10), plaintiffs argue that they should not have to limit themselves to the 14 months selected by BHL, nor "abide by Defendants' 'just trust us' approach" to identifying the relevant VIP users, particularly given that defendants pled guilty to intentionally maintaining deceptive records and misleading regulators. *Id.* Additionally, plaintiffs seek "the identities of the VIPs," in order to "establish" whether they "have jurisdictional ties to New York" and "preserve Plaintiffs' discovery rights." *Id.* at 3-4.

With respect to the remaining RFPs (as narrowed), plaintiffs argue that they too seek documents that are properly the focus of jurisdictional discovery. Pl. Mot. at 5-6. For example, plaintiffs argue that documents responsive to RFPs 14-19 (relating to the Zhao Entities) may show that those "entities or Zhao himself provided critical liquidity or market-making functions for BHL or were themselves VIPs whose market-making activities were enabled by the flow of funds at Signature Bank in New York." *Id.* at 6.

BHL responds that it has already produced sufficient information, in response to RFPs 1-3 and 9-10, to "utterly refute" plaintiff's "main theory of personal jurisdiction," namely, that "New

---

[2] According to BHL, its list of users, although small, is nonetheless "over-inclusive because it includes: (1) users that BHL did not identify as U.S. persons but nevertheless were designated for offboarding because the users failed to provide documentation establishing that they are *not* a U.S. person, and (2) users with U.S. (as opposed to New York touchpoints)." BHL Prod. Letter at 2.

York-based enterprise VIP users" on Binance.com were "essential to liquidity" and hence key to Binance's ability to provide services to Hamas and PIJ. BHL Opp. (Dkt. 87) at 1-2. According to BHL, the 18 Enterprise VIP users as to which it produced discovery made up only "approximately *1.3% of global trading volume (by value) on the Binance Platform*" during the 14 months leading up to the October 7, 2023 attacks. *Id*. Moreover, BHL points out, it has already produced their "physical and operating addresses" (as contained in their KYC documents), and more than a year's worth of trading data to substantiate the volume data provided. *Id*. at 5. In BHL's view, nothing further is required to rebut plaintiffs' claim that "New York-based enterprise VIP users were somehow essential to the services of which Plaintiffs complain." *Id*. at 4.

Plaintiffs' remaining RFPs, according to BHL, seek information that is simply irrelevant to any jurisdictional theory left open to plaintiffs by *Ranaan*. BHL Opp. at 5-7. BHL adds that if and to the extent any of the Zhao Entities were in fact "New York VIP users," their data "will be captured in the trading data that BHL has already produced in response to RFP 9." *Id*. at 6.

Zhao, for his part, agrees with BHL that jurisdictional discovery was authorized as to only "one of the alleged jurisdictional theories," namely, whether BHL's "VIP market makers in New York" provided BHL with the necessary liquidity to service the terrorist organizations who committed the October 7, 2023 attacks in Israel. Zhao Opp. (Dkt. 90) at 1-2. While Zhao does not dispute that RFPs 1-3 and 9-10 seek documents relevant to this theory (which he calls the "market-maker theory"), he argues that *he* should not be required to produce responsive documents because "his records, if responsive, would be duplicative of BHL's production." *Id*. at 4. Zhao adds that after his "comprehensive resolution with U.S. regulators" in November 2023, he "lost access to the records that may be responsive to the RFP[s] from the period at issue here." *Id*. at 5.

11

Zhao also agrees with BHL that the remaining RFPs seek documents that are "not relevant to jurisdictional discovery." Zhao Opp. at 6. As to RFPs 14-19 (relating to the Zhao Entities), Zhao asserts that plaintiffs' "Signature Bank theory" of jurisdiction has already been rejected by the district judge and is "too attenuated to satisfy Plaintiffs' jurisdictional pleading burden as to Mr. Zhao." *Id*.

