**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

JUDITH RAANAN *et al.,*

        Plaintiffs,

    -v-

BINANCE HOLDINGS LIMITED, and
CHANGPENG ZHAO,

        Defendants.

No:1:24-cv-00697-JGK-BCM

**ORAL ARGUMENT**
**REQUESTED**

------------------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' RENEWED MOTION TO DISMISS

**SEIDEN LAW LLP**
Robert W. Seiden
Amiad Kushner
Jake Nachmani
Jennifer Blecher
Dov Gold
322 Eighth Avenue, Suite 1200
New York, NY 10001
(212) 523-0686

**PERLES LAW FIRM, P.C.**
Steven R. Perles
Joshua K. Perles
Edward B. MacAllister
816 Connecticut Avenue, NW
12th Floor
Washington, D.C. 20006
(202) 955-9055

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

RELEVANT FACTUAL BACKGROUND ................................................................................. 2

   Defendants Affirmatively Operated Binance In Violation Of Their Legal Duties ................... 2

   Defendants Knowingly Provided Financial Services Directly To Hamas And PIJ ................. 3

   Terrorist Organizations Transacted In Massive Amounts On Binance ................................... 4

   The February 2025 Order .......................................................................................................... 4

   Defendants' Motions For Reconsideration And Interlocutory Appeal ..................................... 6

   The Renewed Motion ................................................................................................................ 6

ARGUMENT .............................................................................................................................. 6

  I.   RECENT PRECEDENT PROVIDES NO BASIS TO REVISIT THE
      FEBRUARY 2025 ORDER ........................................................................................... 6

     A.   *Smith & Wesson* Provides No Basis To Revisit The February 2025 Order ............... 6

     B.   *Ashley* Provides No Basis To Revisit The February 2025 Order ............................. 7

     C.   *Troell* Provides No Basis To Revisit The February 2025 Order .............................. 8

  II.  THE AMENDED COMPLAINT SUFFICIENTLY STATES ITS JASTA CLAIM ......... 9

     A.   The Amended Complaint Sufficiently Alleges Knowing And Substantial
        Assistance ................................................................................................................ 10

     1.   The Amended Complaint Sufficiently Alleges Conscious
        And Culpable Participation .................................................................................. 10

     2.   The Amended Complaint Sufficiently Alleges A
        Cognizable Nexus To October 7 .......................................................................... 11

     3.   The Amended Complaint Sufficiently Alleges Binance's Unusual And
        Dangerous Services .............................................................................................. 12

CONCLUSION ........................................................................................................................ 15

**TABLE OF AUTHORITIES**

**Cases**

*Ashley v. Deutsche Bank Aktiengesellschaft*,
 144 F.4th 420 (2d Cir. 2025) .............................................................................. *passim*

*Direct Sales Co. v. United States*,
 319 U.S. 703 (1943) ..................................................................................... 14, 15

*Fraenkel v. Standard Chartered Bank*,
 2025 WL 2773251 (S.D.N.Y. Sept. 26, 2025) ......................................................... 12

*Kaplan v. Lebanese Canadian Bank, SAL*,
 999 F.3d 842 (2d Cir. 2021) ...................................................................... 6, 13, 15

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
 605 U.S. 280 (2025) .................................................................................... *passim*

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
 551 U.S. 308 (2007) ............................................................................................. 6

*Troell v. Binance Holdings Ltd.*,
 2026 WL 636849 (S.D.N.Y. Mar. 6, 2026) ......................................................... *passim*

*Twitter, Inc. v. Taamneh*,
 598 U.S. 471 (2023) .................................................................................... *passim*

**Statutes**

18 U.S.C. § 2333(d)(2) ............................................................................................. 9

**Rules**

Federal Rule of Civil Procedure 8 .............................................................................. 8

Federal Rule of Civil Procedure 12(b)(6) .................................................................... 6

Plaintiffs respectfully submit this memorandum of law in opposition to Defendants Binance Holdings Limited ("Binance") and Changpeng Zhao's ("Zhao"; and with Binance, "Defendants") Renewed Motion to Dismiss the Amended Complaint (ECF 114-116).[1]

## PRELIMINARY STATEMENT

This is Defendants' fourth attempt to dismiss the Amended Complaint. In denying Defendants' Motions to Dismiss, to Reconsider, and for Interlocutory Appeal, the Court rightfully concluded that, under *Twitter*, the Amended Complaint sufficiently pled Plaintiffs' JASTA claim. By their Renewed Motion, Defendants maintain that three recent cases, *Smith & Wesson*, *Ashley*, and *Troell*, purportedly require the Court to hold that the Amended Complaint does not sufficiently allege a nexus to October 7 or Defendants' pervasive, systemic assistance. Defendants are wrong.