In reply, plaintiffs accuse defendants of misreading *Ranaan* and engineering a "rigged data dump" that included only the "meager results of a clean-up exercise required by FinCEN's 2023 consent order, requiring BHL to identify straggler U.S. users that remained on the U.S. platform [sic] long after the VIPs and other U.S. users had likely already been offboarded." Pl. Reply (Dkt. 91) at 2. As to RFPs 1-3 and 9-10, plaintiffs argue that they are entitled to the full six years worth of data they requested ("from Binance's inception up to the Attacks"), because BHL's "jurisdictionally relevant conduct" dates back to mid-2017, *id*. at 3, and because it admitted, in its criminal plea agreement, "to having *3,500 U.S. VIPs that generated approximately 23.3% of its overall trading revenue*." *Id*. at 2-3.[3] Plaintiffs also complain that BHL's production contains "gaps"; for example, "[BHL] produced trading data for *only 15 users*," and even for those 15 it produced "*only limited trading data*: (i) margins for only 3 users; (ii) futures for only 8 users; and (iii) spots for only 12 users." *Id*. at 4-5.

---

[3] Plaintiffs attach the "Statement of Facts" portion of the BHL plea agreement. *See* Pl. Reply Ex. A (Dkt. 91-1) (SOF). In that document, BHL admitted the following facts: "On a June 9, 2019 recorded call among senior Binance leaders, including Zhao, Individual 3 stated that Binance had more than 3,500 VIPs from the United States, based on KYC and IP address information Defendant possessed, and the total number of U.S. and non-U.S. VIP and enterprise users accounted for more than 70% of Binance's revenue. On a June 25, 2019 call among senior leaders, Individual 3 further noted that Binance's approximately 11,000 VIPs accounted for more than 70% of its trading revenue. Of that 70% of trading revenue, U.S. VIPs accounted for about one-third." SOF ¶ 37. Individual 3 was a co-founder of BHL and "one of Zhao's close advisors." *Id*. ¶ 8.

As to the remaining RFPs, plaintiffs argue that all of the documents they seek are relevant to at least one viable theory of personal jurisdiction. For example, they read *Ranaan* as permitting discovery into "the relationship between the accounts maintained by Zhao at Signature Bank and the plaintiffs' claims." Pl. Reply at 6 (quoting *Ranaan*, 2025 WL 605594, at *5). Therefore, they contend, both BHL and Zhao (who "has a legal right to obtain responsive documents from his prior counsel," even if he no longer has direct access to BHL records), should be required to produce documents responsive to RFPs 14-19, as narrowed. *Id*. at 5-7.

On January 22, 2026, plaintiffs sought and received leave to file a sur-reply letter advising the Court that, after Zhao's pardon, BHL appointed Yi He (Zhao's "life and business partner" and the mother of three of his children) as its co-CEO, with "sweeping control" over the business. Pl. Sur-Reply (Dkt. 93) at 1. As a result, plaintiffs reason, Zhao now has "the practical ability to obtain responsive documents in Binance's possession," and should be ordered to produce them. *Id*. at 2. In response, Zhao accuses plaintiffs of "repackag[ing] speculation as evidence." Zhao Sur-Reply Resp. (Dkt. 100) at 2. Zhao notes that under Fed. R. Civ. P. 34, a party will not be deemed to "control" documents in the physical or legal custody of another absent proof that he has "the legal right, authority, or practical ability to obtain the documents at issue on demand." *Id*. at 3 (citing *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 138-39 (2d Cir. 2007)). In this case, Zhao argues, plaintiffs have presented nothing beyond the existence of a personal relationship with the new co-CEO, which is insufficient to show that Zhao "controls" BHL's records. *Id*. Zhao adds that although he was pardoned, BHL remains subject to its plea agreement, which forbids it from giving Zhao any role in "operating or managing" the business. *Id*. (internal citation omitted).

13

## IV.    ANALYSIS

### A.    RFPs 1-3, 9-10

The parties agree that these five RFPs seek information relevant to the "market maker" theory of jurisdiction, and that the district judge expressly authorized "limited" discovery as to this theory, to "clarify the character and extent of the connection, if any, between the alleged market-making activities of Binance's New York-based VIP customers and Binance's ability to provide financial services to Hamas and PIJ." *Raanan*, 2025 WL 605594, at *5. The parties disagree as to whether BHL was entitled to whittle down its response to the 18 Enterprise VIP users that remained on Binance.com as of September 2022 and that were U.S. persons (or that might be U.S. persons because BHL could not establish that they were not U.S. persons). They also disagree as to whether BHL was entitled to redact the names of these VIPs, and whether Zhao was entitled to excuse himself from producing any responsive documents because he has no "control" over BHL's documents and/or because any documents he does control would be duplicative of BHL's production.