*Smith & Wesson* and *Ashley* are passive nonfeasance cases and do not involve the direct provision of services to terrorists. The Amended Complaint alleges that Defendants consciously and culpably participated with Hamas and PIJ by: (i) intentionally violating their duties to detect and report terrorist financing by operating a platform designed to allow terrorists to access financial markets and conceal illegal transactions; and (ii) affirmatively assisting FTO users in the provision of these services. The Amended Complaint also alleges that Defendants knowingly provided their services directly to Hamas and PIJ, allowing these FTOs to move millions of dollars

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in Plaintiffs' prior relevant briefing (ECF 24, ECF 66, ECF 86). References to "¶" and "Def. Br." are to paragraphs of the Amended Complaint (ECF 17) and Defendants' Memorandum of Law in Support of the Renewed Motion (ECF 115), respectively. All emphasis is added; all internal quotations and citations are omitted unless otherwise set forth.

before October 7. *Smith & Wesson* and *Ashley* also lacked sufficient allegations that the services were routine but provided in an unusual way or were a dangerous ware. Defendants' operation of Binance as a platform designed to circumvent terrorism financing laws on which terrorists transacted was both "unusual" and "dangerous" and reasonably foreseeable to lead to an attack.

This case is also materially different from *Troell*. While both cases allege that Defendants aided and abetted October 7, the Amended Complaint contains the transaction-specific allegations that Judge Vargas found wanting in *Troell*. Judge Vargas also did not decide whether the allegations in *Troell* aligned with Your Honor's conclusions that Defendants provided routine services in an unusual way or offered a dangerous ware. The Renewed Motion should be denied.

<u>**RELEVANT FACTUAL BACKGROUND**</u>

<u>**Defendants Affirmatively Operated Binance In Violation Of Their Legal Duties**</u>

As a money services business operating in the U.S., Binance was legally required to identify, report, and prevent illegal activity, including terrorist-financing. ¶¶158-73. The law required Binance to establish a robust AML program, perform user due diligence and KYC investigations, and to file SARs to prevent terrorists from accessing the U.S financial system. *Id*.

Instead of complying with their duties, Defendants intentionally created and operated a crypto trading platform with access to global markets that provided a unique benefit to its criminal and terrorist users: ***a program to keep their illegal activities hidden from government scrutiny***. ¶¶174-92. Zhao referred to this as Defendants' ***"international circumvention of KYC."*** ¶177. Defendants falsified users' locations, advised users to install IP-blocking software, and fabricated KYC data. ¶180. From its inception in 2017 through 2021, Binance allowed users to open accounts with ***no KYC whatsoever despite knowledge of nefarious activity.*** ¶183. When Binance needed to project the appearance of due diligence, Binance intentionally loopholed this process. ¶184.

Binance wanted profits from criminal enterprises; as an employee stated, *"we need a banner 'is washing drug money too hard these days - come to binance we got cake for you."'* ¶188.

**<u>Defendants Knowingly Provided Financial Services Directly To Hamas And PIJ</u>**

By design, Hamas, PIJ, and their affiliates transacted on Binance, and Defendants knew this. ¶¶200-03. FinCEN concluded that from July 2017 through July 2023, Defendants' *"willfull failure"* to implement an AML program *"directly led to the platform being used to process transactions related to … terrorist financing"* (¶190) *and that such financing was related to Hamas and PIJ*. ¶¶211-12. FinCEN and the CFTC concluded that *Hamas operated on Binance in February 2019*. ¶¶213, 216. Despite the absence of a KYC program, a Binance service provider identified Hamas usage on Binance *at least twice—in April 2019 and in July 2020*. ¶¶213, 215.