Taking the last question first, plaintiffs have not established that defendant Zhao maintains "control" over BHL's documents, as that term is used in Rule 34(a)(1). "The burden of demonstrating that the party from whom discovery is sought has the practical ability to obtain the documents at issue [from another party] lies with the party seeking discovery." *In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 3822883, at *6 (S.D.N.Y. Aug. 30, 2017) (quoting *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 148 (S.D.N.Y. 2011)). Here, while plaintiffs are understandably suspicious that Zhao, post-pardon, has indirectly re-assumed some control over BHL through his partner Yi He, Zhao is correct that "[c]ourts do not infer control from personal relationships, titles, or status alone." Zhao Sur-Reply Resp. at 3; *see, e.g.*, *Shcherbakovskiy*, 490 F.3d at 138-39 (concluding that appellant could not be sanctioned for failing to produce documents

14

held by a Russian company of which he was the Board Chair where, "[o]n the present record," appellees had not shown that he had the "legal and practical ability to obtain the documents" without facing "criminal sanctions under Russian law"). However, Zhao does have control over documents in the custody of his attorneys, *see, e.g.*, *Lifeguard Licensing Corp. v. Kozak,* 2016 WL 3144049, at *5 (S.D.N.Y. May 23, 2016) ("[T]he clear rule is that documents in the possession of a party's current or former counsel are deemed to be within that party's 'possession, custody and control.'") (citation omitted) (collecting cases), and may well have additional responsive documents in his personal possession. Moreover, it is by no means a foregone conclusion that every responsive document in Zhao's control "would be duplicative of BHL's production," Zhao Opp. at 4, particularly given BHL's reluctance to produce the full complement of documents requested by plaintiffs as to the Retained VIPs. Consequently, although defendant Zhao need not separately search and produce documents from *BHL's* records, he must search his own records (including those held on his behalf by his counsel) for documents that are responsive to plaintiff's RPFs, and produce such documents to the extent required by this Order.

As for the adequacy of BHL's response, the Court agrees, at least in part, that its unilaterally-selected production criteria are too restrictive. The 14-month period for which BHL consented to produce any information at all appears to be both arbitrary and insufficient. BHL has never explained why the last 14 months before the terrorist attacks is a reasonable period of time (except to note, tautologically, that it produced data for "*over a year* preceding the October 7, 2023 Attacks," BHL Opp. at 1), and offers this Court no reason to believe that the only market making activity relevant to "Binance's ability to provide financial services to Hamas and PIJ" is activity that took place in or after September 2022. *Raanan*, 2025 WL 605594, at *5. On the other hand, plaintiffs are not entitled to data stretching back to July 2017 (when Binance.com was launched)

merely because that was the start of the "relevant time period" for FinCEN's BSA investigation. *See* FinCEN Consent Order at 2 & n.5. Rather, the scope of jurisdictional discovery – like the scope of merits discovery – is bounded by the parties' pleadings. *See Societe Generale de Banque au Liban SAL*, 2023 WL 2734641, at *8 (E.D.N.Y. Mar. 31, 2023) (limiting the relevant time frame for merits discovery in a JASTA case to the period "supported by the allegations in the [Second Amended Complaint]"); *Emergency Physicians Servs. of New York v. UnitedHealth Grp., Inc.*, 2023 WL 1106154, at *3 (S.D.N.Y. Jan. 28, 2023) (Koeltl, J.) ("[I]t is the operative amended complaint . . . that defines the scope of the claims for relief and, therefore, the scope of discovery.").