Notwithstanding the risk of illicit finance associated with cryptocurrency, Defendants' assisting Hamas and PIJ on Binance through their intentional circumvention of KYC/AML procedures ensured that these FTOs' transactions would be concealed from regulators. FinCEN concluded that *between July 2017 and July 2023, Binance failed to file SARs regarding Hamas and PIJ transactions "associated with terrorist financing"* and that "*Binance was aware of extensive suspicious activity involving [BuyCash] – including connections [] to terrorist organizations*." ¶¶211-12, 214-16, 218. Zhao admitted that Defendants' deceiving regulators could foster terror-financing, stating "*the U.S. has this law: you have to prevent … terrorists from doing any transactions. In order [for America] to accomplish this … you have to give your data to the American regulators*." ¶221. Defendants pressured their own service provider, *who had identified Hamas transactions*, to mislead regulators about these transactions. ¶214. Binance's former COO instructed compliance personnel to let a customer *flagged as associated with Hamas* leave with his funds and to tip him off that he had been identified by authorities. ¶215.

**Terrorist Organizations Transacted In Massive Amounts On Binance**

Defendants knowingly enabled terrorists to transact in massive amounts on Binance. *Between October 2020 and September 2023, Hamas and PIJ transacted $60 million.* ¶¶194, 209. For example, on November 22, 2022, a *PIJ-owned wallet*, TXBMWt3T4WhFkcPnob1567cGDM3ou27GWE, transferred 201,809 Tether Tokens, approximately $201,809, to wallet TTTSEpcsZgqjgqVpwaLp2PZy41TGC1puCG, a Binance wallet, in a transaction identified on the ledger as c477f66cbf820603c0a787ed90a9a419b9a79d4321c439f17561ca218e6c78f8. ¶152.

Defendants also knowingly enabled known Hamas fundraisers to transact in massive amounts on Binance. *From January 2019 to October 2023, BuyCash transacted $25 million*. ¶196. The largest of these transactions, ranging from $150,000 to $230,000, occurred *immediately preceding the Attacks—in July to September 2023*. *Id.* From January 2019 to October 2023, Binance transferred approximately $4 million to BuyCash wallets, with the largest of these transactions again occurring *immediately preceding the Attacks—between July and early October 2023*. *Id. Dubai Co. transacted $16 million*. ¶197. From May 2020 to October 2023, Dubai Co. transferred approximately $3.5 million; between August 2020 and 2023, Binance transferred approximately $12.5 million to Dubai Co. *Id.* Accordingly, *Defendants enabled Hamas, PIJ, and their known affiliates to transact $101 million leading up to and for the Attacks*. ¶¶194-99.

**The February 2025 Order**

In February 2025, the Court denied Defendants' Motion to Dismiss, holding that Plaintiffs had sufficiently alleged their claim under *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). ECF 53

("February 2025 Order"). The Court held that the Amended Complaint pled Defendants' culpable participation in two ways. *First*, Defendants had legal duties that they violated:

> ***United States laws and regulations required Binance to implement robust anti-money laundering programs, perform due diligence on its customers, and file SARs with regulators flagging suspected illicit activity, all to prevent terrorists from accessing the United States financial system through the Binance exchange*** … defendants failed to comply with—***indeed, intentionally evaded***—these regulatory requirements[.]

February 2025 Order at 63; *see also id.* at 63-64. *Second*, Defendants' program included "affirmative actions" in the form of unique treatment for terrorists. *Id.* at 64-65 (examples of such affirmative conduct). As such, the Court held that "the Amended Complaint alleges ***more than mere passive nonfeasance in the provision of routine services***" and that Defendants "***arguably took deliberate steps to enable such users evade regulatory scrutiny***." *Id.* at 64, 69.

The Court also held that the Amended Complaint sufficiently alleged Defendants' culpable participation in October 7 in two additional ways: (i) "[D]efendants provided services that might otherwise be considered routine—cryptocurrency transaction services—***in an unusual way—designed to evade government detection and regulation***"; and (ii) "in providing financial services that intentionally circumvented anti-terrorist-financing regulations, [Defendants] offered ***such dangerous wares that selling those goods could constitute aiding and abetting a foreseeable terrorist attack***." *Id.* at 66.