Here, plaintiffs allege that Hamas has used cryptocurrency as a fundraising method "[s]ince at least early 2019," and "up to the October 7 Terrorist Attacks." Am. Compl. ¶¶ 134-35; *see also id*. ¶¶ 201-02 (describing a Hamas video, published in 2019, encouraging viewers to create a cryptocurrency account and recommending several crypto trading platforms, including Binance.com); *id*. ¶ 205 (describing an Israeli report in February 2019 that Hamas had received "donations from wallets of U.S. trading platforms" and from Binance). Plaintiffs further allege that between 2019 and September 2023 "Binance processed, at a minimum, thousands of transactions with a total value of at least nearly $60 million involving crypto wallets of Hamas and PIJ." *Id*. ¶ 209.[4] In July 2020, "after a third-party service provider flagged accounts associated with ISIS and Hamas, [Binance's] former Chief Compliance Officer described it as '[e]xtremely dangerous for our company' and instructed compliance personnel to '[c]heck if he is a VIP account, if yes, to . . . [o]ffboard the user but let him take his funds and leave.'" *Id*. ¶ 215 (quoting FinCEN Consent Order at 47) (emphasis omitted and alterations in original).

---

[4] Plaintiffs do not specifically identify any Binance transactions "involving PIJ wallets" until November 2022. Am. Compl. ¶ 152.

For jurisdictional purposes, plaintiffs must assert "specific facts" to support their contention that "Binance's alleged provision of financial services *to Hamas and PIJ* depended on Binance's transactions with VIP customers in New York" *Raanan*, 2025 WL 605594, at *4. Since Binance's alleged provision of financial services "to Hamas and PIJ" began in early 2019 and continued through the terrorist attacks in October 2023, defendants must provide discovery concerning the U.S. Enterprise users in its VIP program over the same period: January 2019 through October 2023.[5]

It is not clear to this Court whether defendants will be able to identify BHL's U.S. Enterprise VIP users dating back to January 2019 using the same methodology that BHL used to select the 18 users that that it identified (by User ID) on July 31, 2025. If not, they must devise a comparable methodology that captures both Enterprise VIP users that were U.S. persons and Enterprise VIP users that failed to establish that they were not U.S. persons, and must disclose that methodology to plaintiffs. As to each qualifying user, moreover, defendants must provide substantially the same documents and data that BHL described in its Production Letter for the 18 users it initially identified.

Finally, defendants must identify the U.S. Enterprise users in its VIP program (including the "single U.S. VIP user" referenced in RFP 10) by name, not merely by User ID.[6] As plaintiffs point out, it will be their burden to determine whether these users "have jurisdictional ties to New

---

[5] Defendants need not provide discovery concerning non-enterprise (retail) VIP users, *see* FinCEN Consent Order at 3, even if they were U.S. persons. While an argument could be made for more expansive discovery, plaintiffs were quite clear, in their discovery requests, that "Retained VIPs," as used in RFPs 1, 2, 3, and 9, meant "the VIPs that Binance retained on the Binance Platform following the launch of the Binance.US exchange," and "VIPs" meant "The U.S. *Enterprise* Users in Binance's VIP Program." Pl. Mot. Ex. A (RFPs) at 2-3 (emphasis added).

[6] This information may be designated "confidential" pursuant to the parties' Protective Order (Dkt. 84). If defendants seek additional limits on disclosure, they may request "attorneys' eyes only" treatment pursuant to ¶ 10 of the Protective Order.

York" specifically, rather than to the United States in general. *See* Pl. Mot. at 3. It will be difficult if not impossible for them to do so without knowing the VIP users' names. Plaintiffs are reminded, however, that the district judge authorized only "limited jurisdictional discovery." *Raanan*, 2025 WL 605594, at *5. Absent leave of Court, obtained in advance, plaintiffs may not serve subpoenas on or otherwise burden the non-party VIP users with discovery for jurisdictional purposes.

### B.    RFPs 4-6

As originally drafted, RFPs 4-6 broadly sought "all Documents and Communications" concerning BHL's "decision in the summer of 2019 to retain certain VIPs on the Binance Platform" following the launch of Binance.us; its "efforts" to do so; and "Zhao's direction or knowledge" of those efforts. As narrowed by plaintiffs, they are limited to documents "relating to liquidity and/or trading volume for the VIPs as a factor in retaining the VIPs," and "Zhao's knowledge, control, direction, or authority as to VIPs on the platform." Pl. Mot. Ex. D, at 1.