In holding that the Amended Complaint established knowing and substantial assistance, the Court also recognized that Plaintiffs sufficiently alleged a cognizable nexus. *Id.* at 63-66, 69-70. Because Defendants deliberately enabled Hamas and PIJ to transact millions and intentionally circumvented anti-terror laws, notwithstanding the foreseeable risk that such illegal financing would result in a terrorist attack, Your Honor concluded that the Amended Complaint sufficiently alleged Defendants' conscious, culpable participation in October 7. *Id.*

**Defendants' Motions For Reconsideration And Interlocutory Appeal**

In March 2025, Defendants filed their Motions for Reconsideration and for Interlocutory Appeal, maintaining that the Court wrongly applied *Twitter* as to culpability and nexus. ECF 58 at 2-8; ECF 62 at 5-14. In April 2025, the Court denied both. ECF 71 at 41:3-10; *id.* at 42:16-24.

**The Renewed Motion**

In May 2026, Defendants filed their Renewed Motion to Dismiss, maintaining that three cases decided after the February 2025 Order purportedly warrant dismissal of the Amended Complaint: (i) *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025); (ii) *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420 (2d Cir. 2025); and (iii) *Troell v. Binance Holdings Ltd.*, 2026 WL 636849 (S.D.N.Y. Mar. 6, 2026). Renewed Motion at 6-15. For the reasons set forth below, Defendants' Renewed Motion should be denied.

## ARGUMENT

On a 12(b)(6) motion, a court "must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 854 (2d Cir. 2021). The inquiry is whether "all of the facts alleged, taken collectively" permit a relevant inference, not whether "any individual allegation, scrutinized in isolation" does. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

I.  **RECENT PRECEDENT PROVIDES NO BASIS TO REVISIT THE FEBRUARY 2025 ORDER**

   A.  ***Smith & Wesson* Provides No Basis To Revisit The February 2025 Order**

*Smith & Wesson* is inapposite for numerous reasons arising from the lack of a direct relationship between the defendants and the gun dealers that subsequently sold guns to narco-terrorists. *First*, *Smith & Wesson* found that ***the gun manufacturer-defendants did not offer any affirmative*** assistance to the "the bad-apple dealers." 605 U.S. at 295. This Court found that ***Defendants engaged in numerous acts of affirmative assistance***. February 2025 Order at 64-66.

*Second*, in *Smith & Wesson*, the defendants had no legal duty to prevent downstream gun sales. 605 U.S. at 297. The Supreme Court dismissed the allegations concerning the manufacturers' failure to improve gun design because "federal law [did] not require" them to do so and accordingly their failure to act constituted "***passive nonfeasance***." *Id*. at 297-98. By contrast, this Court found that ***Defendants had legal duties to prevent Hamas and PIJ from using their platform, which they deliberately violated to assist Hamas and PIJ***. February 2025 Order at 63-66.

And *third*, the *Smith & Wesson* plaintiffs did not establish pervasive and systemic assistance. The plaintiffs' allegations concerning "routine services supplied in an unusual way" or "dangerous wares" failed because the plaintiffs ***did not allege that the gun manufacturers sold their guns directly to drug cartels***: "***the manufacturers do not directly supply any dealers, bad-apple or otherwise***" but rather sold their guns to legitimate "***middlemen distributors***" who subsequently sold the guns to dealers who then provided the guns to the cartels. 605 U.S. at 295. Here, by contrast, this Court found that ***Defendants provided financial services directly to Hamas and PIJ and their known affiliates and that Defendants' provision of services was both unusual and a dangerous ware***. February 2025 Order at 64, 66.

### B. *Ashley* Provides No Basis To Revisit The February 2025 Order

*Ashley* is inapposite for similar reasons. The Second Circuit dismissed the plaintiffs' JASTA claim because *Ashley* was a "***passive nonfeasance***" case with the Second Circuit finding that bank-defendants "***never ... did anything positive***" to assist the terrorists. 144 F.4th at 437, 441. Likewise, the plaintiffs ***did not allege that the defendants dealt directly with terrorists. Id.*** at 443. The allegations concerning the defendants' provision of services to money laundering entities similarly failed: "***it is not enough to say that facilitating the money laundering operations, which are not themselves [terrorist] entities, results in substantial support to the [terrorists]***." *Id.* at 444.