Even as narrowed, I am not persuaded that RFPs 4-6 seek "limited" jurisdictional discovery. *Raanan*, 2025 WL 605594, at *5. If anything, the additional restrictions proposed by plaintiffs would create more work for defendants, who would be required to locate and produce responsive documents that (a) concern what FinCEN describes as a large-scale "scheme to retain lucrative U.S. users," FinCEN Consent Order at 8, and also (b) "relate[]" to liquidity and/or trading volume. Pl. Mot. Ex. D, at 1. More fundamentally, defendants are correct that their "reasons" and "motivations" for retaining VIP users on Binance.com are only tangentially relevant (if at all) to plaintiffs' "market maker" jurisdictional theory, which is that BHL's "transactions with VIP customers in New York" *in fact* provided the liquidity that it needed to provide financial services to Hamas and JIP. *Raanan*, 2025 WL 605594, at *4. Consequently, defendants need not produce documents in response to RFPs 4-6.

### C.    RFPs 7-8

As originally drafted, RFP 7 asked for all of BHL's "marketing materials, policies and procedures, and operational Documents" concerning the VIP program, while RFP 8 sought documents sufficient to show "all incentives or benefits" offered to VIPs. Plaintiffs have again proposed to narrow their requests by limiting them to "documents concerning incentives and fee structures for customers based on liquidity and high-volume trading." Pl. Mot. Ex. D, at 1. Leaving aside the difficulties inherent in attempting to parse the narrowed requests,[7] they too bear only tangentially, if at all, on the jurisdictional questions before the Court. Once again, therefore, I conclude that the discovery sought is insufficiently relevant to personal jurisdiction and would be disproportionately burdensome. Defendants need not produce documents in response to RFPs 7-8.

### D.    RFPs 11-13

RFPs 11, 12, and 13 seek to probe the internal "nuts and bots" of BHL's cryptocurrency platform, asking for documents sufficient to show "the internal process by which exchange and over-the-counter transactions of any kind are executed, processed, and settled" (RFP 11); "how exchange and over-the-counter transactions on the Binance Exchange are recorded in [BHL's] ledgers, books, and records" (RFP 12); and "how crypto to fiat transactions of any kind are processed, converted and reconciled." (RFP 13.) Plaintiffs have not offered to narrow these requests in any way.

---

[7] It is not clear, for example, whether plaintiffs now seek marketing materials that *discuss* "liquidity and high-volume trading," or marketing materials that were *motivated* by BHL's desire to increase liquidity or encourage high-volume trading – in which case, plaintiffs may still believe themselves entitled to *all* marketing materials for the VIP program.

In their moving letter, plaintiffs contend in general terms that they need to understand "how and where Binance performed these processes and how its records are maintained." Pl. Mot. at 6. Likewise, in their reply letter (filed after they had an opportunity to review BHL's production), they claim that they are "entitled to documents that will allow them to understand how Binance makes markets, retains and leverages liquidity, and how Binance concealed it[s] users." Pl. Reply at 6. But they never explain the connection – if any – between this information and the threshold question before this Court, which is whether either defendant is subject to personal jurisdiction in New York. I therefore conclude that the "nuts and bolts" information sought in RFPs 11-13 is relevant – if at all – to the merits of plaintiff's JASTA claim, not to personal jurisdiction. Defendants need not produce documents in response to these RFPs.

### E.    RFPs 14-19

Plaintiffs allege that defendant Zhao "owned and controlled multiple offshore entities that maintained accounts at Signature Bank in New York and were the counterparties to many large transactions with Binance totaling in the hundreds of millions of dollars." Am. Compl. ¶ 17; *see also* FinCEN Consent Order at 29-30 (discussing two Zhao-owned "proprietary trading firms," Sigma Chain AG and Merit Peak Limited, which transacted business on Binance.com). After considering these allegations as a basis for the exercise of personal jurisdiction over Zhao, the district judge noted that "the relationship between the accounts maintained by Zhao at Signature Bank and the plaintiffs' claims is not apparent from the Amended Complaint's allegations." *Raanan*, 2025 WL 605594, at *5. "However," he continued, "jurisdictional discovery is warranted." *Id*.