Further and as in *Smith & Wesson*, the Second Circuit found that the "***attenuation***" between the defendants' services and the terrorists caused the plaintiffs' allegations to fail *Twitter*'s "dangerous wares" and "unusual services" analyses. 144 F.4th at 442-43, 445. As to the fertilizer company allegations, the defendant was "***one step removed from the [fertilizer] manufacturing and then several steps removed from [the fertilizer's] unlawful use in IEDs***[.]" *Id.* at 442. As to the money laundering allegations, because no allegations established that defendants provided their services directly to the terrorists, the Second Circuit found that the link between the defendants' services and the terrorists too "***attenuated***" and that "***the endpoint of the laundered money was entirely amorphous***" such that it could not infer that the defendants' services "were designed or performed with the intent to aid the [terrorists]." *Id.* at 444-45, 446.

**C.** ***Troell* Provides No Basis To Revisit The February 2025 Order**

As a preliminary matter, fatal for the *Troell* complaint was its sprawling, unfocused scope. Nearly violating Rule 8, the complaint alleged 64 terrorist attacks committed by eight different terrorist groups over eight years across twelve countries in the Middle East, Europe, Asia, Africa, and North America. *See Troell*, 2026 WL 636849, at *1, 11. As to its October 7 allegations, Judge Vargas noted the "***dearth of detail*** regarding the nature of transactions or the individuals who allegedly conducted the transactions from which a linkage with the terrorist attacks can reasonably be drawn." *Id.* at *21. As such, Judge Vargas could not "infer[]" that terrorists operated on Binance and conducted transactions related to October 7. *Id.* Here, Your Honor found that "***defendants knew in real-time that terrorists were transacting on the platform***." February 2025 Order at 64.

Asserting that *Troell* forecloses the Amended Complaint, Defendants maintain that *Troell* is based on purportedly "virtually identical" allegations to this case. Def. Br. at 8. Not so. For

numerous reasons, the Amended Complaint's terrorist transaction allegations are materially stronger and more detailed, establishing, where *Troell* failed, a nexus to October 7.

*First*, the *Troell* plaintiffs did not allege any transactions on Binance for any Hamas or PIJ user. Here, ***Plaintiffs identified a specific de-pseudonymized PIJ wallet and Hamas-affiliated users, BuyCash and Dubai Co., and these entities' transactions on Binance***. ¶¶152, 196-98. The *Troell* complaint does not allege any BuyCash transactions (*Troell* ¶502(f)) and does <u>not</u> mention Dubai Co. or any PIJ wallet.

*Second*, the *Troell* allegations were defective because the "amount of any transactions by members of FTOs processed" on Binance "prior to the terrorist attacks is largely unknown." *Troell*, 2026 WL 636849, at *22. Here, ***Plaintiffs allege dates and amounts of these entities' transactions, including in and-flows***. ¶¶152, 194-98, 218.

And *third,* the *Troell* allegations regarding Hamas/PIJ transactions did <u>not</u> identify any specific amount that was attributable to October 7 or any of the ten alleged Hamas attacks occurring over a five-year period, giving rise to the possibility that all of it, some of it, or none of it related to October 7. *Troell*, 2026 WL 636849, at *21. Here, ***Plaintiffs allege that from October 2020 to September 2023, the $60 million in Hamas and PIJ transactions and the $40 million inBuyCash and Dubai Co. transactions were for October 7***. ¶¶194, 196-97, 201. Moreover,Plaintiffs allege that these ***groups' largest transactions occurred in the months leading up to October 7***, strengthening the inference that the funds were used for October 7. ¶¶194-98.

## II.  THE AMENDED COMPLAINT SUFFICIENTLY STATES ITS JASTA CLAIM

Pursuant to 18 U.S.C. § 2333(d)(2), knowing and substantial assistance is alleged by "conscious[] and culpabl[e] participat[ion]" that has a "nexus" to a terrorist attack. *Twitter*, 598 U.S. at 496, 497. Conscious and culpable participation is established by a defendant's doing some

"***affirmative act*** with the intent of facilitating the offense's commission." *Id.* at 490. It can also be established by "***inaction … in the face of some independent duty to act***[.]" *Id.* at 489.