Although the district judge did not spell out precisely what discovery might reveal about "the relationship between the accounts maintained by Zhao at Signature Bank and the plaintiffs' claims," it is clear, in context, that he authorized "limited" jurisdictional discovery concerning

plaintiffs' "Signature Bank" theory (as well as their "market maker" theory). I therefore reject defendants' contention that "Judge Koeltl authorized limited jurisdictional discovery relevant to *only* Plaintiffs' New York-based VIP market-maker theory of jurisdiction." BHL Opp. at 6; *see also* Zhao Opp. at 6 ("[T]he Court never granted discovery into this theory[.]"). The question now before me, therefore, is not whether RFPs 14-18 (all of which seek information about the Zhao Entities and their activities in New York) are entirely outside of the scope of permissible jurisdictional discovery; it is whether (as Zhao argues, in the alternative), they are "overbroad, unduly burdensome, and not proportional to the needs of this case." Zhao Opp. at 6.

RFP 14, which asks for documents "sufficient to identify" the Zhao Entities, is neither overbroad nor unduly burdensome. Consequently, defendants must produce responsive documents. But RFP 15 and 16, which ask for Signature Bank *statements* for accounts held the Zhao Entities (RFP 15) and by Binance itself (RFP 16) serve no apparent purpose beyond harassment. Consequently, defendants need not turn over the statements. RFP 17, as narrowed, asks for contracts between the Zhao Entities and Binance "concerning market-making activities, settlement or clearing." Pl. Mot. Ex. D, at 1. These documents, which are unlikely to be numerous, may well shed light on whether the Zhao Entities "provided critical liquidity or market-making functions for [BHL] or were themselves VIPs whose market-making activities were enabled by the flow of funds at Signature Bank of New York." Pl. Mot at 6. These documents must therefore be produced.

RFP 18 seeks documents sufficient to show "the relative trade volume on the Binance Platform" of each Zhao Entity, "as compared to all trades on the Binance Platform." As defendants point out, this request goes, in part, to the "market-maker theory." BHL Opp. at 6; Zhao Opp. at 6. That is, if any of the Zhao Entities were U.S. Enterprise VIP users, the trading data that plaintiffs

seek has been (or will be) produced in response to RFPs 1-3 and 9-10. *Id*. However, it is possible that one or more of the Zhao Entities engaged in significant market making activities (using funds flowing through Signature Bank in New York), but was never flagged as a U.S. person, or never officially given "VIP status." To ensure that these trades – which may be jurisdictionally significant – are not omitted from defendants' production, defendants must respond to RFP 18. BHL may do so by producing trading data for the Zhao Entities (from January 2019 through October 2023) in the same manner it has produced (or will produce) trading data for the U.S. Enterprise VIP users.

Finally, RFP 19 seeks, in extremely broad terms, "all Documents and Communications sent to or from Zhao (or copying Zhao) relating to the use of funds held at Signature Bank's New York branches in connection with trading or settlement activity on the Binance Platform." On its face, this request would require defendants to search for and produce documents that have nothing to do with the VIP market making activities *or* with Zhao Entities. Moreover, despite encouragement from this Court, *see* 7/1/25 Tr. at 26, plaintiffs did not offer to narrow RFP 19 in any respect. Consequently, defendants need not produce documents in response to RFP 19.

## V. CONCLUSION

For the reasons stated above, plaintiffs' motion to compel defendants to produce additional documents in response to their jurisdictional discovery requests (Dkt. 86) is GRANTED IN PART and DENIED IN PART. Defendants are directed to produce the additional documents required by this Order no later than **April 27, 2026**.

Dated: New York, New York
       March 27, 2025

SO ORDERED.

_____
**BARBARA MOSES**
**United States Magistrate Judge**

22