As to nexus, *Twitter* holds that "***people who aid and abet a tort can be held liable for other torts that were a foreseeable risk of the intended tort***." *Id.* at 496. *Twitter* sets forth three ways to establish nexus. *First*, there can be a "direct" or "close" nexus; where there is such, "courts may more easily infer [] culpable assistance." *Id.* at 506. *Second*, "***more remote support can still constitute aiding and abetting in the right case***." *Id*. at 496. In these circumstances, nexus operates as a sliding scale based on a fact-specific analysis; *e.g.*, "less substantial assistance required more scienter" or "direct, active, and substantial" assistance will suffice "with a lesser showing of scienter." *Id*. at 492, 502. And *third*, where the assistance is "far removed" or not connected to an attack, an aiding and abetting defendant's "role in an illicit enterprise can be ***so systemic*** that [that defendant] is aiding and abetting every wrongful act committed by that enterprise." *Id*. at 496. In such circumstances, "a showing of ***pervasive and systemic aid is required*** [.]" *Id.* at 506. *Twitter* set forth two non-exclusive pathways to establish this: "where the provider of routine services" (i) "does so in ***an unusual way***" or (ii) "provides such ***dangerous ware***s that selling those goods to a terrorist group could constitute aiding and abetting a foreseeable terror attack." 598 U.S. at 502.

**A. The Amended Complaint Sufficiently Alleges Knowing And Substantial Assistance**

1. *The Amended Complaint Sufficiently Alleges Conscious And Culpable Participation*

As the Court concluded, the Amended Complaint sufficiently alleges that, because Defendants had a "***independent legal obligation***" to prevent terrorists from transacting on Binance, Defendants' failure to comply with and their "***intentional[] evasion***" of those duties constituted conscious and culpable participation under *Twitter*. February 2025 Order at 63, 69; *see also* ¶¶158–92 (examples of Defendants' violations and intentional evasion of their duties).

As the Court also concluded, the Amended Complaint sufficiently alleges that Defendants engaged in cognizable affirmative conduct: their directly servicing Hamas and PIJ users by way of Defendants' intentional ***scheme to evade anti-terror financing regulations***. February 2025 Order at 64-65; *see also* ¶¶177-78, 184, 187, 188, 191, 215. As a result, ***Hamas, PIJ, and their known affiliates transacted at least $101 million on Binance leading up to October 7***. ¶¶194-98.

The Amended Complaint also sufficiently alleges Defendants' scienter, as the Court correctly held: "***Defendants knew in real-time that terrorists were transacting on the platform***." February 2025 Order at 64. Defendants do not challenge scienter, waiving this argument.

2.  *The Amended Complaint Sufficiently Alleges A Cognizable Nexus To October 7*

Defendants maintain that Your Honor found "no nexus" between Defendants' assistance and October 7. Def. Br. at 11. This is wrong. While recognizing an absence of a close nexus, ***Your Honor <u>did find</u> that the Amended Complaint sufficiently alleged a cognizable one*** via *Twitter*'s sliding scale of Defendants' deliberate violations of their legal duties, their affirmative assistance to terrorists, their high degree of scienter, and the magnitude of their assistance to Hamas and PIJ in the period leading up to the Attacks. February 2025 Order at 69-70. Indeed, the Amended Complaint alleges that ***Defendants processed over $100 million in transactions for Hamas, PIJ, and their known affiliates in the period leading up to the Attacks, with their largest transactions occurring immediately before and meant for October 7***. ¶¶152, 194-98.

Defendants assert that *Ashley* forecloses liability based upon "affiliated third party transactions" on Binance "from which funds may have later flowed to FTOs." Def. Br. at 11, 12. Relatedly, Defendants contend that *Ashley* held that JASTA liability cannot be based on a theory of money's fungibility. *Id.* at 11. But in *Ashley*, because the terrorists were not the defendants' customers, "[w]ith each money laundering scheme, ***the [terrorist group] was at least one step***

11

*removed, and the endpoint of the laundered money was entirely amorphous*," requiring the Second Circuit to rely on undue "*speculation*" and "*significant assumptions to establish a connection to the [FTO's] terrorist activities*[.]" 144 F.4th at 445, 446. Plaintiffs allege that Defendants, with their real-time capabilities, *knowingly provided services directly to Hamas and PIJ and their known affiliates and that their transactions were for October 7*. February 2025 Order at 70 ("Hamas and PIJ were transacting on [] Binance"); ¶¶146-50,187-90, 194-97, 211-21.

Defendants maintain that, as in *Troell*, the Amended Complaint purportedly does not allege "that any Binance.com transaction was used to fund or assist the Attacks." Def. Br. at 11-12. Not so; *the Amended Complaint alleges the amounts, dates, and entities for terrorist transactions and that these transactions were executed for October 7*. ¶¶152, 194-98; Section I.C *supra*.[2]

3. <u>*The Amended Complaint Sufficiently Alleges Binance's Unusual And Dangerous Services*</u>

The Court correctly held that Defendants provided services that might otherwise be considered routine—cryptocurrency transaction services—in an *"unusual way"—directly to known terrorists and "designed to evade government detection and regulation*." February 2025 Order at 66. The Court also correctly held that Defendants, by "intentionally circumvent[ing] anti-terrorist financing regulations," created a product that constitutes *"dangerous wares such that selling those goods could constitute aiding and abetting a foreseeable terrorist attack*." *Id.*

---

[2] Defendants' reliance on *Fraenkel* is unavailing. As to nexus, there, unlike here, the plaintiffs "offer[ed] no coherent theory of how [the bank-defendant's] conduct connected to the Attacks." *Fraenkel v. Standard Chartered Bank*, 2025 WL 2773251, at *10 (S.D.N.Y. Sept. 26, 2025). Moreover, the *Fraenkel* nexus allegations failed because the plaintiffs did not allege that the terrorists were the defendant's customers. *Id.* at *9.

Defendants maintain that the Amended Complaint's allegations are inadequate because Plaintiffs do not allege an "intent to aid" an FTO or its activities. Def. Br. at 13. However, an intent to aid an FTO may be shown where a provider of a routine services does so in an "unusual way" or provides a "dangerous ware;" the Court found both adequately pled here. *Twitter*, 598 U.S. at 502; February 2025 Order at 66.

Defendants maintain that under *Ashley* allegations that a defendant provided services "writ large" or "opened [its] doors to criminals with ties to terrorists[]" are insufficient to establish pervasive and systemic assistance (Def. Br. at 13), and, assuming this case is "virtually identical" to *Troell* (*id.* at 2), the Amended Complaint should be dismissed based on Judge Vargas' application of *Ashley*. *Id.* at 13-14. For numerous reasons, Defendants' assertions fail.

*First*, Judge Vargas overlooked that the dispositive point in *Ashley* was <u>not</u> the defendants' indiscriminate services but that ***the defendants did not provide services directly to terrorists***. Because the link between those services and the terrorists was highly "***attenuated***" and "***entirely amorphous***," 144 F.4th at 445, Judge Vargas required allegations establishing this link, which could be shown by "unique[]" treatment to the FTOs. *Troell*, 2026 WL 636849, at *21. The *Ashley* defendants also did not provide special treatment to their customers to satisfy the unusual services or dangerous wares analyses:

> The complaint offers [no allegation] that [the bank] sought to indirectly assist the [terrorist's] bomb operations ***by violating sanctions or other restrictions*** as they relate to banking services provided to the [the fertilizer companies]. ***Plaintiffs do not allege that [the bank's] customers were themselves terrorists***.

*Id.* at 441. Reaffirming *Kaplan*, *Ashley* stated as to the basis of such an aiding and abetting claim:

> Not only were the ***bank's clients*** clearly and publicly identified as part of the terrorist organization, ***but the bank violated sanctions laws*** and granted exemptions to obscure the substance of deposits[.]

*Id*. at 445. The Amended Complaint alleges all of this: ***Defendants provided financial services directly to FTOs and their known affiliates as well as special treatment, in doing so, deliberately violated legal duties meant to curb terrorist financing and prevent terrorist violence***.

*Second*, and as to Judge Vargas' conclusion concerning the indiscriminate provision of services, Your Honor rejected the same argument raised by Defendants at the January 2025 oral argument. ECF 47 at 22:4-24. Your Honor called this argument "***breathtaking***," noting it was <u>not</u>

> OK for a regulated entity to say, sure, we accept terrorist accounts which allow the transmission of funds to terrorists because we treat terrorists just like anyone else, and if you want to use our account to finance what you do, that's OK. We're open, and in fact, we advertise that crime can be committed on our site.

*Id.* at 23:2-8. The material differences between the allegations in *Troell* and this case may explain the different views of Judge Vargas and Your Honor on this issue. Moreover and to Your Honor's point, where a defendant offers a dangerous ware or an unusual service, widespread use of it for crime <u>supports</u> intent. *See Direct Sales Co. v. United States*, 319 U.S. 703, 706-07 (1943).

*Third*, Judge Vargas did not apply *Twitter*'s unusual services or dangerous wares analyses. Your Honor did and held that the Amended Complaint alleged both. February 2025 Order at 69.

*Fourth*, the Amended Complaint <u>does</u> allege special treatment. Your Honor correctly recognized that, in July 2020 and after Binance's third-party service provider flagged an account as being associated with Hamas, Binance "***went out of its way to protect" that user***. February 2025 Order at 65 (citing ¶215). Defendants pressured their service provider, to mislead regulators about Hamas transactions. ¶214. Defendants provided FTOs with the additional service of ***keeping their illegal activities hidden from government scrutiny.*** ¶¶174-92. Contrary to what Defendants assert, Plaintiffs <u>do not</u> allege that Defendants engaged in these activities for other criminals on Binance.

And *fifth*, Defendants assert that *Ashley* held that financial services cannot be a dangerous ware. Def. Br. at 15. Not so; *Ashley* held that financial services <u>could</u> "form the basis of a JASTA

claim" and that "[s]imilar banking services in a different context may lead to a different result." 144 F.4th at 443, 445. Indeed, *Ashley* reaffirmed *Kaplan*'s holding that financial services can trigger JASTA liability if a defendant provides them to customers who are FTO members, even if those customers did not carry out the attack or use funds from a bank account at issue to further it. *See id.* at 445. Moreover, Binance had the ability to monitor transactions by FTO users in real time, a capability which the *Ashley* banks were not alleged to have. ¶¶146-51. Here, "***Defendants knew in real-time that terrorists were transacting on the platform***." February 2025 Order at 64. Furthermore, Defendants' intentional scheme to evade anti-terror financing regulations to retain illicit actors is precisely the kind of direct "stimulation" and "instigation" of FTO cryptocurrency use that should state a claim. *See Ashley*, 144 F.4th at 443 (citing *Direct Sales*, 319 U.S. at 713).

## **CONCLUSION**

For the all the reasons set forth herein, Defendants' Renewed Motion should be denied.[3]

Dated: May 22, 2026
    New York, New York

Respectfully submitted,

*/s/ Jake Nachmani*
**SEIDEN LAW LLP**
Robert W. Seiden
Amiad Kushner
Jake Nachmani
Jennifer Blecher
Dov Gold
322 Eighth Avenue, Suite 1200
New York, NY 10001
(212) 523-0686

**PERLES LAW FIRM, P.C.**
Steven R. Perles
(*pro hac vice motion to be filed*)
Joshua K. Perles
(*pro hac vice motion to be filed*)
Edward B. MacAllister
(*pro hac vice*)
816 Connecticut Avenue, NW
Washington, D.C. 20006
(202) 955-9055

*Attorneys for Plaintiffs*

---

[3] If the Court dismisses the Amended Complaint, Plaintiffs respectfully request leave to replead.

## CERTIFICATION OF COMPLIANCE

Pursuant to Section III-D of the Individual Practices of Judge John G. Koeltl and ECF 109, Plaintiffs have complied with the formatting rules contained therein.

Dated: May 22, 2026

*/s/ Jake Nachmani*
Jake Nachmani
**SEIDEN LAW LLP**
322 Eighth Avenue, Suite 1200
New York, NY 10001
(212) 523-0686

*Attorneys for Plaintiffs*
